# EXHIBIT A

**C**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
HAMILTON INDUSTRIES, INC., an Illinois
Corporation, Plaintiff,
v.
MIDWEST FOLDING PRODUCTS MFG. CORP.,
an Illinois Corporation, Defendant.
**No. 89 C 8696.**

March 20, 1990.

MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:
**\*1** This matter is before us on the defendant Midwest Folding Products' motion for a stay pending reexamination of U.S. Patent No. 4,819,569 by the Patent and Trademark Office ("PTO"). The plaintiff, Hamilton Industries, opposes the motion. For the following reasons we grant the defendant's motion and dismiss this action with leave to reinstate subsequent to the patent reexamination.

In passing the legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion as a means of preventing "costly pre-trial maneuvering which attempts to circumvent the reexamination procedure [and to] provide a useful and necessary alternative for challengers and for patent owners to test the validity of United States patents in an efficient and relatively inexpensive manner." H.R.Rep. No 1307 Part I, 96th Cong., 2d Sess. 4, reprinted in 1980 U.S. Code Cong. & Ad. News 6460, 6463.

With this in mind we turn to Hamilton's three reasons for opposing the motion. First, Hamilton claims that the defendant is seeking a stay simply for the sake of delay in an attempt to "frustrate the judicial process and Hamilton's right to exclude [Midwest Folding] from use of its property." Midwest Folding, however, is entitled by law to request a reexamination of the patent. 35 U.S.C. § § 302-307; 37 CFR § 1.525. The reexamination procedure was created to promote speedy and less costly review of the validity of patents in certain limited situations. The fact that the PTO granted Midwest Folding's request for reexamination indicates that the PTO deems it worthy of further consideration. Even assuming there has been some strategic behavior in this case (of which it

is not readily apparent that Hamilton is not also guilty), it occurred fairly contemporaneously and was well within the rights of Midwest Folding. Midwest Folding invoked the reexamination procedure on December 7, 1989, after learning that Hamilton was threatening suit, after first notifying Hamilton that it intended to make the request on November 19, 1989, and only two weeks after Hamilton ultimately filed suit in this Court. Midwest Folding's decision to request reexamination did not occur so late in the proceedings as to warrant the conclusion that it was solely pursued for the purposes of delay.

Second, Hamilton claims that the reexamination will not affect this action or facilitate its prosecution. We disagree. The issue of the patent's validity is clearly one that will have to be resolved in this case. We believe that shifting the validity issue to the PTO in this case will provide the many advantages found by courts as grounds for a stay:
1. All prior art presented to the Court will have been first considered by the PTO with its particular expertise.
2. Many discovery problems relating to prior art can be alleviated by the PTO examination.
3. In those cases resulting in effective invalidity of the patent, the suit will likely be dismissed.
**\*2** 4. The outcome of the reexamination may encourage a settlement without the further use of the Court.
5. The record of reexamination would likely be entered at trial, thereby reducing the complexity and length of the litigation.
6. Issues, defenses, and evidence will be more easily limited in pre-trial conferences after a reexamination.
7. The cost will likely be reduced both for the parties and the Court.

See, e.g., Emhart Indus., Inc. v. Sanyo Seiki Mfg. Co., No. 85 C 7565, slip op. (N.D. Ill. January 30, 1987). Further, once a request for reexamination has been granted, the Commissioner lacks the power to stay the reexamination pending the outcome of an overlapping proceeding in federal court. See Ethicon Inc. v. Quigg, 849 F.2d 1422 (Fed. Cir. 1988). We see no reason why parallel proceedings should be required here and we believe that this litigation may materially benefit from the PTO's disposition of the validity issue.

Finally, Hamilton argues that it will suffer harm from a stay. The only harm which Hamilton contends will occur as a result of the stay is that the stay will delay the imposition of an injunction and thereby deny Hamilton its "right to exclude." The question whether

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or not an injunction will issue in this case, however, will turn upon resolution of the patent's validity. Thus, any delay occasioned by that determination will occur regardless of the forum in which that issue is considered. And we find that, given Congress's mandate that the PTO conduct the patent reexamination expeditiously--that is, "with special dispatch"--it is likely that resolution of the validity issue will occur more swiftly than it would here. Hamilton additionally contends that piecemeal resolution of the validity and infringement issues would increase Hamilton's costs. We see no basis for this contention. To the contrary, we believe that an increase in costs is more likely to result from the inevitable parallel proceedings that would occur were we to refuse to stay this action. As we discussed above, the Commissioner lacks the authority to stay the reexamination. Thus, even if by some chance we were to reach the validity issue before the PTO does, and even if the PTO then exercised its discretion in deferring to our ruling (which the PTO is by no means bound to do), increased costs nevertheless would be incurred in both forums during the race to the patent validity determination. We will concede that race to the PTO. FN1

> FN1 Hamilton also contends that Midwest Folding "will likely seek another reexamination upon completion of the present reexamination." We disregard that contention as having no basis at this time.

We grant the defendant's motion and order this action dismissed with leave to reinstate in the event issues remain after the PTO's consideration of Midwest Folding's request for reexamination. If such be the case, these issues will be disposed of promptly by the Court. It is so ordered.

N.D.Ill., 1990.
Hamilton Industries, Inc. v. Midwest Folding Products Mfg. Corp.
Not Reported in F.Supp., 1990 WL 37642 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:89cv08696 (Docket) (Nov. 22, 1989)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

7590        11/04/2005

Aldo J. Test
DORSEY & WHITNEY LLP
4 Embarcadero Center
Suite 3400
San Francisco, CA  94111

| EXAMINER |
|----------|
| *Erik Klein* |

| ART UNIT | PAPER NUMBER |
|----------|--------------|
| 3992 | |

DATE MAILED: 11/04/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C  (Rev. 10/03)

11/4/05

Lewis V. Popovski, ESQ.

KENYON & KENYON

One Broadway

New York, NY 10004

## *EX PARTE*  REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO  90/007724

PATENT NO.   6,528,784

ART UNI   3992

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a replly has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>16 September 2005</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐  PTO-892,      b)☒  PTO-1449,      c)☐  Other: _____

1. ☒   The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐   The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐  by Treasury check or,

b) ☐  by credit to Deposit Account No. _____,  or

c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Erik Kielin
Primary Examiner
Art Unit: 3992

cc:Requester ( if third party requester )

A substantial new question of patentability affecting claims 1-9 of United States Patent Number US 6,528,784 B1 to Tang et al. is raised by the request for *ex parte* reexamination.

## The References

J. M. **LAZAR** et al., "Design of a Time-of-Flight Mass Spectrometer as a Detector for Capillary Electrophoresis," *Analytical Chemistry*, 1997, vol. 69, no. 16, pp. 3205-3211.

R. D. **SMITH** et al., "Collisional Activation and Collision-Activated Dissociation of Large Multiply Charged Polypeptides and Proteins Produced by Electrospray Ionization," *J. Am. Soc. Mass Spectrom.*, 1990, vol. 1, no. 1, pp. 53-65.

M. V. **BUCHANAN** et al., "Continuous Octopole Electrospray Introduction System for FTICR," *46th ASMS Conference on Mass Spectrometry and Allied Topics*, May 31-June 4, 1.998, p. 518.

B. **THOMSON** "Protein Charge Distribution Studies - From Droplet in Air to Ion in Vacuum" *44th ASMS Conference on Mass Spectrometry and Allied Topics*, May 12-16, 1996, p. 1092.

H. **KAMBARA** et al., "Collision-Induced Dissociation of Water Cluster Ions at High Pressure" *International J. Mass Spectrometry and Ion Physics*, 1977, vol. 25, pp. 129-136.

B. L. **KLEINTOP** et al., "Analyzing Thermally Labile Compounds in Electrospray Sources Using Heated Capillaries," *43rd ASMA Conference on Mass Spectrometry and Allied Topics*, May 21-26 1995 p. 905.

Patent US 6,015,972 to **HAGER**

Patent US 4,977,320 to **CHOWDHURY** et al.

Patent US 5,298,743 to **KATO**

Patent US 5,304,798 to **TOMANY** et al.

## Prosecution History

During the examination of the application (09/715,815) that became the '784 patent, in the sole action on the merits (filed 14 March 2002), the examiner rejected all claims 1-9 over a single reference (WHITEHOUSE, US 5,652,427). Applicant commented and amended the claims in concert with the below remark,

> "Applicants have carefully studied U.S. Patent 5,652,427 [WHITEHOUSE] and admit that this patent shows a mass analyzer disposed in a high vacuum chamber

through the chambers without fragmentation."

> "Applicants' invention, however, is directed to the dissociation of adduct ions prior to entry into the mass analyzer, whereby they form sample ions which increase the sample ion current entering the mass analyzer. There is no teaching in this patent, nor would it have been obvious to one with ordinary skill in art at the time of the invention, to modify the Whitehouse patent in the manner required by the present claims. **There is no teaching of disassociating adduct ions to form sample ions which together with those sample ions which are not adducted with solvent molecules increases the ion current.**" (Applicant's Remarks filed 18 June 2002; emphasis added)

As noted in the Request in the paragraph bridging pages 7 and 8, the examiner of the '815 application stated reasons for allowance as follows:

> "The prior art searched and cited failed to teach or clearly suggest a mass spectrometer system and method for operating the said system including a mass analyzer disposed in a high vacuum chamber for analyzing sample ions formed at atmospheric pressure and directed to the analyzer through intermediate vacuum chambers in which **sample ions and solvent molecules form adduct ions with a reduction of sample ion current** as disclosed in claims 1 and 9. Claim 2 is allowable because of its dependency to claim 1. The prior art searched and cited failed to also teach or clearly suggest a method of mass analyzing sample ion produced at atmospheric pressure and introduce into a mass analyzer disposed in a vacuum chamber, and in which **some sample ions and solvent molecules combine to form adduct ion with a reduction of sample ions** as disclose in claims 3 and 4. Claims 5-8 are allowable because of their dependencies." (Notice of Allowance filed 6 September 2002; emphasis added)

## *SUBSTANTIAL NEW QUESTION OF PATENTABILITY*

(1) The Request notes that the use of an API (atmospheric pressure ion) source such as electrospray ion source --an ion source explicitly disclosed in WHITEHOUSE -- inherently has the problem of the formation of adduct ions or cluster ions formed from the sample ion and weakly held solvent molecules and that the problem must be addressed (Request at pp. 12-13). The Request provides the quote from A. P. BRUINS, "Chapter 3: ESI Source Design and Dynamic Range Considerations" in R. B. Cole, Electrospray Ionization Mass Spectrometry, 1997 at p. 120.

> "In any design of an API mass spectrometer, the problem of the **formation of cluster ions** is addressed. Polar molecules that tend to cluster with ions are water

source. **All** practical designs of API instruments are aimed at either prevention of clustering, or curing the problem by **breaking the cluster**." (Emphasis added.)

With this in mind, the above excerpt suggests that the design of the WHITEHOUSE spectrometer inherently takes into account the breaking of cluster ions because WHITEHOUSE uses an API ion source. While BRUINS was not applied in the Request to a proposed rejection of the '784 claims, given the examiner's reasons for allowance of the '815 application, and the fact the WHITEHOUSE teaches an API mass spectrometer admitted by Patent Owner to disclose all of the features except for the breaking of cluster ions without fragmentation in the ion guides (*supra*), the BRUINS teaching when considered with WHITEHOUSE raises a substantial new question of patentability. Furthermore there is a substantial likelihood that a reasonable examiner would consider this combined teaching important in deciding whether or not the claims are patentable.

**(2)** The Request (pp. 10-12) indicates that Requester considered claims 1, 2, and 4-9 obvious over LAZAR in view of SMITH, and over HAGAR in view of LAZAR.

Neither LAZAR nor SMITH was present during the examination of the '815 application that became the '784 patent. While HAGAR is "old art," a substantial new question of patentability is not precluded when "old art" may be considered anew with new art, e.g. LAZAR.

The Request notes at page 26 (right-hand col., first box) that LAZAR discloses the formation of adducts in one of the experiments discussed therein, with LAZAR stating, "However the paraquat spectrum was mainly compose of a series of **ion clusters**. The signal intensity at 93 m/z was extremely weak and **dependent on the first quadrupole offset voltage**" (p. 3208; emphasis added). Accordingly, LAZAR disclose not only the formation of the cluster ions, but also the implicit or inherent breaking of the sample ion from the cluster ion without fragmentation, as dictated by the "first quadrupole offset voltage."

Additionally, the Request indicates at p. 27 (right-hand col., first box) that SMITH teaches conversion of solvent adduct ions by application of a DC offset voltage between an orifice and an ion guide in the range of 5-40 V in a pressure environment similar to that in the second ion guide chamber of LAZAR (Smith at page 56, left-hand col.).

LAZAR considered with SMITH explicitly discloses, *inter alia*, the feature believed by the examiner of the '815 application to make at least independent claims 1, 4, and 9 of the '784 patent allowable. Accordingly, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable, and Examiner agrees that a substantial new question of patentability exists as to claim 1, 2, and 4-9 over the combined teaching of LAZAR with SMITH.

HAGER, although of record, was never commented on by the examiner of the '815 application. As noted in the Request at p. 28 (right-hand col., first box), HAGER discloses that "ions generated by electrospray ionization techniques may enter the vacuum chamber as monomers, **monomers clustered with solvent molecules**, and possibly **multimers with** and without **solvent molecules**" (col. 10, lines 45-48; emphasis added). Accordingly, HAGER teaches the formation of cluster ions. The request also notes that HAGAR states, "**various stages of declustering** are **commonly used** to reduce this mixture of ionic species to a **larger proportion of bare monomer ions to solvated ions**. Conventional declustering methodologies include... collisional dissociation by acceleration of the ions through relatively high pressure regimes using **voltage gradients** between the orifice and skimmer and **between the skimmer and Q0**" (col. 10, lines 51-56; emphasis added). Accordingly, HAGER additionally teaches "various stages" of breaking of the sample ion from the cluster using a DC offset between the skimmer and the ion guide.

When considered with the mass spectrometer system of LAZAR, the combination of HAGER with LAZAR raises a substantial new question of patentability of claims 1, 2, and 4-8 for disclosing a feature believed by the examiner of the '815 application to make at least independent claims 1 and 4 of the '784 patent allowable. Furthermore there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable.

(4) The Request at pages 10-12 indicates that Requester believes claims 1, 2, and 4-9 to be obvious over BUCHANAN in view of either of SMITH and THOMSON. For the reasons indicated above, HAGER is believed to raise a substantial new question of patentability as to claim 9 of the '784 patent.

BUCHANAN teaches a triple quadrupole ion guide, each with separate chambers and pressures, the pressure decreasing in each from the electrospray ion source toward the mass analyzer. BUCHANAN also teaches varying the potential on the skimmer and each of the octapole rods.

As noted above, SMITH teaches conversion of solvent adduct ions by application of a DC offset voltage between an orifice and an ion guide in the range of 5-40 V in a pressure environment similar to that in the third chamber ion guide chamber of BUCHANAN (octapole #3). Accordingly, the combination of BUCHANAN with SMITH raises a substantial new question of patentability as to claims 1, 2, and 4-9 of the '784 patent. Furthermore there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable.

Alternatively THOMSON teaches the use of a triple quadrupole mass spectrometer wherein the second quadrupole (Q2) is used for "declustering" clustered ions without fragmentation is some examples by using an offset voltage between a preceding lens and Q2. Accordingly, the combination of BUCHANAN with THOMSON raises a substantial new question of patentability as to claims 1, 2, and 4-9 of the '784 patent. Furthermore there is a substantial likelihood that a

(5) The Request at p. 10 indicates that Requester believes claim 3 to be anticipated by each of the following references listed above: SMITH, KAMBARA, CHOWDHURY, KATO, KLEINTOP, THOMSON, TOMANY, and HAGER.

None of SMITH, KAMBARA, CHOWDHURY, KATO, KLEINTOP, THOMSON, and TOMANY was present during the examination of the '815 application that became the '784 patent.

Claim 3 of the '815 application was amended by Applicant to read,

> 3. A method of mass analyzing <u>sample</u> ions produced at atmospheric pressure[, in which adduct ions are formed,] and introduced into a mass analyzer disposed in a vacuum chamber, <u>and in which some sample ions and solvent molecules combine to form adduct ions with a reduction of sample ions comprising</u> the step of dissociating the adduct ions prior to entry into the mass analyzer <u>to form sample ions</u> to increase the [analyte] <u>sample</u> ion current <u>entering</u> into the mass analyzer.

The underlined portion is added while the bracketed portion was removed.

As noted in the Request at p. 32 (right-hand col., 1st and 2nd boxes), SMITH teaches the formation of adduct/cluster ions as well as the use of a DC offset voltage between the orifice and the ion guide to accelerate the cluster ion and thereby dissociate it into sample ions and solvent (p. 56, left-hand col.). Accordingly SMITH raises a substantial new question of patentability of claim 3 of the '784 patent.

Similarly, each of KAMBARA (p. 130, Fig. 1 and p. 135), CHOWDHURY (col. 2, lines 19-24 and col. 3, lines 54-58), KATO (col. 4, line 61 to col. 5, line 6 and col. 7, lines 18-28), KLEINTOP (p. 905, Fig. 2b), THOMSON (p. 1092), and TOMANY (col. 5, lines 11-19 and lines 26-37) teaches both the formation and dissociation of cluster ions without fragmentation by the acceleration of cluster ions through ion guides and therefore raises a substantial new question of patentability as to claim 3 of the '784 patent. Furthermore there is a substantial likelihood that a reasonable examiner would consider each of these teachings important in deciding whether or not claim 3 is patentable.

HAGER is old art. The substantial new question of patentability of claim 3 is based solely on a patent already cited in an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

Office or considered by the Office.

For any reexamination ordered on or after November 2, 2002, the effective date of the statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily preclude the existence of a substantial new question of patentability (SNQ) that is based exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance shall be based upon a fact-specific inquiry done on a case-by-case basis.

While HAGER was present before the examiner during the examination of the 10/166,718 application, the reference was not relied on to reject the claims. When a substantial new question of patentability is raised solely over previously cited art, the Court stated in the sole footnote, in *In re Robert T. Bass*, 314 F.3d 575, 576-77, 65 USPQ2d 1156, 1157 (Fed. Cir. 2002), in pertinent part,

> "37 CFR 1.2 requires that all Office business be transacted in writing. Thus, the Office cannot presume that a prior art reference was previously relied upon or discussed in a prior Office proceeding if there is no basis in the written record to so conclude other than the examiner's initials or a check mark on a PTO 1449 form, or equivalent, submitted with an information disclosure statement. Thus, any specific discussion of prior art must appear on the record of a prior related Office proceeding."

Accordingly, because no written consideration of HAGER exists of record, a substantial new question of patentability is not precluded.

As noted above HAGER teaches both the formation and dissociation of cluster ions without fragmentation by the acceleration of cluster ions through ion guides and therefore raises a substantial new question of patentability as to claim 3 of the '784 patent. Furthermore there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not claim 3 is patentable.

(6) The Request at pages 11-12 indicates that Requester believes claim 9 to be anticipated or obvious over HAGER. For the reasons indicated above, HAGER is believed to raise a substantial new question of patentability as to claim 9 of the '784 patent.

Note, because a substantial new question of patentability exists as to at least one claim, <u>all claims will be examined</u>.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extension of time in reexamination proceedings are provided for in 37 CFR 1.550(c).

After the filing of a request for reexamination by a third party requester, any document filed by either the patent owner of the third party requester must be served on the other party (or parties where two or more third-party-requester proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550(f).

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. US 6,528,784 B1 throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

Please mail any communications to:

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA  22313-1450

Please FAX any communications to:

(571) 273-9900
Central Reexamination Unit

Please hand-deliver any communications to:

Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA  22314

Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

Erik Kielin
Primary Examiner
Central Reexam Unit 3992
(571) 272-1693

November 3, 2005

Conferees:

SPRE 3992

ST.JC   11-3-2005

(Sheet 1 of 1)

| | |
|---|---|
| Filing Date: November 16, 2000 | Serial No. 09/715,815 |

U. S. PATENT DOCUMENTS

| EXAMINER'S INITIALS | PATENT NUMBER | PATENT DATE | NAME | CLASS | SUBCLASS | FILING DATE |
|---|---|---|---|---|---|---|
| EK | US- 6,015,972 | 01-18-2000 | HAGER | — | — | |
| EK | US- 4,977,320 | 12-11-1990 | CHOWDHURY et al. | — | — | |
| EK | US- 5,298,743 | 03-29-1994 | KATO | — | — | |
| EK | US- 5,304,798 | 04-19-1994 | TOMANY et al. | — | — | |

FOREIGN PATENT DOCUMENTS

| EXAMINER'S INITIALS | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

OTHER DOCUMENTS

| EXAMINER'S INITIALS | AUTHOR, TITLE, DATE, PERTINENT PAGES, ETC. |
|---|---|
| EK | J. M. LAZAR et al, "Design of a Time-of-Flight Mass Spectrometer as a Detector for Capillary Electrophoresis," *Analytical Chemistry*, 1997, vol. 69, no. 16, pp. 3205-3211. |
| EK | R. D. SMITH et al., "Collisional Activation and Collision-Activated Dissociation of Large Multiply Charged Polypeptides and Proteins Produced by Electrospray Ionization," *J. Am. Soc. Mass Spectrom.*, 1990, vol. 1, no. 1, pp. 53-65. |
| EK | M. V. BUCHANAN et al., "Continuous Octapole Electrospray Introduction System for FTICR," *46th ASMS Conference on Mass Spectrometry and Allied Topics*, May 31- June 4, 1998, p. 518. |
| EK | B. THOMSON, "Protein Charge Distribution Studies – From Droplet in Air to Ion in Vacuum," *44th ASMS Conference on Mass Spectrometry and Allied Topics*, May 12-16, 1996, p. 1092. |
| EK | H. KAMBARA et al, "Collision-Induced Dissociation of Water Cluster Ions at High Pressure," *Int'l J. Mass Spectrom. and Ion Physics*, 1977, vol. 25, pp. 129-136. |
| EK | B. L. KLEINTOP et al., "Analyzing Thermally Labile Compounds in Electrospray Sources Using Heated Capillaries," *43rd ASMS Conference on Mass Spectrometry and Allied Topics*, May 21-26, 1995, p. 905. |
| EK | S. C. BEU et al., "Fourier-Transform Electrospray Instrumentation for Tandem High-Resolution Mass Spectrometry of Large Molecules," *J. Am. Mass Spec.*, 1993, vol. 4, pp. 557-565. |
| EK | S. A. JARVIS et al., "A New Atmospheric Pressure Ionization Orthogonal Acceleration Time of Flight Mass Spectrometer," *45th ASMS Conference on Mass Spectrometry and Allied Topics*, June 1-5, 1997, p. 1193. |
| EK | A. P. BRUINS, "ESI Source Design and Dynamic Range Considerations," in *Electrospray Ionization Mass Spectrometry – Fundamentals, Instrumentation, and Applications*, (R. B. COLE ed., John Wiley & Sons, Inc., 1997), chp. 3, pp. 107-136. |

| EXAMINER | E K | DATE CONSIDERED 10/31/2005 |
|---|---|---|

EXAMINER: Initial if citation considered, whether or not citation is in conformance with M.P.E.P. 609; draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

# EXHIBIT C

LEXSEE 2003 U.S. DIST. LEXIS 11917

**ALLOC, INC., a Delaware corporation, et al., Plaintiffs, v. UNILIN DECOR N.V., a Belgian company, et al., Defendants.**

**Civil Action No. 03-253-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 11917*

**July 11, 2003, Decided**

**DISPOSITION:** [*1] Defendants' motion to stay litigation granted. Plaintiffs' motion to strike portions of answer and complaint dismissed, without prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, patent holders, brought a complaint alleging patent infringement against defendants, floor companies. Before the court was the companies' motion to stay litigation of the '579 patent pending the completion of both the '621 reexamination proceedings and the United States Federal Circuit's decision on the '267, '907, and '410 patents.

**OVERVIEW:** In the present case, the '579 patent was the only patent in dispute. However it was the latest of the continuation patents that stemmed from the original '621 patent. The '579 patent had never been reviewed by the United States Patent and Trademark Office, the International Trade Commission, or any other court. Even though the '579 patent did not contain precisely the same claims of the other patents that were under review or reexamination, there was a sufficient correlation among all of the patents for the court to conclude that a stay was appropriate. With regard to the issue of efficiency, it was beyond dispute that the court would benefit from a narrowing of the numerous complex issues relating to claims, which, if clearly defined, would streamline discovery and subsequent litigation. To this end, the reexamination of the '621 patent would greatly serve the purpose of defining the issues in this case. The court found that a stay would not unduly burden the patent holders' case as the stay would then be of short duration. The court noted that discovery had not yet begun, nor had a discovery schedule been entered at this time. Likewise, the court had not yet set a trial date.

**OUTCOME:** The floor companies' motion to stay pending the reexamination was granted. The floor companies' motion to strike portions of the answer and complaint was without prejudice.

**LexisNexis(R) Headnotes**

*Patent Law > Remedies > Collateral Assessments > Costs*
*Civil Procedure > Entry of Judgments > Stay of Proceedings & Supersedeas*
[HN1] The decision to stay a case is firmly within the discretion of the court. This authority applies equally to patent cases in which a reexamination by the United States Patent and Trademark Office (PTO) has been requested. Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination. In passing legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion. In determining whether a stay is appropriate, courts are directed to consider the following factors: (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set.

*Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Priority*
*Patent Law > Date of Invention & Priority > General Overview*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals*
[HN2] A continuing application is one filed during the pendency of another application which contains at least

part of the disclosure of the other application and names at least one inventor in common with that application. Thus, a continuation application claims the same invention claimed in an earlier application, although there may be some variation in the scope of the subject matter claimed.

**COUNSEL:** For Alloc Inc, Berry Finance NV, Valinge Aluminium AB, PLAINTIFFS: Francis Digiovanni, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

For Unilin Decor NV, Quick-Step Flooring Inc, DEFENDANTS: Richard L Horwitz, David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Unilin Decor NV, COUNTER-CLAIMANT: Richard L Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Unilin Decor NV, Quick-Step Flooring Inc, COUNTER-CLAIMANTS: David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Alloc Inc, Berry Finance NV, Valinge Aluminium AB, COUNTER-DEFENDANTS: Francis Digiovanni, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On March 5, 2003, Alloc, Inc. ("Alloc"), Berry Finance N.V. ("Berry"), and Valinge [*2] Aluminum AB, ("Valinge") (collectively "the plaintiffs") filed a complaint against Unilin Decor, N.V. ("Unilin") and Quick-Step Flooring, Inc. ("Quick-Step") (collectively "the defendants") alleging infringement of U.S. Patent No. 6,516,579 ("the '579 patent"). The '579 patent is the latest in a series of continuation patents that include U.S. Patent Nos. 5,706,621 ("the '621 patent"), 5,860,267 ("the '267 patent"), 6,023,907 ("the '907 patent"), and 6,182,410 ("the '410 patent").

The '621 patent is currently undergoing reexamination in the United States Patent and Trademark Office ("PTO"). Additionally, the Federal Circuit is considering infringement issues with regard to the '267, '907, and '410 patents after the International Trade Commission

("ITC") rendered a non-infringement decision in favor of Unilin and against the plaintiffs.

Presently before the court is the defendant's motion to stay litigation of the '579 patent pending the completion of both the '621 reexamination proceedings and the Federal Circuit's decision on the '267, '907, and '410 patents. After consideration of each of the factors involved, and for the reasons detailed below, the court will grant the motion [*3] to stay.

**II. BACKGROUND**

The parties involved in the present action have attempted to resolve their patent infringement issues in many different forums, both in the United States and in Europe. Specifically, in July 2000, Pergo Inc. ("Pergo"), Unilin's licensee, brought a declaratory action in the District of Columbia with regard to the '267, '907, and '621 patents in response to the plaintiffs' threats of infringement litigation. Pergo additionally filed a request for reexamination of the '621 patent in the PTO. This reexamination is currently ongoing. The plaintiffs subsequently filed a complaint in the Eastern District of Wisconsin asserting that Pergo and Unilin infringed the '267 and '907 patents. In response, Unilin filed its own declaratory judgment action in the District of Columbia, alleging that its product did not infringe the '267, '907, and '621 patents.

In December 2000, the plaintiffs initiated a proceeding in the ITC asserting that Unilin infringed the '267, '907, and '410 patents. Upon the filing of the ITC action, all of the district court actions between the two parties concerning the alleged infringement of the '267, '907, and '410 patents were stayed [*4] pursuant to *28 U.S.C. § 1659*. In November 2001, an ITC Administrative Law Judge ("ALJ") issued a decision finding that Unilin did not infringe the '267, '907, or '410 patents. The ITC affirmed the ALJ's decision in April 2002. The plaintiffs then appealed to the Federal Circuit, which heard oral argument on that case in March 2003. No decision has yet issued.

In the present case, the '579 patent is the only patent in dispute. However, as the court noted above, it is the latest of the continuation patents that stem from the original '621 patent. The '579 patent has never been reviewed by the PTO, the ITC, or any other court.

**III. DISCUSSION**

[HN1] The decision to stay a case is firmly within the discretion of the court. *See Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985)*. This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988)* (not-

ing that "courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination. [*5] ") (internal citations omitted); *see also Emhart Indus. v. Sankyo Seiki Mfg., 1987 U.S. Dist. LEXIS 15033, 3 U.S.P.Q.2d 1889, 1890 (N.D. Ill. 1987)* (recognizing that, "in passing legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion."); *Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983)* (citing legislative history of reexamination statute).

In determining whether a stay is appropriate, courts are directed to consider the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp. v. 3 Comm Corp., 69 F. Supp.2d 404, 406 (W.D.N.Y. 1999)* (citing cases); *cf. United Sweetner USA, Inc. v. Nutrasweet Co., 766 F. Supp. 212, 217 (D. Del. 1991)* (stating a similar test).

In opposition to the defendants' motion to stay, the plaintiffs first argue that, since the '579 patent itself is not at issue [*6] in the reexamination proceedings, or in the Federal Circuit appeal, there is no need to stay the case before this court. *See* D.I. 21 at 7. The court must disagree because the plaintiffs cannot credibly argue that the patents are not alike in subject matter, as well as in many of their claims. This is so because, in general, [HN2] "a continuing application is one filed during the pendency of another application which contains at least part of the disclosure of the other application and names at least one inventor in common with that application." *Transco Products, Inc. v. Performance Contracting, Inc., 38 F.3d 551, 555 (Fed. Cir. 1994)*. Thus, a continuation application "claims the same invention claimed in an earlier application, although there may be some variation in the scope of the subject matter claimed." *Id.* Indeed, the plaintiffs themselves admit that the patents in question do have some terms in common. *See* D.I. 21 at 10. Therefore, even though the '579 patent does not contain precisely the same claims of the other patents that are under review or reexamination, there is a sufficient correlation among all of the patents for the court to conclude that a [*7] stay is appropriate.

Additionally, with regard to the issue of efficiency, it is beyond dispute that the court would benefit from a narrowing of the numerous complex issues relating to claims, which, if clearly defined, would streamline discovery and subsequent litigation. To this end, the reexamination of the '621 patent will greatly serve the purpose of defining the issues in this case. For example, the

court will gain the benefit of the PTO's particular expertise in evaluating the prior art. *See Pegasus Development Corp. v. DirecTV, Inc., 2003 U.S. Dist. LEXIS 8052, 2003 WL 21105073, *2 (D. Del. May 14, 2003)* (citations omitted). Likewise, the court will also benefit from the reexamination process in that (1) many discovery issues relating to prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; and (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court. *Id.* (citations omitted). Such a refinement of the issues will benefit both parties by reducing litigation costs. [*8] *See id.* This approach will also best conserve the court's scarce resources. *See id.* Similar benefits will likewise flow from the Federal Circuit's analysis of the '267, '907, and '410 patents.

The plaintiffs alternatively contend that the motion is premature because the two proceedings that have a potential impact on this case may be decided well before this case reaches the claim interpretation stage. *See* D.I. 21 at 5. However, if the decisions of the PTO and Federal Circuit are imminent, as the plaintiffs suggest, a stay at this time would not unduly burden their case as the stay would then be of short duration.

Finally, the court notes that discovery in this case has not yet begun, nor has a discovery schedule been entered at this time. Likewise, the court has not yet set a trial date. Therefore, the stay will be entered before any party incurs substantial litigation-related expenses.

## IV. CONCLUSION

In light of the above considerations, the court concludes that a stay at this point in the case would not unduly prejudice the plaintiffs or create for them a clear tactical disadvantage. Indeed, a stay will allow the issues before the court to be further simplified [*9] and defined to the benefit of the parties, as well as the court.

For the foregoing reasons, IT IS HEREBY ORDERED that:

> 1. The Defendants' Motion to Stay Pending the Reexamination by the U.S. Patent and Trademark Office and Ruling by the United States Court of Appeals for the Federal Circuit (D.I. 15) is GRANTED.

> 2. The parties shall advise the court of any decision that results from the PTO's reexamination of the '621 patent and any decision that results from the Federal Circuit's

consideration of the '267, '907, and '410 patents within thirty (30) days of the date of each decision.

3. The Plaintiffs' Motion to Strike Portions of the Answer and Complaint (D.I. 11) is DISMISSED, without prejudice, and with leave to re-file should it become necessary following the stay.

Dated: July 11, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT D

**H**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

PEGASUS DEVELOPMENT CORPORATION and Personalized Media Communications, L.L.C., Plaintiffs

v.

DIRECTV, INC., Hughes Electronics Corporation, Thompson Consumer Electronics, Inc., and Philips Electronics North America Corporation, Defendants.

**No. Civ.A. 00-1020-GMS.**

May 14, 2003.

MEMORANDUM AND ORDER

SLEET, J.

*1 AND RELATED COUNTERCLAIMS

I. INTRODUCTION

On December 4, 2000, Pegasus Development Corporation ("Pegasus") and Personalized Media Communications, L.L.C. ("PMC") filed a complaint against several defendants, alleging infringement of six patents, including U.S. Patent Nos. 4,965,825 ("the '825 patent") and 5,335,277 ("the '277 patent"). Since that time, the original scheduling order has been revised several times. Currently, fact discovery is scheduled to close on August 22, 2003, and a trial is scheduled for February of 2004.

On February 4, 2003 and March 14, 2003, respectively, the defendant Thomson Consumer Electronics, Inc. ("Thomson") filed with the Patent and Trademark Office ("PTO") a request for *ex parte* reexaminations of the '825 and '277 patents. The request for reexamination of the '825 patent was granted on April 10, 2003. FN1 Presently before the court is a joint motion by the defendants to stay the litigation pending the completion of the patent reexaminations (D.I.459). After careful consideration of the parties' submissions, and for the reasons detailed below, the court will grant the motion.

> FN1. The court is not yet aware of a decision by the PTO regarding reexamination of the '277 patent.

II. DISCUSSION

The decision to stay a case is firmly within the discretion of the court. _Cost Bros., Inc. v. Travelers Indem. Co.,_ 760 F.2d 58, 60 (3d Cir.1985). This authority applies equally to patent cases in which a reexamination by the PTO has been requested. _Ethicon, Inc. v. Quigg,_ 849 F.2d 1422, 1426-27 (Fed.Cir.1988) ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citation omitted); _see also Emhart Indus. v. Sankyo Seiki Mfg.,_ 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987) ("[I]n passing the legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion."); _Gould v. Control Laser Corp.,_ 705 F.2d 1340, 1342 (Fed.Cir.1983) (citing legislative history of reexamination statute). In determining whether a stay is appropriate, the court is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." _Xerox Corp v. 3 Comm Corp.,_ 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing cases); _cf. United Sweetner USA, Inc. v. Nutrasweet Co.,_ 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

In this case, there are two plaintiffs, four defendants, and several counter claimants, as well as six patents comprising dozens of claims. In addition, the written submissions in this case have been particularly voluminous; the briefing on claim construction alone, for example, constitutes 576 pages. _See_ Report and Recommendation of Special Master Regarding Claim Construction at 2 (citing "copious briefing"). In these ways, the present suit is quite complex, although, perhaps, not extraordinarily so. The greater context of this suit is extraordinary, however: the plaintiffs have filed more than 300 related patent applications based upon an original patent application filed in 1981 and supplemented in 1987. Together, these applications contain an estimated 10,000 claims. Furthermore, as observed by the Special Master appointed in this case, the 1987 application alone constitutes over 300 columns of patent text and "is, by any measure, an extremely complex document." _Id._ at 2. These related applications may become relevant to the present case in respect to several issues including claim construction, enablement, adequacy of written description, indefiniteness, and inequitable conduct. _See id._ at 21. Thus, in this case, more than many, the court would benefit from a narrowing of the issues.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** The reexamination process will serve this purpose. For example, the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency. *See Braintree Laboratories, Inc. v. Nephron-Tech, Inc., 1997 WL 94237, at \*9 (D.Kan.1997); Hamilton Indus., Inc. v. Midwest Folding Products Mfg., 1990 WL 37642, at \*1-2 (N.D.Ill.1990).* Other potential efficiencies resulting from the reexamination process are numerous: (1) many discovery problems relating to the prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial, reducing the complexity and length of the litigation; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court; and (5) if the patent is declared invalid, the suit likely will be dismissed as to that patent. *Id.* These efficiencies will result in a reduced cost of litigation for the parties and more effective utilization of the limited resources of the court. *Id.*

Thus, a stay may result in a simplification or reduction of issues for the court's consideration, or it may dispense with the litigation entirely. These are considerable economies indeed, particularly in this case. Given the involved prosecution history of the various patents-in-suit and hundreds of related patents, the number of claim terms at issue, the inordinate amount of prior art references, and the PTO's conclusion that all of the challenged claims warrant reexamination, the court finds particular merit in permitting an additional layer of review by the PTO before expending further judicial resources. *See Digital Magnetic Systems, Inc. v. Ainsley, 213 U.S.P.Q. 290, 290 (W.D.Okla.1982)* ("Congress enacted the reexamination procedure to provide an inexpensive, expedient means of determining patent validity which, if available and practical, should be deferred to by the courts."); *Softview Computer Products Corp. v. Haworth, Inc., 2000 WL 1134471, at \*3 (S.D.N.Y.2000)* ("[T]he grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims."). Furthermore, the court notes that discovery is not complete, and the trial, although scheduled, is some nine months in the future. In light of all these factors, and considering that the reexamination process will proceed "with special dispatch," 35 U.S.C. 305, the court concludes that a stay is the most compelling alternative.

The court recognizes that a stay will cause further delay in a case that has suffered several delays already, as well as considerable distress to the plaintiffs. The court is sensitive to the plaintiffs' right to have their day in court. Nonetheless, for the reasons already mentioned, the court is convinced that a stay is appropriate in this particular case. In addition, the court reminds the plaintiffs that they affirmatively invoked the rights of the patent statute; they can hardly be heard now to complain of the rights afforded others by that same statutory framework. Thomson is legally entitled to invoke the reexamination mechanism, and the PTO has determined that reexamination is warranted. There is nothing facially untoward in that. Moreover, the court notes that if, after reexamination, the plaintiffs' patents are again upheld, the plaintiffs' rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc. 807 F.2d 955, 961 (Fed.Cir.1986)* (holding that upon reissue, the burden of proving invalidity is 'made heavier') (quoting *Interconnect Planning Corp. v. Feil, 774 F.2d 1132, 1139 (Fed.Cir.1985)*). In this light, and given the particular circumstances of this case, the court cannot find that the prejudice to the plaintiffs is undue.

**\*3** Objecting to a stay, the plaintiffs also have complained of dilatory conduct by the defendants, who, in turn, have accused the plaintiffs of "burying" the PTO in claims and prior art references. *See, e.g.,* Mem. of Plaintiffs in Opp. to Defs.' Joint Motion to Stay (D.I.488) at 5-22 (detailing ways in which the defendants allegedly "have repeatedly acted to complicate and delay the resolution of this litigation"); Defs.' Joint Brief in Support of Motion to Stay (D.I.460) at 4 ("Many of the Harvey patents had vast numbers of cited prior art references of record, effectively burying the most relevant ones.") and 7 ("[I]t appears that PMC sought to 'overwhelm' the PTO and the Courts.").

As a brief response to the accusation of dilatory conduct, the court notes that Thomson's request for reexamination of the '825 patent comprised 2,610 pages; its request regarding the '277 patent totaled 4,736 pages. It is presumed that such an effort requires an enormous expenditure of time and other resources; thus, the timing of Thomson's reexamination requests does not, necessarily, reflect undue delay. Furthermore, as noted above, Thomson was legally entitled to invoke the reexamination procedure when it did. As to the defendants' repeated complaint that the plaintiffs overwhelmed the PTO with prior art references during prosecution of the patents-in-suit, the implications of such alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conduct will be explored at another time in the litigation, if necessary. At this stage in the process, the court is satisfied that the PTO has found "substantial new questions of patentability" raised by each of the cited references, and has determined that all of the challenged claims of the '825 patent necessitate a reexamination. *See* PTO's Decision Granting Reexamination, Supp. Appendix to Defs.' Joint Brief in Support of Motion to Stay (D.I.467) at 138. Although the court regrets a further delay in the present case, it is confident that the advantages of a stay outweigh the costs.

### III. CONCLUSION

Because the PTO's reexamination of one or more of the patents-in-suit may materially affect the issues in this case, the court will grant the defendants' motion to stay. The case is stayed pending a disposition of the PTO's reexamination of patent '825, and will be stayed pending reexamination of the '277 patent, if applicable. All pending motions will be denied without prejudice; the parties may refile them following the stay and upon the entry of a new scheduling order, if applicable.

Thus, for the aforementioned reasons, IT IS HEREBY ORDERED that:
1. The defendants' Motion to Stay Pending Reexamination by the U .S. Patent and Trademark Office (D.I.459) is GRANTED. The proceedings are stayed from the date of this order until further notice.
2. The parties shall advise the court of any decision that results from the PTO's reexamination of the '825 patent, and any other decision of the PTO regarding reexamination of any of the other patents-in-suit.
*4 3. The plaintiffs' Motion for Leave to Assert Claim 15 of U.S. Patent 4,965,825 (D.I.399) is DENIED without prejudice.
4. Thomson's Motion to Dismiss or in the Alternative for Summary Judgment (D.I.376) is DENIED without prejudice.
5. Phillips' Motion to Dismiss for Lack of Standing (D.I.396) is DENIED without prejudice.

D.Del.,2003.
Pegasus Development Corp. v. Directv, Inc.
Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00cv01020 (Docket) (Dec. 04, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

C

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
GIOELLO ENTERPRISES LTD., Plaintiff,
v.
MATTEL, INC., Defendant.
**No. C.A. 99-375 GMS.**

Jan. 29, 2001.

Philip A. Royner, Potter, Anderson & Corroon LLP, Wilmington, DE, James G. Goggin, Verrill & Dana LLP, Portland, Maine, for Plaintiff, of counsel. Robert W. Whetzel, Chad M. Shandler, Richards, Layton & Finger, Wilmington, DE, Peter E. Heuser, David A. Fanning, Charles H. DeVoe, Kolisch, Hartwell, Dickinson, McCormick, & Heuser, Portland, Oregon, for Defendants, of counsel.

ORDER

SLEET, J.
*1 On June 11, 1999, the plaintiff, Gioello Enterprises Ltd. ("Gioello"), filed a complaint against Mattel, Inc. ("Mattel") claiming infringement of U.S. Patent 4,546,434 (the " '434 patent"). Mattel answered and filed a counterclaim which Gioello, in turn, answered. Both parties filed motions which are currently pending. Mattel filed a request with the U.S. Patent and Trademark Office (the "PTO") on November 9, 2000 for an reexamination of claims 1-3 of the '434 patent. The PTO granted Mattel's request on December 21, 2000, and issued a schedule for statements from the parties (D.I.104). Currently before the court is Mattel's motion to stay proceedings pending reexamination (D.I.84). FN1 Upon consideration of the parties' submissions, the court will grant Mattel's motion and stay the proceedings until further notice.

> FN1. Although Mattel filed its motion before the PTO granted its request, the court will consider the PTO's actions.

In deciding whether to stay the proceedings, the court's discretion is guided by the following factors: (1) whether a stay would unduly prejudice Gioello or present a clear tactical advantage for Mattel, (2) whether a stay will simplify the issues, and (3) whether discovery is complete and whether a trial date has been set. See Xerox Corp v. 3Comm Corp., 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing

cases); cf. United Sweetner USA, Inc. v. Nutrasweet Co., 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

The PTO's recent decision to reexamine the '434 patent will simplify the issues in this case and focus the litigation. Numerous courts have cited a number of advantages of granting a stay pending PTO reexamination: (1) all prior art presented to the court at trial will have been first considered by the PTO with its particular expertise, (2) many discovery problems relating to the prior art can be alleviated, (3) if patent is declared invalid, the suit will likely be dismissed, (4) the outcome of the reexamination may encourage a settlement without further involvement of the court, (5) the record of the reexamination would probably be entered at trial, reducing the complexity and the length of the litigation, (6) issues, defenses, and evidence will be more easily limited in pre-trial conferences and (7) the cost will likely be reduced both for the parties and the court. See, e.g., Braintree Laboratories, Inc., Civ. A. No. 96-2459-JWL, 1997 WL 94237, at *9 (D.Kan. Feb. 26, 1997); Hamilton Indus. v. Midwest Folding Products Mfg., Civ. A. No. 89-C-8689, 1990 WL 37642, at *1- *2 (N.D.Ill. March 20, 1990) (citing cases). All of these potential advantages are present, to some degree, if the court imposes a stay of the proceedings pending the outcome of the PTO's reexamination.

Not staying the proceedings runs the risk of inconsistent adjudications or issuance of advisory opinions. Presently, this case is scheduled for trial on April 13, 2001. According to the PTO's order granting the request for reexamination, it is possible that submission of statements will not be complete until April 12, 2001. FN2 Additionally, the outstanding motions for summary judgment by Mattel claim invalidity and non-infringement-two issues the PTO's decision could render moot. Since the court must decide the summary judgment motions well in advance of trial, it would have to address the arguments raised before the PTO. Such a situation raises resource questions. As one court noted:

> FN2. The PTO's order of December 21, 2000 states that Gioello has up to two months to submit an optional response. If Gioello submits a response, Mattel has up to two months to submit a reply. Since no extensions will be granted, the court believes April 12, 2001-16 weeks from the date of the order is the maximum time allowable for written submissions to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PTO.

**\*2** ... if the parties continue to litigate the validity of the claims in this Court [sic], and the PTO subsequently finds that some or all of the claims in issue here are invalid, the Court [sic] will have wasted time and the parties will have spend additional funds addressing an invalid claim or claims. Thus, although the denial of a stay can have no effect whatsoever on past events, the grant of a stay will maximize the likelihood that neither the Court [sic] nor the parties expend their assets addressing invalid claims.
_Softview Computer Products Corp. and Ergo View Technologies Corp. v. Haworth, Inc.,_ No. 97 Civ. 8815 KMW HBP, 2000 WL 1134471, at \*3 (S.D.N.Y. Aug. 10, 2000). Since the PTO cannot stay the reexamination once a request has been granted, the court's issuance of a stay is the only way to avoid the potential for conflict. _See Hamilton,_ 1990 WL 37642, at \*2 (citing _Ethicon, Inc. v. Quigg,_ 849 F.2d 1422 (Fed.Cir.1988).

The court finds the prejudice to Gioello is slight, if any. Gioello claims it is prejudiced both by Mattel's dilatory tactics in not requesting an examination earlier and by it spending money on discovery that is nearly complete. Leaving aside timing arguments, the court finds no merit in this position. First, Gioello is not selling or actively licensing goods or services related to the '434 patent; money damages is an adequate remedy for any delay in redress. Second, both Mattel and Gioello have spent money on discovery. Third, Mattel is entitled by law to request a reexamination. _See_ 35 U.S.C. § § 302-307; 37 C.F.R. § 1.525. The fact that the request was granted means the PTO deems the '434 patent worthy of reexamination. It is not for the court to second guess the PTO's decision to reassess the prior art.

Given the possibility that the PTO's reexamination could materially affect the issues in this case, the court will deny Mattel's motions for summary judgment and Gioello's motion to strike without prejudice. FN3 Although the could will hold a status conference in late April or early May, 2001, the parties should advise the court of any earlier developments in the PTO's reexamination.

> FN3. Upon the entry of a new scheduling order, the parties are free to re-file their motions.

Therefore, IT IS HEREBY ORDERED that:
1. Mattel's motion to stay the proceeding pending

reexamination (D.I.84) is GRANTED. The proceedings are stayed from the date of this order until further notice.
2. Mattel's motion for summary judgment on invalidity (D.I.87) is DENIED without prejudice.
3. Mattel's motion for summary judgement on noninfringement (D.I.89) is DENIED without prejudice.
4. Gioello's motion to strike (D.I.91) is DENIED without prejudice.
5. The parties shall advise the court of any decision that results from the PTO's reexamination of the '434 patent.


D.Del.,2001.
Gioello Enterprises Ltd. v. Mattel, Inc.
Not Reported in F.Supp.2d, 2001 WL 125340 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

**H**

United States District Court,N.D. California.
TARGET THERAPEUTICS, INC., Plaintiff,
v.
SCIMED LIFE SYSTEMS, INC., and Cordis
Endovascular Systems, Inc., Defendants.
**No. C-94-20775 RPA (EAI).**

Jan. 13, 1995.

### ORDER GRANTING STAY

**\*1** Defendant Cordis Endovascular Systems, Inc. ("Cordis") moves for a stay of this patent infringement action pending re-examination of Plaintiff Target Therapeutics, Inc.'s ("Target") United States Patent No. 4,739,768. The court, after reading the moving and responding papers, deemed this motion submitted without oral argument. For the reasons discussed below, Cordis' motion to stay is GRANTED.

### BACKGROUND

This action arises out of defendants alleged infringement of Target's '768 Patent, which covers a microcatheter device used in the treatment of neurovascular disorders. The '768 patent issued in 1988. In June 1993, Target initiated a reexamination of the patent based on the discovery of prior art which the United States Patent and Trademark Office ("PTO") had not considered in 1988. During the reexamination, Target voluntarily cancelled several claims of the original patent and submitted revised patent language in their place. On August 4, 1994, the PTO announced that the revised claims were patentable and that it would issue Target a Reexamination Certificate with those revised claims.

On August 22, 1994 defendant SciMed Life Systems, Inc. ("SciMed") filed a request for a second examination. Scimed based its reexamination petition on two pieces of prior art: the '176 patent, the scope of which SciMed claims Target misrepresented to the PTO during the first reexamination; and a 1967 article describing a catheter which allegedly anticipates the claims of the '768 Patent. The PTO granted Scimed's request for reexamination on October 23, 1994, finding that the newly submitted prior art raised a "substantial new question of patentability." 35 U.S.C. § 305(a). On

November 9, 1994, Target filed the instant action against Cordis and SciMed. Cordis now moves for a stay of all proceedings until the PTO has completed reexamination of the '768 Patent.

### ANALYSIS

Cordis argues that this litigation should be stayed because the reexamination may cancel or substantially change the claims of the '768 Patent. A stay of the proceedings, Cordis contends, will result in the simplification of issues and help avoid the possibility of unnecessary litigation.

A district court has the inherent power to control and manage its docket. *Gould v. Control Laser Corp.,* 705 F.2d 1340, 1341 (Fed.Cir.1983), *cert. denied,* 464 U.S. 935 (1983). This power includes the authority to order a stay pending the outcome of reexamination proceedings in the PTO. *Ethicon v. Quigg,* 849 F.2d 1422, 1426 (Fed.Cir.1988); *Gould,* 705 F.2d at 1342. "There is a liberal policy in favor of granting motions to stay proceedings pending the outcome of reexamination proceedings." *ASCII Corp. v. STD Entertainment USA, Inc.,* 844 F.Supp. 1378, 1381 (N.D.Cal.1994). In ruling on a motion to stay, courts consider whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party, whether a stay will simplify the issues in question and trial of the case, whether discovery is completed and whether a trial date has been set. *GPAC, Inc. v. DWW Enterprises, Inc.,* 144 F.D.R. 60, 66 (D.N.J.1992); *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991).

**\*2** In this case, the relevant factors weigh heavily in favor of staying the proceedings pending the conclusion of the reexamination. First, this case is in its incipient stages. The parties have not engaged in expensive discovery and no trial date has been set. Second, waiting for the outcome of the reexamination could eliminate the need for trial if the claims are cancelled or, if the claims survive, facilitate trial by providing the court with expert opinion of the PTO and clarifying the scope of the claims. The claims of the patent will likely be amended or narrowed during reexamination. *See Output Tech. Corp. v. Dataproducts Corp.,* 22 U.S.P.Q. 1072, 1074 (W.D.Wash.1991) (noting that 77% of reexaminations lead to cancelled or amended claims). The final form of the claims therefore will remain uncertain until the conclusion of the reexamination procedure. It makes sense to ascertain the ultimate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

scope of the claims before trying to figure out whether defendants' products infringe the patent-in-suit.   Absent a stay, the parties may end up conducting a significantly wider scope of discovery than necessary, and the court may waste time examining the validity of claims which are modified or eliminated altogether during reexamination.

Finally, Target has failed to demonstrate that it will suffer undue prejudice if this action is stayed.   As mentioned above, this case, filed only two months ago, is brand new.   No significant discovery or trial preparation has taken place.   As in *GPAC, supra,* "[plaintiff] has not demonstrated that substantial expense and time has been invested in this litigation which would militate against a further delay of disposition of this matter." 144 F.R.D. at 64.   Nor is there any merit to Target's suggestion that SciMed initiated reexamination proceeding as a dilatory tactic.   Scimed filed its request for reexamination within three weeks of the PTO's announcement that it would issue a reexamination certificate with revised claims and months before Target filed this lawsuit.   By contrast, in *Freeman v. Minnesota Mining,* 661 F.Supp. 886 (D.Del.1987), a case on which Target relies, the defendant was aware of prior art on which the reexamination was based eight months before filing a petition for reexamination and the reexamination petition was filed more than two years after the plaintiff had filed suit.

For the foregoing reasons, the court concludes that this action should be stayed pending the outcome of the reexamination of the '768 Patent.   Cordis' motion to stay is GRANTED.

IT IS SO ORDERED.

N.D.Cal. 1995
Target Therapeutics, Inc. v. SciMed Life Systems, Inc.
Not Reported in F.Supp., 1995 WL 20470 (N.D.Cal.), 33 U.S.P.Q.2d 2022

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.