# EXHIBIT P

CLOCK_D COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| APPLERA CORPORATION, MDS INC.,<br>and APPLIED BIOSYSTEMS/MDS SCIEX, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | Civil Action No. 00-105 (RRM) |
| v. | ) ) | |
| MICROMASS UK LTD.<br>and MICROMASS INC., | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
THAT THE '736 PATENT IS UNENFORCEABLE
DUE TO INEQUITABLE CONDUCT

November 20, 2001

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

Attorneys for Plaintiffs Applera Corporation,
MDS Inc., and Applied Biosystems/MDS Sciex

Of Counsel:

Walter E. Hanley, Jr.
James Galbraith
Lewis V. Popovski
Jeffrey S. Ginsberg
Huiya Wu
KENYON & KENYON
One Broadway
New York, NY 10004
(212) 425-7200

**TA    297**

APL 017624

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

COUNTERSTATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     The Invention of the '736 Patent . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.     The Applicants Disclosed All Relevant Prior Art References
             and Did Not Believe That References Relating to "Ion Traps"
             or "Collision Cells" Were Relevant . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.     The Original Prosecution of the '736 Patent . . . . . . . . . . . . . . . . . . 6

      D.     The Reexamination of the '736 Patent . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.     LEGAL STANDARD: PROOF OF INEQUITABLE CONDUCT . . . . . . 10

      A.     Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.     Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.    MICROMASS CANNOT PROVE BY CLEAR AND
          CONVINCING EVIDENCE THAT AB/SCIEX WITHHELD ANY
          MATERIAL INFORMATION WITH INTENT TO DECEIVE THE
          PTO DURING THE ORIGINAL PROSECUTION PROCEEDING . . . . 13

      A.     The Applicants Did Not Withhold the French Application
             During the Original Prosecution with the Intent to Deceive the
             PTO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.     The Applicants Did Not Disclose the Caldecourt Article
             Because They Did Not Believe it Was Material, and it Is Not . . . . . 17

i

## TA   298

APL 017625

C.     Dr. Douglas Did Not Disclose His Low Pressure Experimental
       Results Because They Are Not Material, and There Was No
       Intent to Deceive the PTO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.   MICROMASS CANNOT PROVE BY CLEAR AND
       CONVINCING EVIDENCE THAT AB/SCIEX
       MISREPRESENTED THE CITED     PRIOR ART OR INTENDED
       TO DECEIVE THE PTO BY ITS CHARACTERIZATION OF THE
       CITED PRIOR ART DURING THE REEXAMINATION
       PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       A.     Arguments Made to Distinguish Prior Art Do Not Constitute a
              Material Misrepresentation Because the Examiner Had the
              Cited Prior Art Before Him and Could Make His Own
              Judgments about What the Prior Art Taught
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       B.     The Applicants Did Not Make Any Misrepresentations
              Relating to the Cited Ion Trap References and Did Not Intend
              to Deceive the PTO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       C.     The Applicants Did Not Make Any Misrepresentations
              Relating to the  Cited Collision Cell References and Did Not
              Intend to Deceive the PTO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ii

**TA    299**

APL 017626

TABLE OF AUTHORITIES

**FEDERAL CASES**

*Akron Polymer Container Corp. v. Exxel Container, Inc.*,
    148 F.3d 1380 (Fed. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

*Akzo N.V. v. U.S. Int'l Trade Comm'n*,
    808 F.2d 1471 (Fed. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Akzo v. E.I. Du Pont de Nemours*,
    810 F.2d 1148 (Fed. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

*Allen Organ Co. v. Kimball Int'l, Inc.*,
    839 F.2d 1556 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

*Braun, Inc. v. Dynamics Corp. of America*,
    975 F.2d 815 (Fed. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 23

*FMC Corp. v. Manitowoc Co.*,
    835 F.2d 1411 (Fed. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . 11, 18, 19, 22, 24, 28

*GFI, Inc. v. Franklin Corp.*,
    88 F. Supp. 2d 619 (N.D. Miss. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*,
    45 F.3d 1550 (Fed. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Halliburton Co. v. Schlumberger Tech. Corp.*,
    925 F.2d 1435 (Fed. Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 17, 23

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,
    863 F.2d 867 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Korody-Colyer Corp. v. General Motors Corp.*,
    760 F.2d 1293 (Fed. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

iii

**TA    300**

APL 017627

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.,*
  2000 U.S. Dist. LEXIS 20888 (D. Del. Aug. 8, 2000) . . . . . . . . . . . . . . . 16, 25, 28

*Molins PLC v. Textron, Inc.,*
  48 F.3d 1172 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 16

*Monsanto Co. v. Mycogen Plant Science, Inc.,*
  61 F. Supp. 2d 133 (D. Del. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18, 28

*Northern Telecom, Inc. v. Datapoint Corp.,*
  908 F.2d 931 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Paragon Podiatry Lab., Inc. v. KLM Lab.,*
  984 F.2d 1182 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 25, 28

*Semiconductor Energy Lab. Co. v. Samsung Elec. Co.,*
  204 F.3d 1368 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**FEDERAL REGULATIONS**

37 C.F.R. § 1.56(b) (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

iv

TA   301

APL 017628

## INTRODUCTION

Plaintiffs Applera Corporation, MDS Inc., and Applied Biosystems/MDS Sciex (collectively "AB/Sciex") respectfully submit this brief in opposition to defendants' Micromass UK Ltd. and Micromass Inc. (collectively "Micromass") motion for summary judgment that U.S. Patent No. 4,963,736 ("the '736 patent") is unenforceable due to inequitable conduct. Micromass's motion should be denied because neither the inventors nor their attorneys nor any other individual associated with the original prosecution or reexamination of the '736 patent engaged in inequitable conduct before the PTO.

Micromass has identified various alleged omissions and misstatements, but has failed to establish clear and convincing evidence as to the materiality of them or intent. First, Micromass's "proof" of intent rests entirely on inferences to be drawn from the materiality of the alleged omissions or misrepresentations. Micromass, in effect, is asking this Court to set aside Supreme Court precedent regarding summary judgment standards, which directs that all inferences are to be drawn in favor of the non-movant. Micromass cannot carry its burden here of establishing clear and convincing evidence of intent by inferences drawn from alleged materiality. Second, at the very minimum, there are issues of fact regarding the materiality of the references on which Micromass relies in support of its motion. Thus, as Micromass cannot meet its burden of proving materiality and deceptive intent, its motion for summary judgment of that the '736 patent is unenforceable due to inequitable conduct must be denied.

1

**TA    302**

APL 017629

## NATURE AND STAGE OF THE PROCEEDING

On February 18, 2000, AB/Sciex filed this action against Micromass for infringing the

'736 patent. In its Answers, Micromass raised, *inter alia*, an affirmative defense of inequitable

conduct, seeking a declaratory judgment that the '736 patent is unenforceable. *See*

Micromass, Inc. Am. Answer, D.I. 46 at 10, 15-19; Micromass UK Am. Answer, D.I. 47 at

10, 15-19. On October 22, Micromass filed nine motions for summary judgment, including the

instant motion. On October 23, AB/Sciex filed a motion for summary judgment to dismiss

Micromass's inequitable conduct defense and related counterclaim for declaratory judgment of

unenforceability. *See* Pls.' Mot. for Summ. J., D.I. 120.

Fact discovery closed on September 7, 2001. The parties exchanged their opening

briefs on claim construction on November 9, 2001, and rebuttal briefs are due on November

30, 2001. A hearing on claim construction is set for December 13, 2001. The case is set for a

ten-day jury trial beginning on January 28, 2001.

## SUMMARY OF ARGUMENT

1.    Micromass contends that AB/Sciex committed inequitable conduct by

withholding certain references and information during the original prosecution of the '736

patent, and by misrepresenting certain cited art before the Examiner during the reexamination

proceeding. Micromass's motion for summary judgment of unenforceability should be denied

because Micromass has not established materiality or intent to deceive the PTO by clear and

convincing evidence.

2

**TA    303**

APL 017630

2.      Micromass cannot prove intent by clear and convincing evidence because the undisputed facts rebut Micromass's claim that AB/Sciex intended to deceive the PTO.  The evidence demonstrates that the '736 patent was prosecuted in good faith.  Moreover, Micromass's "proof" of intent consists entirely of inferences based on the alleged materiality of the omitted or misrepresented references.  As inferences must be drawn in favor of the non-movant on a motion for summary judgment, Micromass's reliance on inferences drawn in its favor is misplaced.

3.      Micromass also cannot prove materiality of the alleged omissions or misrepresentations by clear and convincing evidence.  At the very least, there are genuine issues of fact with respect to the materiality of the alleged omissions or misrepresentations that preclude summary judgment in favor of Micromass.

## COUNTERSTATEMENT OF FACTS[1]

### A.    The Invention of the '736 Patent

The '736 patent relates to a quadrupole mass spectrometer and its method of operation.  *Id.* at col. 1, ll. 6-12.  (App. Tab 1 at B16.)[2]  The disclosed mass spectrometer has several structural elements, such as a "first vacuum chamber," a "second vacuum chamber," a

---

[1]  A more complete version of the facts relating to the invention, the inventors' understanding of the invention, and the prosecution and reexamination of the '736 patent, can be found in Pls.' Opening Br. in Supp. of Mot. For Summ. J. on Defs.' Inequitable Conduct Defense and Antitrust Counterclaims.  See D.I. 121 at 6-13.

[2]  AB/Sciex has submitted a single Appendix covering all of its answering briefs in opposition to Micromass's nine summary judgment motions.

3

**TA    304**

APL 017631

"first rod set," a "second rod set," an "inlet orifice," an "interchamber orifice." *E.g.*, *id.* at col. 14, ll. 24-49. (App. Tab 1 at B22.) The inventors, Dr. Donald Douglas and Dr. John French, discovered that operating the ion guide of a mass spectrometer at a high pressure, while maintaining the kinetic energy of the ions entering the ion guide relatively low, improves ion transmission, and, consequently, improves the sensitivity of the mass spectrometer. *See id.* at col. 5, ll. 40-49, col. 12, ll. 30-49. (App. Tab 1 at B18, B21.) Ion transmission is improved through what the inventors refer to as "collisional focusing." A key element of the claimed invention is that the pressure within the ion guide time the length of the rod set in the ion guide ("P x L product") is equal to greater than $2.25 \times 10^{-2}$ torr cm. *Id.* at col. 14, ll. 65-68. (App. Tab 1 at B22.) The kinetic energies of the ions entering the ion guide are maintained relatively low to avoid fragmenting the ions into their constituent parts. *Id.* at col. 12, ll. 30-49. (App. Tab 1 at B21.) The '736 patent teaches that such fragmentation causes losses of ion transmission and thereby should be avoided. *Id.* at col. 12, ll. 47-49. (App. Tab 1 at B21.)

**B.    The Applicants Disclosed All Relevant Prior Art References and Did Not Believe That References Relating to "Ion Traps" or "Collision Cells" Were Relevant**

Drs. Douglas and French understood that the crux of their invention is an ion guide (1) operated at a high pressure, such that the P x L product in the ion guide is equal to or greater than $2.25 \times 10^{-2}$ torr cm; while (2) the kinetic energies of the ions entering the ion guide are maintained relatively low. *See, e.g.*, French Tr. of 6/27/01, at 35-36. (App. Tab 15 at B913-914.) The inventors testified that they disclosed all references that they believed were relevant, *i.e.*, those that relate to the ion guide section of a mass spectrometer. *See* French Tr. of

4

**TA    305**

APL 017632

6/28/01, at 276 (App. Tab 16 at B918); Douglas Tr. of 8/24/01, at 526 (App. Tab 14 at

B909). The inventors correctly believed that references relating to "ion traps," a type of mass

spectrometer, and "collision cells," a part of a "tandem" mass spectrometer, were not relevant.

An ion trap is a device that consists of a chamber that is capable of storing ions for a

relatively long period of time before ejecting the ions out of the device. Declaration of Dr.

Christie G. Enke in Support of Plaintiffs' Opposition to Defendants' Motions for Summary

Judgment ("Enke Decl. of 11/19/01"), Ex. 6 at 3. (App. Tab 6 at B693.) Dr. Douglas testified

that an ion trap is "a very different device" because, *inter alia*, "there's no ion storage in the

'736 patent." *See* Douglas Tr. of 8/24/01, at 397-98. (App. Tab 14 at B896-897.)

A collision cell is a part of a "tandem" mass spectrometer used fragment "parent" ions

into their constituent parts, called "daughter" or "product" ions. Enke Decl. of 11/19/01, Ex. 6

at 4. (App. Tab 6 at B694.) Generally, a "collision gas" is introduced into the collision cells so

that parent ions entering at high kinetic energies fragment into daughter ions when they collide

with a molecule of the collision gas. Dr. Douglas testified that collision cells are different from

the claimed invention of the '736 patent. *See* Douglas Tr. of 8/24/01, at 346 ("It's because this

is a collision cell for fragmenting ions; whereas, our patent is an ion guide for transporting ions

with minimum fragmentation. So, the purpose of the two devices is completely different.").

(App. Tab 14 at B891.)

5

TA    306

APL 017633

C.    The Original Prosecution of the '736 Patent

On November 15, 1989, AB/Sciex filed a patent application that later issued as the '736 patent. The specification cited three prior art references, each of which disclosed an ion guide: (1) U. S. Patent No. 4,328,420 ("the '420 patent"), (2) Richard D. Smith, On-Line Mass Spectrometric Detection for *Capillary Zone Electrophoresis*, 59 Anal. Chem. 1230 (1987) ("1987 Smith article"); and (3) Richard D. Smith, *Capillary Zone Electrophoresis – Mass Spectrometry Using an Electrospray Ionization Interface*, 60 Anal. Chem. 436 (1988) ("1988 Smith article") (collectively the "Smith articles"). *Id.* at col. 4, ll. 51 - col. 5, ll. 5. (App. Tab 1 at B17-18.)

The Examiner correctly understood that the invention related to the ion guide section of a mass spectrometer, stating in his reasons for allowance that the prior art does not teach the operation of an ion guide at a high pressure such that the P x L product is greater than or equal to $2.25 \times 10^{-2}$ torr cm. *See* Notice of Allowability of 5/8/90 at 2. (App. Tab 3 at B114.) The '736 patent issued on October 16, 1990.

D.    The Reexamination of the '736 Patent

On September 30, 1997, AB/Sciex requested reexamination of the '736 patent in light of the following references:

    (1)    Four references directed to collision cells ("Collision Cell references"), including:

        (a)    French, European Patent Application Publication No. 0 023 826, February 11, 1981 ("French application");

6

**TA    307**

APL 017634

(b)   Boinott *et al.*, *Optimization of Instrument Parameters for Collision Activated Decomposition (CAD) Experiments for a Finnigan Triple Stage Quadrupole GC/MS/MS/DS*, 1981 Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy, March 9-13, 1981, Abstract No. 782 ("Finnigan abstract");

(c)   Boinott *et al.*, *Optimization of Instrument Parameters for Collision Activated Decomposition (CAD) Experiments for a Finnigan Triple Stage Quadrupole (TSQ™) GC/MS/MS/DS*, Finnigan Topic 8160 ("Finnigan paper"); and

(d)   Caldecourt *et al.*, *An Atmospheric-Pressure Ionization Mass Spectrometer/Mass Spectrometer*, 49 International Journal of Mass Spectrometry and Ion Physics 223 (1983) ("Caldecourt article"); and

(2)   four references that are directed to ion traps ("Ion Trap references").

Patent Owner's Req. for Reexamination at 4-5. (App. Tab 4 at B183-84.)

On November 20, 1997, the Examiner granted AB/Sciex's request for reexamination, stating that the French application, considered with the Finnigan abstract or the Finnigan paper, raised a substantial new question of patentability. Order Granting Req. for Reexamination at 2. (App. Tab 4 at B274.) The Examiner did not find that the Caldecourt article raised a substantial new question of patentability, nor did he find that the Finnigan abstract or the Finnigan paper, by themselves, raised a substantial new question of patentability. Similarly, the Examiner did not find that any of the Ion Trap references raised a substantial new question of patentability.

The Examiner found that the French application raised a substantial new question of patentability because he incorrectly applied the French application's disclosure of the pressure range of $10^{-2}$ to $10^{-4}$ torr in the collision cell of the tandem system described therein to the

7

TA    308

French application's brief disclosure relating to an ion guide in a two-stage system. *See* Order

Granting Req. for Reexamination at 2. (App. Tab 4 at B274.) The Examiner apparently

understood the French application to be pertinent based a brief passage at the end concerning

the use of the *invention* described therein in a two-stage system rather than the tandem system

that is the subject of most of the specification of the French application. The Examiner stated:

> At lines 4 through 17 on page 20, the *French application teaches*
> *that instead of the three quadrupole system discussed in the rest of*
> *the application, it is possible to arrange only two quadrupoles in*
> *series.* According to the application, *the first quadrupole in such a*
> *system should have only AC applied to it so that it acts as an ion*
> *guide* to direct ions produced outside the system to the second
> quadrupole, which has both AC and DC applied to it so that it acts as a
> mass spectrometer. As requester points out, the *French application*
> *also teaches that such an AC-only quadrupole should have rods*
> *which are 4 inches long and be operated at pressures of $10^{-2}$ to $10^{-4}$*
> *torr for a product of 0.1016 to 10.16 x $10^{-2}$ torr cm.*

Order Granting Request for Reexamination at 2 (emphasis added). (App. Tab 4 at B279.) In

essence, the Examiner applied the description of the range of pressure in the collision cell in the

tandem system to the ion guide of the two-stage system. The Examiner was incorrect in that

respect. The disclosure of the French application provides no support for doing so. In fact, the

French application makes abundantly clear what portion of the description of the tandem

system applies to the two-stage system.

   In the passage cited by the Examiner, the French application states that "[a]lthough the

*invention* has been described for use with three quadrupole sections in series, it may also be

used with only two such sections in series, namely an AC-only section and an AC-DC section."

French Application at 20, ll. 4-7 (emphasis added). (App. Tab 4 at B425). The French

8

**TA    309**

APL 017636

application goes on to state that "[s]uch an arrangement is shown and described in the said co-pending application of J. B. French." French Application at 20, ll. 7-10. (App. Tab 4 at B425.) The co-pending application referred to is European Patent Application No. 80302634.3 to French ("second French application") (App. Tab 5), which has the same text and drawings as the '420 patent. The '420 patent is referenced in several places in the specification of the '736 patent, and was considered by the Examiner during the original prosecution of the '736 patent. Notice of References Cited at 1 (App. Tab 3 at B116); *see* Second French Application, Figs. 13 and 14 (App. Tab 5 at B530); '420 patent, Figs. 13 and 14 (App. Tab 3 at B167); Enke Decl. of 11/19/01, at Ex. 3 at 21, ¶ 46 (App. Tab 6 at B638).

The *invention* of the French application is not the described pressure range in the collision cell. The *invention* is close spacing quadrupole sections through the use "open structure" rods, and synchronization of the AC voltages applied to them. *See, e.g.*, French Application at 1, ll. 25-29 (App. Tab 4 at B374); Enke Decl. of 11/19/01 at 6, ¶20 (App. Tab 6 at B536). The passage cited by the Examiner is explicit that this *invention* is what can be applied to a two-stage system:

> In such system ions entering a vacuum chamber are guided into a conventional AC-DC quadrupole mass spectrometer by an AC-only section arranged in series with the conventional section, *the rods of the AC-only section being of open construction* to permit gas entering with the ions to flow through the rods and escape. *The same phasing and space relationships as described previously apply.*

French Application at 20, ll.10-17 (emphasis added). (App. Tab 4 at B425). The French application does *not* state that any other aspect of the tandem system described therein applies

9

**TA    310**

APL 017637

to a two-stage system having an AC-only ion guide. Enke Decl. of 11/19/01, at 6-8. (App. Tab 6 at B536-538.) In particular, the French application does *not* state that the range of pressure in the collision cell of the tandem system applies to an AC-only ion guide. Enke Decl. of 11/19/01, ¶28. (App. Tab 6 at B537.)

Significantly, the Examiner did *not* find that the description of the tandem system, including the description of the collision cell, was, by itself, material. The Examiner was apparently unaware that the only relevant disclosure of the French application – that relating to the ion guide – was previously before him during the original prosecution in the form of the '420 patent. Once the Examiner understood that the range of pressure relating to the collision cell did not apply to an ion guide, the Examiner found that all of the original twenty-four claims in the '736 patent were patentable. *See* Office Action of 6/15/98, at 2-3. (App. Tab 4 at B330-31.) Importantly, in light of this understanding, the Examiner did not find that the Finnigan abstract or the Finnigan paper had any effect of the patentability of the '736 patent.

## ARGUMENT

### I.    LEGAL STANDARD: PROOF OF INEQUITABLE CONDUCT

A party alleging inequitable conduct must prove both materiality and intent to deceive by clear and convincing evidence. *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439 (Fed. Cir. 1991). The determinations relating to materiality and intent are questions of fact. *Id.* Specifically, the party alleging inequitable conduct must offer clear and convincing proof that: (1) the prior art or information is material; (2) the patent applicant knew

10

**TA    311**

APL 017638

of the prior art or information and of its materiality; and (3) the applicant intentionally failed to disclose or misrepresented the prior art or information to the PTO in order to mislead the PTO. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987). Such proof of inequitable conduct may be rebutted by a showing that: (1) the prior art was not material; (2) if the prior art was material, a showing that the applicant did not know of that art; (3) if the applicant did know of that art, a showing that the applicant did not know of its materiality; or (4) a showing that the applicant's failure to disclose the art did not result from an intent to deceive the PTO. *Id.*

### A. Materiality

Prior to 1992, information was considered material if there was a "substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1179 (Fed. Cir. 1995). In 1992, the PTO amended the regulation governing materiality to include information as material if "it refutes, or is inconsistent with, a position the applicant takes in (i) opposing an argument of unpatentability relied on by the [PTO], or (ii) asserting an argument of patentability." 37 C.F.R. § 1.56(b) (2001). A reference that is "merely cumulative" of other references that are before the examiner is not material. *Molins*, 48 F.3d at 1179. In determining the materiality of a reference, a court must consider the overall degree of similarity between the omitted reference and the claimed invention in light of the other references before the PTO. *Halliburton*, 925 F.2d at 1441.

11

**TA    312**

APL 017639

**B.    Intent**

The materiality of an omission or misrepresentation does not lead automatically to an inference of intent to deceive, because intent "is a separate and essential component of inequitable conduct." *Molins*, 48 F.3d at 1178 (quoting *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988)); *Braun, Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 822 (Fed. Cir. 1992) ("materiality does not presume intent"); *Akzo v. E.I. Du Pont de Nemours*, 810 F.2d 1148, 1153 (Fed. Cir. 1987) (affirming finding that inequitable conduct was not proved where there was a "material representation" because the threshold level of intent was not met).

Further, gross negligence, by itself, does not justify an inference of intent to deceive. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867 (Fed. Cir. 1988) (en banc). Negligent conduct can support an inference of intent only when, "viewed in light of all the evidence, including evidence indicative of good faith," the conduct is culpable enough "to require a finding of intent to deceive." *Id.* at 876. Further, there can be no inference of intent to deceive where an applicant fails to appreciate the materiality of a reference. *Monsanto Co. v. Mycogen Plant Science, Inc.*, 61 F. Supp. 2d 133, 198 (D. Del. 1999). "[G]iven the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required." *Molins*, 48 F.3d at 1181 (quoting *Northern Telecom, Inc. v. Datapoint Corp*, 908 F.2d 931, 939 (Fed. Cir. 1990)). *See also Paragon Podiatry Lab., Inc. v. KLM Lab.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993) (stating that in determining whether

12

**TA    313**

there was intent to deceive the PTO, "all of the circumstances, including those indicative of good faith, must be considered").

## II.     MICROMASS CANNOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT AB/SCIEX WITHHELD ANY MATERIAL INFORMATION WITH INTENT TO DECEIVE THE PTO DURING THE ORIGINAL PROSECUTION PROCEEDING

### A.     The Applicants Did Not Withhold the French Application During the Original Prosecution with the Intent to Deceive the PTO

Micromass contends that the French application is material, that Dr. French was aware of the reference, and that an inference of deceptive intent may be drawn from the fact that the applicants disclosed the "far less material '420 Patent during the original prosecution." Defs.' Br., D.I. 100 at 18. Micromass is wrong.

The '420 patent is not "far less material" than the French application. Rather, the '420 patent includes the disclosure of the French application that the Examiner thought was pertinent. The Examiner primarily relied upon the brief passage in the French application relating to the use of the invention in that application to a two-stage system having an ion guide. That passage incorporates the second French application by reference, and the second French application has the same disclosure as the French '420 patent. Although the Examiner initially rejected the claims of the '736 patent during the reexamination proceeding based in part on the French application, he later confirmed the patentability of the claims over the French application once he understood the range of pressure in the collision cell of the tandem system did not apply to the ion guide of the two-stage system. The French application is thus no more material than the '420 patent, which was before the Examiner during the original prosecution.

13

**TA     314**

Micromass's citations of *Korody-Colyer Corporation v. General Motors Corporation*, 760 F.2d 1293 (Fed. Cir. 1985) and *GFI, Inc. v. Franklin Corporation*, 88 F. Supp. 2d 619 (N.D. Miss. 2000) are misplaced. Defs.' Br., D.I. 100 at 19. Neither of these cases stand for the proposition that deceptive intent may be inferred solely from the non-disclosure of a material reference, much less a cumulative reference like the French application. Micromass also cites to several additional cases for the proposition that an inference of intent to mislead may be drawn where there is a high level of materiality (which is absent here). Defs.' Br., D.I. 100 at 19. The cases cited by Micromass indicate that the existence of aggravating circumstances and the absence of good faith prompted the courts to infer deceptive intent. *See, e.g., Semiconductor Energy Lab. Co. v. Samsung Elec. Co.*, 204 F.3d 1368, 1376 (Fed. Cir. 2000) (inferring deceptive intent where "the record as a whole reflects a clear pattern and practice of initial disclosure, followed by incremental disclosure only when compelled by the circumstances to do so, followed, at times, by mischaracterization"); *Korody*, 760 F.2d at 1293 (inferring deceptive intent where applicant failed to disclose a material reference to the PTO when "its internal correspondence referred to part of that [reference] as 'most relevant,'" and the implication that such non-disclosure was "a calculated recklessness with regard to the truth"); *GFI*, 88 F. Supp. 2d at 625-32 (inferring deceptive intent where, in the absence of any evidence of good faith, the applicant failed to disclose material references – of which it was aware – that taught elements of the claimed invention that were not taught in any of the cited references). Even assuming that the French application was non-cumulative, there are no such aggravating circumstances in this case.

14

**TA   315**

APL 017642

Rather, the evidence of good faith in this case weighs against any inference of deceptive

intent. *See Paragon*, 984 F.2d at 1190. The uncontroverted sworn testimony of both Dr.

French and Dr. Douglas establishes that they approached the prosecution of their '736 patent in

good faith and had no intent to deceive the PTO:

> Q: Did you provide to counsel, in connection with the '763 [sic]
> patent, references that you considered to be material with regard to the
> grant of the application that matured into the '763 [sic] patent?
>
> A: Yes.

French Tr. of 6/28/01, at 276. (App. Tab 16 at B918.)

> Q: Okay. Did you provide to the U.S. Patent Office all references that
> you believed were relevant to your discovery and the 736 patent?
>
> A: Yes.

Douglas Tr. of 8/24/01, at 526. (App. Tab 14 at B909.) In light of this evidence of good faith,

and as all reasonable factual inferences must be drawn in favor of the AB/Sciex, *see Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Akron Polymer Container Corp. v.*

*Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998), Micromass cannot establish

intent to deceive the PTO by clear and convincing evidence.

Moreover, the Federal Circuit has affirmed a finding of no inequitable conduct based on

facts less compelling than those present here. *See Glaverbel Societe Anonyme v. Northlake*

*Mktg. & Supply, Inc.*, 45 F.3d 1550, 1557-58 (Fed. Cir. 1995). In *Glaverbel*, the applicant

knew about a Swedish patent but did not disclose it to the PTO during the original prosecution

of its patent. In a reexamination of the patent at issue, the Examiner initially rejected the claims

15

TA   316

based on the Swedish patent, but later withdrew the rejection after the claims were amended. The defendant asserted inequitable conduct based on, *inter alia*, the applicant's failure to cite the Swedish patent during the original prosecution. In finding that the defendant had not proven materiality or intent to deceive by clear and convincing evidence, the Federal Circuit stated that "[n]o adverse inference flows from a patentee's actions in adjusting its claims on reexamination, whether or not the patentee itself initiated the reexamination." *Id.* at 1558.

Here, not only did the patentee initiate the reexamination, but the original claims were allowed *without* amendment over the French application. As in *Glaverbel*, there is no evidence here that either inventor perceived the references to be material or had any intent to deceive the PTO. "In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *Molins*, 48 F.3d at 1181. Rather, the fact that the applicants sought reexamination of the '736 patent over the French application and other references supports an inference of good faith. *See, e.g.*, *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 2000 U.S. Dist. LEXIS 20888, at *36-40 (D. Del. Aug. 8, 2000).

Therefore, as the applicants did not intend to mislead the PTO in not citing the French application during the original prosecution, Micromass cannot rely on the fact that the French application was not cited to prove inequitable conduct by clear and convincing evidence.

16

**TA    317**

APL 017644

**B.     The Applicants Did Not Disclose the Caldecourt Article Because They Did Not Believe it Was Material, and it Is Not**

Micromass argues that the Caldecourt article is material because it: (1) discloses a P x L product of the claimed invention; (2) suggests the DC offset voltage range disclosed in the '736 patent; and (3) teaches collisional focusing.  The Caldecourt article, however, is not material.  As stated previously, the '736 patent is directed to an improved ion guide wherein the improvement is obtained by operating the ion guide at high pressures and maintaining kinetic energies of entering ions relatively low to avoid fragmentation.

The Caldecourt article is not material because, in light of the cited prior art, there is little similarity between the mass spectrometer of Caldecourt article and that of the claimed invention.  *See Halliburton*, 925 F.2d at 1441.  The Caldecourt article: (1) does not describe an ion guide section, and (2) teaches away from using higher pressures to improve ion transmission.  While it discloses a high pressure of $2.2 \times 10^{-3}$ torr for fragmenting ions in the collision cell, the pressure disclosed is less than $1 \times 10^{-4}$ torr when the collision cell is not operated to cause fragmentation and acts like an ion guide.  Thus, the Caldecourt article is less material and cumulative in light of the cited references, such as the 1987 Smith article, which discloses an ion guide operated at a pressure of about $8 \times 10^{-4}$ torr.  *See id.*  This conclusion is confirmed by the Examiner's finding – that the Caldecourt article did not raise a substantial new question of patentability – since he did not reject any claim based on it.[3]  In light of the

---

[3] AB/Sciex cited the Caldecourt article in the Request for Reexamination because Micromass had asserted it was pertinent, not because the inventors believed it was.

17

**TA     318**

APL 017645

differences between the Caldecourt article and the claimed invention, and the Examiner's

conclusion, Micromass cannot establish that the Caldecourt article is material by clear and

convincing evidence. *A fortiori*, its non-disclosure does not support an inference of intent to

deceive the PTO. At minimum, there is a genuine issue of material fact as to whether the

Caldecourt article is material, which by itself defeats Micromass' motion for summary judgment

of inequitable conduct.

Moreover, while the applicants were aware of the Caldecourt article, they correctly did

not believe that it was relevant. As this Court has explained, even where, unlike here, a

reference is material, there can be no intent to deceive if an applicant does not appreciate its

materiality. *Monsanto*, 61 F. Supp. 2d at 198; *see also FMC*, 835 F.2d at 1415. For

instance, in discussing why he did not disclose the Caldecourt article in the original prosecution,

Dr. Douglas stated:

> Q: Okay. Given that Caldecourt discloses a pressure time path length
> in excess of the significant parameter of the patent, why didn't you
> disclose it to the United Stated Patent Office when you applied for the
> '736 patent?
>
> * * * *
>
> A: I will try and answer it. It's because this is a collision cell for
> fragmenting ions; whereas, our patent is an ion guide for transporting
> ions with minimum fragmentation. So, the purpose of the two devices is
> completely different.

18

TA    319

APL 017646

Douglas Tr. of 8/24/01, at 346.  (App. Tab 14 at B891.)  Dr. Douglas, and the other

applicants, did not believe that the Caldecourt article was relevant.[4]  This evidence rebuts

Micromass's "proof" of inequitable conduct.  *See FMC*, 835 F.2d at 1415.

    Thus, drawing all inferences in favor of AB/Sciex, Micromass cannot establish

materiality or intent by clear and convincing evidence.

    **C.    Dr. Douglas Did Not Disclose His Low Pressure Experimental Results Because They Are Not Material, and There Was No Intent to Deceive the PTO**

    Micromass argues that AB/Sciex committed inequitable conduct based on "Dr.

Douglas' suppression of [certain low pressure] experimental results during the original

prosecution of the '736 Patent . . . ."  Defs.' Br., D.I. 100 at 28.  According to Micromass, the

results of these low pressure experiments are material because: (1) they "contradict" the P x L

product limitation; and (2) they show improved ion signal at pressures disclosed in the prior art,

*i.e.*, in the 1987 Smith article.  Micromass also contends that "Dr. Douglas' failure to provide

an explanation for his actions supports a finding of deceptive intent."  Defs.' Br., D.I. 100 at 32.

    Dr. Douglas' low pressure experiments are not material.  The fact that ion transmission

was found by Dr. Douglas not to be equal at different values within the low pressure regime of

---

    [4] Micromass asserts that the difference cited by Dr. Douglas – that the Caldecourt article discloses a collision cell and not an ion guide – is disingenuous because AB/Sciex had claimed that a Micromass system with a collision cell infringed the '736 patent.  *See* Letter from Parr to Micromass of 1/10/97, at 1.  (App. Tab 29 at B1048.)  Although the "hexapole transfer lens" of Micromass's system could be used as a collision cell, that use was not the source of AB/Sciex's concern.  Thus, Dr. Douglas's distinction is a valid one.

19

**TA   320**

APL 017647

the prior art, *i.e.*, that some low pressures were better than other low pressures, in no way undermines the inventors' discovery of improved ion transmission at higher pressures.

Micromass also argues that Douglas's low pressure experiments are material because they contradict statements made by the applicants with respect to the 1987 Smith article. More specifically, Micromass argues that if the applicants had disclosed the Douglas low pressure experiments, they would not be able to distinguish the 1987 Smith article. Dr. Douglas's experiments, however, have nothing to do with what the 1987 Smith article discloses. The teaching of the 1987 Smith article was accurately represented. Further, the subsequent 1988 Smith article teaches an even lower pressure than the 1987 Smith article does, indicating that the trend at the time of the invention was to maintain pressure in the ion guide as low as possible. Thus, the Smith articles teach away from the claimed invention. Micromass cannot satisfy its burden of proof to show that the Douglas low pressure experiments are material. At the very least, there exists a genuine issue of material fact as to whether the Douglas low pressure experiments are material that precludes summary judgment.

Moreover, there is no evidence that Dr. Douglas or any of the applicants withheld the Douglas low pressure experiments with the intent to deceive the PTO. Micromass cannot rely on the fact that Dr. Douglas had no recollection as to why his low pressure experiments were not disclosed to the PTO to support its claim of deceptive intent. All reasonable factual inferences must be drawn in favor of AB/Sciex, the non-moving party, not Micromass. *See Anderson*, 477 U.S. at 255; *Akron*, 148 F.3d at 1384. Drawing all inferences in favor of

20

APL 017648

AB/Sciex, Micromass cannot establish intent to deceive the PTO by clear and convincing evidence.

**III. MICROMASS CANNOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT AB/SCIEX MISREPRESENTED THE CITED PRIOR ART OR INTENDED TO DECEIVE THE PTO BY ITS CHARACTERIZATION OF THE CITED PRIOR ART DURING THE REEXAMINATION PROCEEDING**

**A.    Arguments Made to Distinguish Prior Art Do Not Constitute a Material Misrepresentation Because the Examiner Had the Cited Prior Art Before Him and Could Make His Own Judgments about What the Prior Art Taught**

Micromass asserts that AB/Sciex committed inequitable conduct when it misrepresented the teachings of the Ion Trap references and the Collision Cell references to the PTO during the reexamination of the '736 patent. Micromass further asserts that deceptive intent may be inferred from the inventors' awareness of these allegedly material references. Micromass is wrong.

The Federal Circuit has held that arguments made to distinguish prior art, even though favorable to an applicant's position, do not constitute a material misrepresentation because the Examiner has the ability to independently evaluate the prior art. *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1482 (Fed. Cir. 1986) ("the examiner was free to reach his own conclusion regarding [the claimed invention] based on the art in front of him"). The Federal Circuit also found that such arguments cannot support a finding of intent to mislead the PTO. *Id.* Here, the Ion Trap references and the Collision Cell references were squarely before the Examiner, who was in a position to determine what the prior art taught. Thus, AB/Sciex's

21

**TA    322**

APL 017649

arguments distinguishing these cited references from the claimed invention cannot constitute inequitable conduct.

**B.    The Applicants Did Not Make Any Misrepresentations Relating to the Cited Ion Trap References and Did Not Intend to Deceive the PTO**

Micromass contends that AB/Sciex's arguments, made during reexamination to distinguish the cited Ion Trap references from the claimed invention, are contradicted by the 1992 Douglas and French article (App. Tab 27), which is not prior art. Micromass focuses on the applicants' statement that "ion traps operate on a fundamentally different principle," and asserts that this statement is a misrepresentation because the Douglas and French article states that the effect on ions of collisional focusing "appears to be analogous to the behavior of ions in three-dimensional ion traps." Defs.' Br., D.I. 100 at 33-35. Micromass further contends that AB/Sciex's "misrepresentation" is material, and given the inventors' awareness of the Douglas and French article, that the "misrepresentation" was made with deceptive intent. These contentions are not supported by the facts and fail to satisfy the clear and convincing standard for materiality and intent. *See FMC*, 835 F.2d at 1415.

Contrary to Micromass's assertions, the applicants did not make any misrepresentations to the PTO. The statement on which Micromass's premises its argument ("ion traps operate on a fundamentally different principle") is factually correct. *See* Douglas Tr. of 8/24/01, at 397-98. (App. Tab 14 at B896-897.) During the reexamination, the applicants distinguished ion traps from the claimed invention on several grounds: the purpose of an ion trap is different from that of an ion guide, the two systems are structurally different, and their

22

**TA    323**

APL 017650

methods of operation are different. *E.g.*, Patent Owner's Req. for Reexamination at 6-8. (App. Tab 4 at B185-87.) The applicants' arguments to that effect are not contradicted by the theoretical observation in the Douglas and French article that an analogous effect to collisional focusing could be said to exist in ion traps.

Moreover, the Ion Trap references are not material. In determining the materiality of a reference, a court must consider the overall degree of similarity between the reference and the claimed invention in light of the other references before the PTO. *Halliburton*, 925 F.2d at 1441. In light of the plethora of differences between the ion trap and the claimed invention, and the fact that the applicants disclosed all relevant references relating to ion guides, it cannot be said that the Ion Trap references are material. Further, the fact that the Examiner did not rely on the Ion Trap References in granting the applicants' request for reexamination, *i.e.*, they did not raise a substantial new question of patentability, is strong evidence that the Ion Trap references are not material. If characterizations of a material prior art reference before the PTO cannot constitute a material misrepresentation as a matter of law, *see, e.g., Akzo v. ITC*, 808 F.2d at 1482, then certainly characterizations of a prior art reference that is not material cannot do so. At minimum, there is a genuine issue of material fact as to whether the Ion Trap references are material. Thus, Micromass cannot prove materiality by clear and convincing evidence.

Regarding an intent to deceive, Micromass contends that AB/Sciex's intent should be inferred based on the alleged materiality of the Douglas and French article and the inventors' awareness of the article. Micromass is wrong as materiality does not prove intent. *Braun*, 975

23

TA   324

F.2d at 822; *Akzo v. Du Pont*, 810 F.2d at 1153. Micromass also contends that AB/Sciex

cannot show good faith. Micromass, however, fails to prove any intent to deceive the PTO by

clear and convincing evidence. First, the inventors testified that they disclosed all references

that they believed were relevant, *i.e.*, those that relate to ion guides in mass spectrometers. *See*

Douglas Tr. of 8/24/01, at 526 (App. Tab 14 at B909); French Tr. of 6/28/01, at 276 (App.

Tab 16 at B918). Second, the applicants did not believe that ion traps were relevant, *see*

Douglas Tr. of 8/24/01, at 397-98 (App. Tab 14 at B896-897), and thus, the disclosure

relating to ion traps in the Douglas and French article was also not relevant. At the very least,

there is an genuine issue of material fact as to the materiality of the Douglas and French article

and the materiality of the alleged misrepresentations relating to the Ion Trap references.

With respect to intent, Micromass incorrectly relies on Dr. Douglas' deposition

testimony in support of its assertion that the Douglas and French article is material. When Dr.

Douglas was asked whether he would have disclosed the 1992 Douglas and French article, he

stated that it was relevant only because it describes their experimental work relating to *an ion*

*guide*, Douglas Tr. of 8/24/01, at 445 (App. Tab 14 at B903), not because it observed that the

collisional focusing effect of ions of was analogous to the behavior of ions in an ion trap. As a

result, there is no basis upon which Micromass may rely to support an inference of deceptive

intent. *See FMC*, 835 F.2d at 1415. Neither can Micromass provide an independent showing

of intent.

This Court has previously found that the act of initiating a reexamination to confirm the

validity of a patent prior to asserting it in a litigation supports an inference of good faith. *See*

24

**TA    325**

APL 017652

*LNP*, 2000 U.S. Dist. LEXIS 20888, at *31-40 (finding no intent to deceive the PTO because

"[k]nowingly withholding a material reference [during the reexamination] would have been

inconsistent with [patentee's] goal of evaluating the validity of its own patents prior to

litigation"). Thus, drawing all inferences in favor of the non-movant AB/Sciex, at minimum,

supports a finding of no deceptive intent. *See Paragon*, 984 F.2d at 1190. Accordingly,

Micromass has failed to carry its burden with regard to intent.

> **C.    The Applicants Did Not Make Any Misrepresentations Relating to the
> Cited Collision Cell References and Did Not Intend to Deceive the PTO**

Micromass contends that the arguments made by applicants during the reexamination to

distinguish the cited Collision Cell references from the claimed invention are contradicted by

various undisclosed references that are not prior art, including: (1) U.S. Patent No. 5,248,875

("the '875 patent"); (2) Bruce Thomson & Donald Douglas, *Improved Collisionally*

*Activated Dissociation Efficiency and Mass Resolution on a Triple Quadrupole Mass*

*Spectrometer System*, 67 Analytical Chemistry 1696 (1995) ("the Thomson and Douglas

article"); (3) SciTech Project Milestone Review ("Milestone Review"); and (4) AB/Sciex's

notice letter of infringement to Micromass dated January 10, 1997 ("1997 Letter"). Micromass

asserts that the undisclosed later references (1) and (3) – which relate to the *subsequent*

discovery of collisional focusing of daughter ions in collision cells – refute statements made by

applicants during the reexamination, including statements that Collision Cell references "teach

away from" and "diametrically opposed" to that of the claimed invention. Micromass further

asserts the applicants were aware of the undisclosed references and their materiality, and that

25

**TA    326**

APL 017653

deceptive intent may be inferred from the applicants' alleged misrepresentations and their failure to disclose the Collision Cell references to the Examiner. Micromass is wrong.

First, the *subsequent* discovery of collisional focusing of daughter ions in a collision cell has no bearing on what the Collision Cell references disclose or what those skilled in the art as of the invention of the '736 patent would have understood from those disclosures. Science advances. The inventors of the '736 patent made a pioneering advance, but not the final advance in the field of mass spectrometry.

Second, the invention of the '736 patent concerns transmission of ions generated in a source to a mass filter for those ions. It does not concern fragmentation of ions in a collision cell or transmission of fragments in a collision cell. Micromass agrees that the claims are directed to "the ions generated in the source – *not daughter ions* – traveling from the inlet orifice through the second space," *i.e.*, the space defined by the second rod set. *See* Defs.' Br. in Supp. of Mot. for Summ. J. as to Non-Infring. Concerning Claim Limitations 1(D) and 14(B), D.I. 104 at 4 (emphasis added). The statements made by the applicants to the Examiner during the reexamination proceeding were accurate. The applicants explained to the Examiner that ions guides are "diametically opposed" to collision cells with respect to the function and purpose, and the Examiner understood as much. There is no evidence that shows that the applicants misrepresented any information when they stated that the Collision Cell references were designed to fragment ions. Moreover, the statements that the claimed ion guide, unlike a collision cell, seeks to transmit ions while minimizing fragmentation is true. '736 patent at col. 12, ll. 47-49 (stating that fragmentation, or collisionally induced dissociation, is

26

**TA    327**

undesirable) (App. Tab 1 at B21); Douglas Tr. of 8/24/01, at 363 ("the 736 patent is about ion

guides, where we attempt to minimize fragmentation") (App. Tab 14 at B893). Similarly, the

applicants' statements that the Collision Cell references teach away from the claimed invention

are also accurate as none of them disclose (1) operating an ion guide at high pressure to

improve transmission, or (2) maintaining the kinetic energy of the ions relatively low. In fact, the

Collision Cell references indeed teach away from the claimed invention because they teach that

parent ions are maintained at high kinetic energies so that when they collide with a molecule of

the collision gas, they will fragment into daughter ions. There is, at the very least, a genuine

issue of material fact as to the materiality of the undisclosed references and the alleged

misrepresentations relating to the Collision Cell references.

Finally, there are no facts to support Micromass's statement that "Dr. Douglas testified

that the teachings of [the Collision Cell references] could have been relevant to the Examiner's

determination of patentability in light of the contradictory statements made by Plaintiffs during

reexamination." Defs.' Br., D.I. 100 at 42. Rather, Dr. Douglas testified that as a scientist

evaluating a paper for peer review, he may consider the undisclosed references, "depending on

the context of what [he] was doing." Douglas Tr. of 8/24/01, at 520. (App. Tab 14 at B906.)

Dr. Douglas also testified that collision cells not relevant because are different from the claimed

invention of the '736 patent. *See* Douglas Tr. of 8/24/01, at 346 ("It's because this is a

collision cell for fragmenting ions; whereas, our patent is an ion guide for transporting ions with

minimum fragmentation. So, the purpose of the two devices is completely different."). (App.

Tab 14 at B891.) Further, Micromass may not rely on the applicants' awareness of the

27

TA    328

undisclosed references to support its inference that applicants were aware of the *materiality* of

their alleged misrepresentations.[5] *See Monsanto.*, 61 F. Supp. 2d at 198. As there is no

evidence to support Micromass's contention that the applicants were aware of the materiality of

the undisclosed references, there is no basis to support Micromass's claim of deceptive intent.

*See FMC*, 835 F.2d at 1415.

Moreover, as discussed above, the act of initiating a reexamination to confirm the

validity of a patent prior to asserting it in a litigation supports an inference of good faith. *See*

*LNP*, 2000 U.S. Dist. LEXIS 20888, at *31-40. Thus, drawing all inferences in favor of the

non-movant AB/Sciex, at the minimum, supports a finding of no deceptive intent. *See*

*Paragon*, 984 F.2d at 1190.

Accordingly, Micromass has not established inequitable conduct by clear and

convincing evidence.

---

[5] Micromass also relies on the incorrect assumption that collisional focusing inherently
occurs in a collision cell to infer that the applicants were aware of the materiality of the alleged
misrepresentations. Defs.' Br., D.I. 100 at 42, 44. Micromass's reliance is misplaced. For
example, in support of its contentions, Micromass cites to Dr. Fulford's testimony for the
proposition that "collision focusing occurs whenever pressure and rod length parameters of the
'736 Patent are satisfied." Defs.' Br., D.I. 100 at 42 n.11. Dr. Fulford did not rule out other
factors as bearing on whether collisional focusing occurs. Fulford Tr. at 5/11/01, at 57. (App.
Tab 39 at B1342.) Similarly, Dr. Douglas testified that the rod length and the pressure are not
exclusively determinative of whether collisional focusing occurs, but that "[i]t will depend on the
ion energies and all the other operating parameters." Douglas Tr. of 8/24/01 at 317. (App.
Tab 14 at B317.) Thus, contrary to Micromass's assertions, collisional focusing does not
inherently occur in collision cells and Micromass may not rely on this assumption to support its
contention that applicants were aware of the materiality of the alleged misrepresentation.

28

**TA  329**

APL 017656

## CONCLUSION

Micromass cannot establish that any of the alleged omissions or misrepresentations are material by clear and convincing evidence. At the very minimum, there are genuine issues of material fact as to the materiality of the alleged omissions and misrepresentations. Further, Micromass has not presented any evidence of intent to deceive other than that based on supposition and inference. Inferences, however, must be drawn in favor of AB/Sciex, the non-moving party. Given the lack of materiality of the alleged omissions or misrepresentations and the applicants' belief that the references are not relevant, as well as the pattern of good faith during the prosecution and reexamination of the '736 patent, Micromass has failed to establish inequitable conduct. Accordingly, its motion for summary judgment of unenforceability must be denied.

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

Attorneys for Plaintiffs Applera Corporation,
MDS Inc., and Applied Biosystems/MDS Sciex

29

**TA     330**

APL 017657

Of Counsel:

Walter E. Hanley, Jr.
James Galbraith
Lewis V. Popovski
Jeffrey S. Ginsberg
Huiya Wu
KENYON & KENYON
One Broadway
New York, NY 10004
(212) 425-7200

30

**TA    331**

APL 017658

## CERTIFICATE OF SERVICE

I, Julia Heaney, hereby certify that copies of the foregoing were caused to be

served this 20th day of November, 2001, upon the following in the manner indicated:

### BY FEDERAL EXPRESS (First A.M. Delivery)

Jaimie Bennett
Latham & Watkins
Sears Tower
Suite 5800
Chicago, IL  60606

### BY HAND

Robert W. Whetzel
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

Julia Heaney

**TA    332**

APL 017659