IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| APPLERA CORPORATION, MDS INC., and APPLIED BIOSYSTEMS/MDS SCIEX INSTRUMENTS, | ) ) ) ) | **REDACTED PUBLIC VERSION** |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 04-1230 GMS |
| THERMO ELECTRON CORP., | ) ) ) | |
| Defendant | ) | |
| THERMO FINNIGAN LLC, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 05-110-GMS |
| APPLERA CORPORATION, MDS INC., and APPLIED BIOSYSTEMS/MDS SCIEX INSTRUMENTS | ) ) ) ) | |
| Defendants. | ) ) | |

## APPENDIX TO THERMO'S ANSWERING MARKMAN BRIEF

OF COUNSEL:
Wayne L. Stoner
Richard Goldenberg
Stephen M. Muller
John M. Golden
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

Frederick L. Cottrell, III (#2555)
Cottrell@RLF.com
Kelly E. Farnan (#4395)
Farnan@RLF.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
Telephone: (302) 651-7700

Attorneys for Thermo Electron Corp.
and Thermo Finnigan LLC

Dated:  December 22, 2005

**THERMO APPENDIX DOCUMENTS**

TAB A    Excerpts from *McGraw-Hill Dictionary of Scientific and Technical*    TB 1
         *Terms* (4th ed. 1989).

TAB B    Excerpts from *Webster's Ninth New Collegiate Dictionary* (1988).    TB 4

TAB C    Excerpts from *Webster's Third New International Dictionary* (1986)    TB 7

TAB D    Excerpts from Plaintiff's Opening Claim Construction Brief, *Applera*    TB 10
         *Corp. v. Micromass UK, Ltd.*, Civ. Action No. 00-105-RRM
         (D. Del., brief filed Nov. 9, 2001).

TAB E    Excerpts from Plaintiff's Answering Brief in Opposition to    TB 18
         Defendants' Motion for Summary Judgment of Invalidity for
         Indefiniteness, *Applera Corp. v. Micromass UK, Ltd.*, Civ.
         Action No. 00-105-RRM (D. Del., brief filed Nov. 20, 2001).

TAB F    Excerpts from Plaintiffs' Rebuttal Claim Construction Brief, *Applera*    TB 20
         *Corp. v. Micromass UK, Ltd.*, Civ. Action No. 00-105-RRM
         (D. Del., brief filed Nov. 30, 2001).

TAB G    Excerpts from Plaintiffs' Response to Micromass' Sixth Set of    TB 24
         Interrogatories, *Applera Corp. v. Micromass UK, Ltd.*, Civ.
         Action No. 00-105-RRM (D. Del., filed Aug. 13, 2001).

TAB H    Excerpts from Defendants' Opening Claim Construction Brief,    TB 27
         *Applera Corp. v. Micromass UK, Ltd.*, Civ. Action No. 00-105-
         RRM (D. Del., brief filed Nov. 9, 2001).

TAB I    Excerpts from Defendants' Answering Claim Construction Brief,    TB 32
         *Applera Corp. v. Micromass UK, Ltd.*, Civ. Action No. 00-105-
         RRM (D. Del., brief filed Nov. 30, 2001).

TAB J    .Excerpts from transcript of *Markman* hearing, *Applera Corp. v.*      TB 38
           *Micromass UK, Ltd.*, Civ. Action No. 00-105-RRM (D. Del.,
           held Dec. 13 2001).

TAB K    Excerpts from Brief of Plaintiff – Appellees, *Applera Corp. v.*      TB 43
           *Micromass*, Nos. 024434, 021459 (Fed. Cir., brief filed Oct. 1,
           2002)

TAB L    U.S. Patent No. Re. 34,000      TB 50

TAB M    Excerpts from  Plaintiff's Second Supplemental Response to      TB 62
           Interrogatory No 1, *Applera Corp. v. Micromass UK, Ltd.*, Civ.
           Action No. 00-105-RRM (D. Del., filed  Oct. 19, 2001).

TAB N    RPW Scott, *"Gas Chromatography – Tandem Techniques,"* available      TB 65
           at http://www.chromatography-online.org/GC-Tandem/GC-
           IR/rs41.html

TAB O    Extrel Core Mass Spectrometers, *"Quadrupole Mass Filters,"*      TB 70
           available at
           http://www.extrel.com/sitehtml/QMS/sitehtml/products/quadso
           ct.php

TAB P    Pfeiffer Vacuum *"Mass Spectrometer 05 06 07,"* available at      TB 73
           http://www.Pfeiffer-vacuum.com/download/MS_catalog.pdf

TAB Q    Waters *Corp.*, *"The Mass Spectrometer: Instrument Architectures and*      TB 93
           *Main Characteristics,"* available at
           http://www.waters.com/watersdivision/ContentD.asp?watersit=
           EGOO-66MNYR&WT.svl=1

TAB R    *Norian Corp. v. Stryker Corp.* 05-1172, slip op. (Fed. Cir. Dec. 6,      TB 103
           2005)

# EXHIBIT A

RECEIVED

APR 2 3 2004

HALE AND DORR
LIBRARY

# McGraw-Hill
# DICTIONARY OF
# SCIENTIFIC AND
# TECHNICAL
# TERMS

## Fourth Edition





**Sybil P. Parker**

EDITOR IN CHIEF



**McGRAW-HILL BOOK COMPANY**

New York
St. Louis
San Francisco

| | |
|---|---|
| Auckland | Bogotá |
| Caracas | Colorado Springs |
| Hamburg | Lisbon |
| London | Madrid |
| Mexico | Milan |
| Montreal | New Delhi |
| Oklahoma City | Panama |
| Paris | San Juan |
| São Paulo | Singapore |
| Sydney | Tokyo |
| Toronto | |

TB   1

On the cover: Pattern produced from white light by a computer-generated diffraction plate containing 529 square apertures arranged in a 23 × 23 array. (R. B. Hoover, Marshall Space Flight Center)

On the title pages: Aerial photograph of the Sinai Peninsula made by Gemini spacecraft. (NASA)

Included in this Dictionary are definitions which have been published previously in the following works: P. B. Jordain, *Condensed Computer Encyclopedia*, Copyright © 1969 by McGraw-Hill, Inc. All rights reserved. J. Markus, *Electronics and Nucleonics Dictionary*, 4th ed., Copyright © 1960, 1966, 1978 by McGraw-Hill, Inc. All rights reserved. J. Quick, *Artists' and Illustrators' Encyclopedia*, Copyright © 1969 by McGraw-Hill, Inc. All rights reserved. *Blakiston's Gould Medical Dictionary*, 3d ed., Copyright © 1956, 1972 by McGraw-Hill, Inc. All rights reserved. T. Baumeister and L. S. Marks, eds., *Standard Handbook for Mechanical Engineers*, 7th ed., Copyright © 1958, 1967 by McGraw-Hill, Inc. All rights reserved.

In addition, material has been drawn from the following references: R. E. Huschke, *Glossary of Meteorology*, American Meteorological Society. 1959; *U.S. Air Force Glossary of Standardized Terms*, AF Manual 11-1, vol. 1, 1972; *Communications-Electronics Terminology*, AF Manual 11-1, vol. 3, 1970; W. H. Allen, ed., *Dictionary of Technical Terms for Aerospace Use*, 1st ed., National Aeronautics and Space Administration, 1965; J. M. Gilliland, *Solar-Terrestrial Physics: A Glossary of Terms and Abbreviations*, Royal Aircraft Establishment Technical Report 67158, 1967; *Glossary of Air Traffic Control Terms*, Federal Aviation Agency; *A Glossary of Range Terminology, White Sands Missile Range, New Mexico*, National Bureau of Standards, AD 467-424; *A DOD Glossary of Mapping, Charting and Geodetic Terms*, 1st ed., Department of Defense, 1967; P. W. Thrush, comp. and ed., *A Dictionary of Mining, Mineral, and Related Terms*, Bureau of Mines, 1968; *Nuclear Terms: A Glossary*, 2d ed., Atomic Energy Commission; F. Casey, ed., *Compilation of Terms in Information Science Technology*, Federal Council for Science and Technology, 1970; *Glossary of Stinfo Terminology*, Office of Aerospace Research, U.S. Air Force, 1963; *Naval Dictionary of Electronic, Technical, and Imperative Terms*, Bureau of Naval Personnel, 1962; *ADP Glossary*, Department of the Navy, 1967.

**McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, Fourth Edition**

Copyright © 1989, 1984, 1978, 1976, 1974 by McGraw-Hill, Inc. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a data base or retrieval system, without the prior written permission of the publisher.

1 2 3 4 5 6 7 8 9 0    DOW/DOW    8 9 5 4 3 2 1 0 9 8

ISBN 0-07-045270-9

Library of Congress Cataloging-in-Publication Data

McGraw-Hill dictionary of scientific and technical terms.

1. Science—Dictionaries.   2. Technology—Dictionaries.
I. Parker, Sybil P.
Q123.M34       1989       503'/21       88-13490
ISBN 0-07-045270-9

**TB    2**

For more information about other McGraw-Hill materials, call 1-800-2-MCGRAW in the United States. In other countries, call your nearest McGraw-Hill office.

**multiply connected region** [MATH] An open set in the plane which has holes in it  { 'məl·tə·plē kə¦nek·təd 'rē·jən }

**multiply defined symbol** [COMPUT SCI] Common assembler or compiler error printout indicating that a label has been used more than once  { 'məl·tə·plē di¦fīnd 'sim·bəl }

**multipoint line** [COMMUN] A line which is shared by two or more different tributary stations  { 'məl·tə‚pȯint ‚līn }

**multipolar** [ELECTROMAG] Having more than one pair of magnetic poles  { ‚məl·tə'pō·lər }

**multipolar machine** [ELECTROMAG] An electric machine that has a field magnet with more than one pair of poles. { ‚məl·tə'pō·lər mə'shēn }

**multipole** [ELECTROMAG] One of a series of types of static or oscillating distributions of charge or magnetization; namely, an electric multipole or a magnetic multipole  { 'məl·tə‚pōl }

**multipole fields** [ELECTROMAG] The electric and magnetic fields generated by static or oscillating electric or magnetic multipoles.  { 'məl·tə‚pōl ‚fēlz }

**multipole radiation** [PHYS] **1.** Electromagnetic radiation which has characteristics equivalent to those of radiation generated by an oscillating electric or magnetic multipole, and is made up of photons of well-defined angular momentum and parity.  **2.** Internal conversion electrons, or positron-electron pairs having similar characteristics, emitted from an atom when the nucleus makes a transition between two energy states.  { 'məl·tə‚pōl ‚rād·ē'ā·shən }

**multipole transition** [PHYS] A transition between two energy states of an atom or nucleus in which a quantum of multipole radiation is emitted or absorbed  { 'məl·tə‚pōl tran'zish·ən }

**multiport burner** [ENG] A burner having several nozzles which discharge fuel and air.  { 'məl·tə‚pȯrt 'bər·nər }

**multiport memory** [COMPUT SCI] A memory shared by many processors to communicate among themselves.  { 'məl·tə‚pȯrt 'mem·rē }

**multiport network analyzer** [ENG] A linear, passive microwave network having five or more ports which is used for measuring power and the complex reflection coefficient in a microwave circuit. Also known as multiport reflectometer  { 'məl·tə‚pȯrt 'net‚wərk 'an·ə‚līz·ər }

**multiport reflectometer** See multiport network analyzer.  { 'məl·tə‚pȯrt ‚rē‚flek'täm·əd·ər }

**multiprecision arithmetic** [COMPUT SCI] A form of arithmetic similar to double precision arithmetic except that two or more words may be used to represent each number.  { ‚məl·tə·prə'sizh·ən ə'rith·mə‚tik }

**multiprocessing** [COMPUT SCI] Carrying out of two or more sequences of instructions at the same time in a computer  { ‚məl·tə'prä‚ses·iŋ }

**multiprocessing system** See multiprocessor.  { ‚məl·tə'prä‚ses·iŋ ‚sis·təm }

**multiprocessor** [COMPUT SCI] A data-processing system that can carry out more than one program, or more than one arithmetic operation, at the same time. Also known as multiprocessing system.  { ‚məl·tə'prä‚ses·ər }

**multiprocessor interleaving** [COMPUT SCI] Technique used to speed up processing time; by splitting banks of memory each with x microseconds access time and accessing each one in sequence 1/n-th of a cycle later, a reference to memory can be had every x/n microseconds; this speed is achieved at the cost of hardware complexity  { ‚məl·tə'prä‚ses·ər ‚in·tər'lēv·iŋ }

**multiprogramming** [COMPUT SCI] The interleaved execution of two or more programs by a computer, in which the central processing unit executes a few instructions from each program in succession  { ‚məl·tə'prō‚gram·iŋ }

**multiprogramming executive control** [COMPUT SCI] Control program structure required to handle multiprogramming with either a fixed or a variable number of tasks  { ‚məl·tə'prō‚gram·iŋ ig¦zek yəd·iv kən'trōl }

**multipropellant** [AERO ENG] A rocket propellant consisting of two or more substances that are fed separately to the combustion chamber  { ‚məl·tə prə'pel·ənt }

**multipurpose projectile** [ORD] A projectile designed so that the type of payload can be changed; this is accomplished by using prepared loads in canister form and providing a removable base plug to permit change of canister; thus a canister containing colored smoke mixture can be replaced by, for instance, one containing leaflets  { 'məl·tə'pər·pəs prə'jek·təl }

**multiread feeding** [COMPUT SCI] A system of reading

punched cards in which the card passes a sensing station several times and successive fields of the card are read on consecutive machine cycles, enabling several lines to be printed from a single card  Also known as multicycle feeding  { 'məl tē‚rēd ‚fēd·iŋ }

**multiring structure** [ASTRON] A formation on the moon's surface consisting of two or more craters within a larger crater  { 'məl·tə‚riŋ ‚strək'chər }

**multirole programmable device** [CONT SYS] A device that contains a programmable memory to store data on positioning robots and sequencing their motion  { 'məl·tə‚rōl prō¦gram·ə·bəl di'vīs }

**multirope friction winder** [MECH ENG] A winding system in which the drive to the winding ropes is the frictional resistance between the ropes and the driving sheaves  { 'məl·tə‚rōp 'frik·shən ‚wīn·dər }

**multisegment magnetron** [ELECTR] Magnetron with an anode divided into more than two segments, usually by slots parallel to its axis.  { 'məl·tə‚seg·mənt 'mag·nə‚trän }

**multispeed motor** [ELEC] An induction motor that can rotate at any one of two or more speeds, independent of the load.  { 'məl·tə‚spēd 'mōd·ər }

**multistable circuit** [ELECTR] A circuit having two or more stable operating conditions  { 'məl·tə‚stā·bəl 'sər·kət }

**multistage** [ENG] Functioning or occurring in separate steps  { 'məl·tē‚stāj }

**multistage amplifier** See cascade amplifier  { 'məl·tē‚stāj 'am·plə‚fī·ər }

**multistage compressor** [MECH ENG] A machine for compressing a gaseous fluid in a sequence of stages, with or without intercooling between stages  { 'məl·tē‚stāj kəm'pres·ər }

**multistage pump** [MECH ENG] A pump in which the head is developed by multiple impellers operating in series  { 'məl·tē‚stāj 'pəmp }

**multistage queuing** [IND ENG] A situation involving two or more sequential stages in a process, each of which involves waiting in line.  { 'məl·tē‚stāj 'kyü·iŋ }

**multistage rocket** [AERO ENG] A vehicle having two or more rocket units, each unit firing after the one in back of it has exhausted its propellant; normally, each unit, or stage, is jettisoned after completing its firing  Also known as multiple-stage rocket; step rocket.  { 'məl·tē‚stāj 'räk·ət }

**multistatic radar** [ENG] Radar in which successive antenna lobes are sequentially engaged to provide a tracking capability without physical movement of the antenna  { 'məl·tē‚stad·ik 'rā‚där }

**multistation** [COMMUN] Pertaining to a network in which each station can communicate with each of the other stations  { 'məl·tē‚stā·shən }

**multistator watt-hour meter** [ELEC] An induction type of watt-hour meter in which several stators exert a torque on the rotor  { 'məl·tē‚stād·ər 'wat ‚aúr ‚mēd·ər }

**multistrip coupler** [ELECTR] A series of parallel metallic strips placed on a surface acoustic wave filter between identical apodized interdigital transducers; it converts the spatially nonuniform surface acoustic wave generated by one transducer into a spatially uniform wave received at the other transducer, and helps to reject spurious bulk acoustic modes  { 'məl·tə‚strip 'kəp·lər }

**multisystem coupling** [COMPUT SCI] The electronic connection of two or more computers in proximity to make them act as a single logical machine  { 'məl·tə‚sis·təm 'kəp·liŋ }

**multisystem network** [COMPUT SCI] A data communications network that has two or more host computers with which the various terminals in the system can communicate  { 'məl·tə‚sis·təm 'net‚wərk }

**multitape Turing machine** [COMPUT SCI] A variation of a Turing machine in which more than one tape is permitted, each tape having its own read-write head  { 'məl·tē‚tāp 'tür·iŋ mə‚shēn }

**multitask operation** [COMPUT SCI] A sophisticated form of multijob operation in a computer which allows a single copy of a program module to be used for more than one task  { 'məl·tē‚task ‚äp·ə'rā·shən }

**multithreading** [COMPUT SCI] A processing technique that allows two or more of the same type of transaction to be carried out simultaneously.  { 'məl·tə‚thred·iŋ }

**multitrack operation** [COMPUT SCI] The selection of the next read/write head in a cylinder, usually indicated by bit zero of

# EXHIBIT B

# Ninth New Collegiate Dictionary

*A Merriam-Webster*®

MERRIAM-WEBSTER INC., *Publishers*
Springfield, Massachusetts, U.S.A.

**TB   4**



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1988 by Merriam-Webster Inc

Philippines Copyright 1988 by Merriam-Webster Inc.

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's ninth new collegiate dictionary.

  Includes index.
  1  English language—Dictionaries.   I  Merriam-
Webster Inc
PE1628 W5638      1988        423        87-24041
ISBN 0-87779-508-8
ISBN 0-87779-509-6 (indexed)
ISBN 0-87779-510-X (deluxe)

Webster's Ninth New Collegiate Dictionary principal copyright 1983

COLLEGIATE trademark Reg. U S  Pat  Off.

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying. taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

282930RMcN88

**TB  5**

**910    polaron • political**

po-lar-on \'pō-lə-,rän\ n [ISV polar + ¹-on] (1946) : a conducting electron in an ionic crystal together with the induced polarization of the surrounding lattice

pol-der \'pōl-dər, 'päl-\ n [D] (1604) : a tract of low land reclaimed from a body of water (as the sea)

¹pole \'pōl\ n [ME, fr. OE pāl stake, pole, fr. L palus stake; akin to L pangere to fix — more at PACT] (bef. 12c) 1 a : a long slender usu. cylindrical object (as a length of wood) b : a shaft which extends from the front axle of a wagon between wheelhorses and by which the wagon is drawn : TONGUE c : a long staff of wood, metal, or fiberglass used in the pole vault 2 a : a varying unit of length; esp : one measuring 16½ feet (5.03 meters) b : a unit of area equal to a square rod (25.293 square meters) 3 : a tree with a breast-high diameter of from 4 to 12 inches (10 to 30 centimeters) 4 : the inside front row position on the starting line for a race

²pole vb poled; pol-ing vi (ca 1753) 1 : to act upon with a pole 2 : to impel or push with a pole ~ vi 1 : to propel a boat with a pole 2 : to use ski poles to gain speed

³pole n [ME pool. fr. L polus, fr. Gk polos pivot, pole; akin to Gk kyklos wheel — more at WHEEL] (14c) 1 : either extremity of an axis of a sphere and esp. of the earth's axis 2 a : either of two related opposites b : a point of guidance or attraction 3 a : one of the two terminals of an electric cell, battery, or dynamo b : one of two or more regions in a magnetized body at which the magnetic flux density is concentrated 4 : either of two morphologically or physiologically differentiated areas at opposite ends of an axis in an organism or cell — see BLASTULA illustration 5 a : the fixed point in a system of polar coordinates that serves as the origin b : the point of origin of two tangents to a conic section that form a polar — spoken apart : as diametrically opposed as possible (the two voters were poles apart on that issue)

Pole \'pōl\ n [G, of Slavic origin; akin to Pol Polak Pole] (1589) 1 : a native or inhabitant of Poland 2 : a person of Polish descent

¹pole-ax \'pō-,laks\ n [ME polax, pollax, fr. pol. pole poll + ax] (14c) 1 a : battle-ax with short handle and often a hook or spike opposite the blade; also : one with a long handle used as an ornamental weapon 2 : an ax used in slaughtering cattle

²poleax vt (1882) : to attack, strike, or fell with or as if with a poleax

pole bean n (1770) : a cultivated bean that is usu. trained to grow upright on supports

pole-cat \'pōl-,kat\ n. pl polecats or polecat [ME poleat, prob. fr. MF poul. pol cock + ME cat; prob. fr. its preying on poultry — more at PULLET] (14c) 1 : a European carnivorous mammal (Mustela putorius) of which the ferret is considered a domesticated variety 2 : SKUNK

pole horse n (1823) 1 : a horse harnessed beside the pole of a wagon 2 : the horse having a starting position next to the inside rail in a harness race

poleis pl of POLIS

pole-less \'pōl-ləs\ adj (1647) : having no pole

po-lem-ic \pə-'lem-ik\ n [F polémique, fr. MF, fr. polemique controversial. fr. Gk polemikos warlike, hostile, fr. polemos war; akin to OE ealfelo baleful, Gk pallein to brandish] (1638) 1 a : an aggressive attack on or refutation of the opinions or principles of another b : the art or practice of disputation or controversy — usu. used in pl. than or in pl. in constr. 2 : an aggressive controversialist : DISPUTANT — po-lem-i-cist \-'lem-ə-səst\ n

po-lem-i-cal \-i-kəl\ also polem-ic \-ik\ adj (1640) 1 : of, relating to, or being a polemic : CONTROVERSIAL 2 : engaged in or addicted to polemics : DISPUTATIOUS — po-lem-i-cal-ly \-i-k(ə-)lē\ adv

po-lem-i-cize \-'lem-ə-,sīz\ vi -cized; -ciz-ing (1950) : to engage in controversy : deliver a polemic

po-lem-ist \pə-'lem-əst, 'päl-ə-məst\ n [irreg. fr. polemic] (1825) : one skilled in or given to polemics

po-lem-ize \'päl-ə-,mīz\ vi -mized; -miz-ing (1828) : POLEMICIZE

pol-e-mo-ni-um \,päl-ə-'mō-nē-əm\ n [NL, fr. Gk polemōnion. a plant] (1900) : JACOB'S LADDER

po-len-ta \pō-'lent-ə, pə-, 'len-,tä\ n [It, fr. L, pearl barley — more at POLLEN] (1598) : mush made of chestnut meal, cornmeal, semolina. or farina

pol-er \'pō-lər\ n (ca 1864) : one that poles; esp : one that poles a boat

pole-star \'pōl-,stär\ n (1555) 1 : NORTH STAR 2 a : a directing principle : GUIDE b : a center of attraction

pole vault n (ca. 1890) : a vault with the aid of a pole; specif : a field event consisting of a vault for height over a crossbar — pole-vault vi — pole-vault-er n

pole-ward \'pōl-wərd\ adv or adj (1875) : toward or in the direction of a pole of the earth (as the sun moves ~ /~ variation in temperature)

¹po-lice \pə-'lēs\ vt po-liced; po-lic-ing (1589) 1 archaic : GOVERN 2 : to control, regulate, or keep in order by use of police 3 : to make clean and put in order 4 : to supervise the operation, execution, or administration of or prevent or detect and prosecute violations of rules and regulations b : to exercise such supervision over the policies and activities of 5 : to perform the functions of a police force in or over

²police n. pl police often attrib [F, fr. LL politia, government, administration. fr. Gk politeia, fr. politeuein to be a citizen, engage in political activity. fr. politēs citizen, fr. polis city, state; akin to Skt pur city] (1716) 1 a : the internal organization or regulation of a political unit through exercise of governmental powers esp. with respect to general comfort, health, morals, safety, or prosperity b : control and regulation of affairs affecting the general order and welfare of any unit or area c : the system of laws for effecting such control 2 a : the department of government concerned primarily with maintenance of public order, safety, and health and enforcement of laws and possessing executive, judicial. and legislative powers b : the department of government charged with prevention. detection, and prosecution of public nuisances and crimes 3 a : POLICE FORCE b pl : POLICEMEN 4 a : a private organization resembling a police force (campus ~) b pl : the members of a private police organization 5 a : the action or process of cleaning and putting in order b : military personnel detailed to perform this function

police action n (1933) : a localized military action undertaken without formal declaration of war by regular forces against persons held to be violators of international peace and order

police court n (1823) : a court of record that has jurisdiction over various minor offenses (as breach of the peace) and the power to bind over for trial in a superior court or for a grand jury persons accused of more serious offenses

police dog n (1908) 1 : a dog trained to assist police (as in drug detection) 2 : GERMAN SHEPHERD

police force n (1838) : a body of trained officers entrusted by a government with maintenance of public peace and order. enforcement of laws. and prevention and detection of crime

police-man \pə-'lē-smən\ n (1801) 1 : a member of a police force 2 : one held to resemble a policeman (making the United States the ~ for the whole wide world — R.B. Long)

police officer n (1800) : a member of a police force

police power n (1827) : the inherent power of a government to exercise reasonable control over persons and property within its jurisdiction in the interest of the general security. health. safety, morals, and welfare except where legally prohibited

police reporter n (1834) : a reporter regularly assigned to cover police news (as crimes and arrests)

police state n (1865) : a political unit characterized by repressive governmental control of political. economic. and social life usu. by an arbitrary exercise of power by police and esp. secret police in place of regular operation of administrative and judicial organs of the government according to publicly known legal procedures

police station n (1846) : the headquarters of the police for a particular locality

po-lice-wom-an \pə-'lē-,swûm-ən\ n (1853) : a woman who is a member of a police force

¹pol-i-cy \'päl-ə-sē\ n, pl -cies often attrib [ME policie, government, policy, fr. MF, government, regulation, fr. LL politia — more at POLICE] (15c) 1 a : prudence or wisdom in the management of affairs : SAGACITY b : management or procedure based primarily on material interest 2 a : definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future decisions b : a high-level overall plan embracing the general goals and acceptable procedures esp. of a governmental body

²policy n. pl -cies [alter. of earlier police, fr. MF, certificate, fr. Olt polizza, modif. of ML apodixa receipt, fr. MGk apodeixis, fr. Gk, proof, fr. apodeiknynai to demonstrate — more at APODICTIC] (1565) 1 : a writing whereby a contract of insurance is made 2 a : a daily lottery in which participants bet that certain numbers will be drawn from a lottery wheel b : NUMBER 7a

pol-i-cy-hold-er \-,hōl-dər\ n (1851) : the owner of an insurance policy

pol-i-cy-mak-ing \-,mā-kiŋ\ n (1942) : the high-level elaboration of policy and esp. of governmental policy — pol-i-cy-mak-er \-kər\ n

policy science n (1950) : a social science dealing with the making of high-level policy (as in a government or business)

po-lio \'pō-lē-,ō\ n (1931) : POLIOMYELITIS

po-lio-my-el-i-tis \,pō-lē-(,)ō-,mī-ə-'līt-əs\ n [NL, fr. Gk polios gray + myelos marrow — more at FALLOW, MYEL] (1878) : an acute infectious virus disease characterized by fever, motor paralysis, and atrophy of skeletal muscles often with permanent disability and deformity and marked by inflammation of nerve cells in the anterior horns of the spinal cord — called also infantile paralysis

po-lio-vi-rus \'pō-lē-(,)ō-,vī-rəs\ n [NL, fr. poliomyelitis + virus] (1953) 1 : an enterovirus that causes in several antigenically distinct forms and is the causative agent of human poliomyelitis

po-lis \'päl-əs\ n, pl po-leis \'päl-,ās\ [Gk — more at POLICE] (1894) : a Greek city-state; broadly : a state or society esp. when characterized by a sense of community

¹-po-lis \p-(ə-)ləs\ n comb form [LL, fr. Gk. fr. polis]: city (megalopolis)

¹pol-ish \'päl-ish\ vb [ME polishen, fr. MF poliss-, stem of polir, fr. L polire] (14c) vt 1 : to make smooth and glossy usu. by friction : BURNISH 2 : to smooth, soften, or refine in manners or condition 3 : to bring to a highly developed, finished, or refined state : PERFECT ~ vi : to become smooth or glossy by or as if by friction — pol-ish-er n

²polish n (1704) 1 a : a smooth glossy surface : LUSTER b : freedom from rudeness or coarseness : CULTURE c : a state of high development or refinement 2 : the action or process of polishing 3 : a preparation that is used to produce a gloss and often a color for the protection and decoration of a surface (furniture ~) (nail ~)

¹Polish \'pō-lish\ adj [Pole] (1674) : of, relating to, or characteristic of Poland, the Poles, or Polish

²Polish n (1784) : the Slavic language of the Poles

polish off vt (1829) : to finish off or dispose of rapidly or completely

pol-it-bu-ro \'päl-ət-,byü(ə)r-ō, 'pō-lət-, pə-'lit-\ n [Russ politbyuro, fr. politicheskoe byuro political bureau] (1925) : the principal policy-making and executive committee of a Communist party

po-lite \pə-'līt\ adj [L politus, fr. pp. of polire] (1501) 1 a : of, relating to, or having the characteristics of advanced culture b : marked by refined cultural interests and pursuits esp. in arts and belles lettres 2 a : showing or characterized by correct social usage b : marked by an appearance of consideration, tact, deference, or courtesy c : marked by a lack of roughness or crudities (uses terms seldom met with in ~ literature) syn see CIVIL — po-lite-ly adv — po-lite-ness n

po-li-tesse \,päl-i-'tes, ,pō-li-\ n [F, fr. MF, fr. OIt pulitezza. fr. pulito, pp. of polire to polish, clean- fr. L polire] (1717) : formal politeness : DECOROUSNESS

pol-i-tic \'päl-ə-,tik\ adj [ME politik. fr. MF politique, fr. L politicus, fr. Gk politikos, fr. politēs citizen — more at POLICE] (15c) 1 : POLITICAL 2 : characterized by shrewdness in managing, contriving, or dealing 3 : sagacious in promoting a policy 4 : shrewdly tactful syn see EXPEDIENT SUAVE

po-lit-i-cal \pə-'lit-i-kəl\ adj [L politicus] (1551) 1 a : of or relating to government. a government, or the conduct of government b : of, relating to, or concerned with the making as distinguished from the administration of governmental policy 2 a : of, relating to, or involving politics and esp. party politics b : adept at, sensitive to, or engrossed in politics (highly ~ students) 3 : organized in governmental terms (~ units) 4 : involving or charged or concerned with acts

**TB  6**

# EXHIBIT C

# Webster's Third New International Dictionary

## OF THE ENGLISH LANGUAGE

## UNABRIDGED



*A Merriam-Webster*

REG U S PAT OFF

*Utilizing all the experience and resources of more than one hundred years of Merriam-Webster® dictionaries*

EDITOR IN CHIEF
PHILIP BABCOCK GOVE, Ph.D.
AND
THE MERRIAM-WEBSTER
EDITORIAL STAFF

MERRIAM-WEBSTER INC., *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.

**TB  7**



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster*® is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

COPYRIGHT © 1986 BY MERRIAM-WEBSTER INC

PHILIPPINES COPYRIGHT 1986 BY MERRIAM-WEBSTER INC.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY
PRINCIPAL COPYRIGHT 1961

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's third new international dictionary of
the English language, unabridged.

Includes index.
1. English language—Dictionaries. I. Gove,
Philip Babcock, 1902–1972. II. Merriam-Webster Inc.
PE1625.W36    1986    423    85-31018
ISBN 0-87779-201-1 (blue Sturdite)
ISBN 0-87779-206-2 (imperial buckram)

*All rights reserved. No part of this work covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, or information storage and retrieval systems—without written permission of the publisher.*

MADE IN THE UNITED STATES OF AMERICA
44AG/KP91

**TB    8**

**MULTIPLICATION TABLE**

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|----|----|----|-----|
| 2 | 4 | 6 | 8 | 10 | 12 | 14 | 16 | 18 | 20 | 22 | 24 |
| 3 | 6 | 9 | 12 | 15 | 18 | 21 | 24 | 27 | 30 | 33 | 36 |
| 4 | 8 | 12 | 16 | 20 | 24 | 28 | 32 | 36 | 40 | 44 | 48 |
| 5 | 10 | 15 | 20 | 25 | 30 | 35 | 40 | 45 | 50 | 55 | 60 |
| 6 | 12 | 18 | 24 | 30 | 36 | 42 | 48 | 54 | 60 | 66 | 72 |
| 7 | 14 | 21 | 28 | 35 | 42 | 49 | 56 | 63 | 70 | 77 | 84 |
| 8 | 16 | 24 | 32 | 40 | 48 | 56 | 64 | 72 | 80 | 88 | 96 |
| 9 | 18 | 27 | 36 | 45 | 54 | 63 | 72 | 81 | 90 | 99 | 108 |
| 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 |
| 11 | 22 | 33 | 44 | 55 | 66 | 77 | 88 | 99 | 110 | 121 | 132 |
| 12 | 24 | 36 | 48 | 60 | 72 | 84 | 96 | 108 | 120 | 132 | 144 |

# EXHIBIT D
# REDACTED

# EXHIBIT E
# REDACTED

# EXHIBIT F
# REDACTED

EXHIBIT G

REDACTED

# EXHIBIT H
# REDACTED

# EXHIBIT I
# REDACTED

EXHIBIT J

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          IN AND FOR THE DISTRICT OF DELAWARE
 3
 4   APPLERA CORPORATION, MDS, INC.,      CIVIL ACTION
     and APPLIED BIOSYSTEMS/MDS SCIEX
 5
          Plaintiffs
 6
          vs
 7
     MICROMASS UK LTD. and
 8   MICROMASS, INC.,
 9        Defendants           NO  2000-105 (RRM)
10                       - - -
11                    Wilmington, Delaware
                      Thursday, December 13, 2001
12                    2:00 o'clock. p m
13                       - - -
14   BEFORE   HONORABLE RODERICK R  McKELVIE, U S D C J
15                       - - -
16   APPEARANCES:
17
          MORRIS, NICHOLS, ARSHT & TUNNELL
18        BY:  JULIA HEANEY, ESQ
19
                    -and-
20
21
22
23                       Valerie J. Cunning
                         Official Court Reporter
24
25
```

Page 2

```
 1   APPEARANCES (Continued):
 2
          KENYON & KENYON
 3        BY:  JAMES GALBRAITH, ESQ.,
          WALTER E. HANLEY, JR., ESQ.,
 4        LEWIS V. POPOVSKI, ESQ.,
          JEFFREY S. GINSBERG, ESQ. and
 5        HUIYA WU, ESQ.
          (New York, New York)
 6
          Counsel for Plaintiffs
 7
          RICHARDS, LAYTON & FINGER
 8        BY:  ROBERT W. WHETZEL, ESQ
 9
                    -and-
10
11
          LATHAM AND WATKINS
12        BY:  JAMES G. HUNTER, ESQ.,
          KENNETH G. SCHULER, ESQ. and
13        KEVIN C MAY, ESQ.
          (Chicago, Illinois)
14
          Counsel for Defendants
15
                       - - -
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2                 P R O C E E D I N G S
 3
 4        (Proceedings commenced in the courtroom,
 5   beginning at 2:00 p m )
 6
 7        THE COURT:  Good afternoon
 8        Shall we do some introductions first?
 9        MS HEANEY:  Good afternoon, your Honor.
10   Julie Heaney, for the plaintiff.
11        We have Walter Hanley, Jim Galbraith, Lewis
12   Popovski and Huiya Wu and Jeffrey Ginsberg, of Kenyon &
13   Kenyon
14        THE COURT:  Okay.  Good afternoon.
15        MR WHETZEL:  Your Honor, Bob Whetzel, for
16   defendant Micromass
17        We're outnumbered by a few, but with me is
18   Jim Hunter, Ken Schuler and Kevin May, from Latham
19        I'd also like to introduce some representatives
20   of Micromass that are in the back of the courtroom.  Mr.
21   Bob Williams, who's Chairman of Micromass, Mr  Norman
22   Lynaugh, who's a Managing Director, David Yorke, who's
23   the I.P. Manager for Micromass
24        THE COURT:  Nice to see everybody.
25        MR. HANLEY:  Your Honor, just one more.  I'd
```

Page 4

```
 1   be remiss in not according the AB/Sciex representative.
 2   Also, we have Andrew Karnakis, who's patent counsel at
 3   AB/Sciex.
 4        THE COURT:  Good.
 5        So why don't I get two victims up and we'll
 6   talk about what we want to do and how we want to do it.
 7   And that lectern is only there because the lawyers during
 8   closing argument end up leaving it there  Usually, it
 9   floats back over here.
10        In light of current conditions, meaning the
11   fact that I bumped you out of this morning to this
12   afternoon, and that we have a number of things to get
13   done, let me make some suggestions, and then we'll see
14   whatever suggestions you have about it.  My thought is
15   that we do claim construction and then, to the extent that
16   we have time left over, we'll let people pick a topic that
17   they'd like to address and we'll just go back and forth on
18   topics.
19        We're not going to get everything done today.
20   I know we've got a trial coming up, pretrial conference
21   coming up, and at least from my perspective the priority
22   is going to be to get claim construction done, get an
23   opinion out as soon as I can and to offer the suggestion
24   we get back together as soon as I get claim construction
25   out and have further argument and see what the claim
```

TB   38

APL 014051

Court Hearing                    Condenselt™                    Thursday, December 13, 2001

Page 17

1  see how that works out
2            MR HUNTER  Starting what time, your Honor?
3            THE COURT  If people come in from out of town,
4  would you rather do it
5            MR HUNTER  I think we're afraid to try it on
6  the day in question, so the morning would be fine
7            MR HANLEY  That's fine with us
8            THE COURT  That may be a snow day, too
9            MR HUNTER: Another reason we're afraid
10           THE COURT  In between now and January 31st,
11 any time anybody wants to talk about a case, we can get
12 together on the phone and have the conversation about it.
13           I expect I will get claim construction out in
14 time for everybody to get it and read it and digest it
15 before the 31st
16           MR. HUNTER: Thank you, your Honor
17           MR HANLEY: Thank you, your Honor, very much
18           THE COURT: Claim construction.
19           MR HANLEY: Right
20           THE COURT: How do you want to do it?
21           MR HANLEY: I think we're the plaintiffs, it's
22 our patent  Our proposal would be we go first  We have a
23 very minor subset of the issues, 20 issues before the
24 Court because, if we attempted to address everything, we
25 think it would be like fast-forwarding through a movie.

Page 18

1  And so we have a couple of issues we want to address and
2  use our time to do that
3            THE COURT: All right  Do you have any comments
4  on what you'd like to do?
5            MR. HUNTER: I'm content for plaintiffs to go
6  first, your Honor
7            THE COURT: All right  Typically, what I do is
8  pick an issue and have each side talk about it  I don't
9  want to prevent one side from making the presentation they
10 want to make.
11           So why don't we start with them making
12 plaintiffs' presentation  If you want to engage them,
13 great  If you want to just do your presentation, fine.
14           In terms of where I am on preparation, I've
15 been on a death March of trials for about a month, and so
16 you should assume I start with a blank slate on views
17 about the relations of the parties  And it's not that we
18 aren't familiar with what the issues are, it's just that
19 I can't tell you that I'm going to engage you too much in
20 it, because I've been distracted. All right?
21           MR HUNTER: Thank you, your Honor
22           THE COURT: So that may be good or bad
23           MR HANLEY: All right  May it please the
24 Court, as I said, I intend to address a minor subset  Not
25 minor in the sense of importance, believe me, but we have

Page 19

1  some 20-plus terms  And what I would like to present in
2  terms of the claim construction issues is argument on
3  just two of them  They are what I will call the first and
4  second issue, and they're also -- the second one is the
5  meaning of the means for maintaining cometic energies of
6  ions at a relatively low level
7            So I intend to talk about what is in elements
8  1A, 1C and 1K of Claim 1 and their corresponding terms to
9  some degree in Claim 14 as well, which are two independent
10 claims
11           I start with a precept that I think we can
12 all agree on, and that is claims are construed from the
13 standpoint of a person of ordinary skill in the art  And
14 that being the case, it seems to us that a patent,
15 typically, would be read by the person of ordinary skill
16 in the art from the beginning to the end. So from that
17 sense, what I'd like to do by way of background and also
18 by way of foundation for some of the remarks when we get
19 to the terms in particular, is talk a bit about the
20 invention as it's described in the specification
21           So, first, I would like to start with Figure
22 12, which is one of the two preferred embodiments of the
23 mass spectrometer that is operated in the manner described
24 in the patent in order to achieve the improved ion
25 transmission

Page 20

1            Looking at Figure 12, what we've done, just to
2  have a convention that will not confuse us in comparing
3  this to other things, including prior art, if we get to
4  that, is have the -- we reverse the figure so that the ion
5  flow goes from left to right, instead of right to left, as
6  it's shown in the patent  But, other than that, this is
7  figures with the numbers that appear on it in the patent.
8            And starting at the beginning on the left here,
9  we have what is referred to in the patent as the ion
10 source, 16 prime  This is where the ions are generated
11 Analyte substance that is to be analyzed is ionized and
12 then the ions traverse a path through the instrument to
13 this destination  And this is the mass filter for the
14 ions  The mass filter essentially does what the name
15 implies: It will filter out ions, depending on their mass-
16 to-charge ratio, and permit some ions to pass through to
17 this detector, which is shown schematically here (indicating)
18 for analysis, and basically inject all the other ions that
19 are not of interest.
20           And the mass filter can be tuned by adjusting
21 the DC voltage so that a mass, ions of a mass-to-charge
22 ratio in a particular range can be examined by passing
23 them to the detector for analysis.
24           Now, the manner in which this operates is --
25 it's not at the core of the patent here  This is not a

Applera, et al. vs. Micromass, et al., CA No. 2000-105 (RRM)                    Page 17 - Page 20

TB    39

APL 014055

Court Hearing                    Condenselt™            Thursday, December 13, 2001

Page 37

1  before the Quattro Ultima was designed, there was some
2  correspondence between the parties regarding another
3  instrument or at least an instrument in development about
4  which Micromass had published a paper. In the course of
5  that correspondence, a letter was written back identifying
6  certain prior-art references. And Micromass has said in
7  their brief that at that time -- this is in 1997 -- they
8  read the claims, in particular, these terms, the very same
9  way that we read them and are urging the Court, how we're
10 urging the Court to construe them.
11       Do we have their brief?
12       This is in Micromass' opening brief. And the
13 Micromass points out that, this is in the context of
14 discussing this 1997 correspondence. They say, Micromass
15 suggested that, for purposes of evaluating the validity of
16 the '736 patent, one could ignore the precise arithmetic
17 sequence and location of the rod sets and vacuum chambers
18 in the prior art, so long as the second vacuum chamber
19 and rod set followed the first vacuum chamber and rod set.
20 As noted, that is the very claim construction plaintiffs
21 urge the Court to adopt herein.
22       So back in 1997, they didn't view the plain
23 meaning of these terms to confine them to the very first
24 and the very second. They believed that the construction
25 was as we now urged it in this case.

Page 38

1       So we submit that the plain meaning argument
2  really does not apply here. That, in fact, the plain
3  meaning of the terms is as we had proposed. And the
4  question then becomes: Did that change? Did the
5  re-examination prosecution change what was otherwise
6  plain meaning and the scope of these terms?
7       And to put it in perspective, it's useful to
8  look at the standard that the Court applies in examining
9  now the question of whether or not the re-examination
10 prosecution changed the scope of the claims from what it
11 was when they were issued.
12       This is a page from the York Products versus
13 Central Tractor case, which we cited, and in the opinion,
14 the Court says, unless altering claim language to escape
15 an examiner rejection. Okay.
16       So unless there is an amendment to the claims,
17 a patent applicant only limits claims during prosecution
18 by clearly disavowing claim coverage.
19       Now, in this case, as in York Products, there
20 was no claim amendment.
21       So that being the case, there's no amendment
22 in the original prosecution and none in the re-examination.
23 That being the case, the standard that we apply in looking
24 at the re-examination prosecution is: Was there a clear
25 disavowal of claim coverage? And we submit that one reads

Page 39

1  the re-examination prosecution and one does not find it
2  clear to disavow the claim coverage by any means.
3       Now, the argument that Micromass relies on
4  primarily are arguments that were made in the request for
5  re-examination that initiated a re-examination proceeding.
6  And they rely in particular on arguments that were
7  directed to three prior-art references. One was the
8  so-called French application. One was the Caldecourt
9  article. And the other was the Finnigan article.
10      And in all that, a similar set of arguments
11 were made in distinguishing each because basically
12 they're similar. The apparatus in each case is a so-called
13 tandem mass spectrometry, and one that has a three-stage
14 mass analyzer.
15      So the points that were being made, since the
16 instruments in these references operated similarly, the
17 points that were being made by way of distinction are
18 similar points. And so I think it's sufficient here to
19 look at the arguments that were made concerning the French
20 application, that those appear to be -- that the primary
21 emphasis is on Micromass' position that there was a
22 narrowing of claims.
23      So if we can have -- let's take a look at
24 French first.
25      This is a Figure 1 from the French application,

Page 40

1  which was before the patent examiner in their
2  re-examination. And just for ease of illustration, we've
3  colored up some of the sections of this.
4       We see, looking at the instrument in toto, on
5  the left-hand side, we see what's labeled an ion source
6  36, and then an aperture 34 to which ions pass into this
7  housing, which has basically three stages. And three
8  stages we colored in green, red in the middle and blue at
9  the end.
10      But the first stage, which we colored green
11 here, is a mass filter for the ions that are generated in
12 the source.
13      This is a quadrupole and consists of four rods.
14 Has the AC and DC voltages applied to it. Its function,
15 again, is to filter out ions that are not of interest,
16 that are generated in a source.
17      We then pass to the -- this middle stage,
18 which is called a collision cell. And the function of
19 the collision cell is to take the ions that pass
20 through this initial mass filtering stage and to fragment
21 them into fragments or daughter ions, and they are then
22 passed onto the -- a second mass filtering stage, that
23 we've colored in blue, and there, that mass filtering
24 stage will select from the fragments, fragments of a
25 ratio that are of interest to analysis. They're then

Applera, et al. vs. Micromass, et al., CA No. 2000-105 (RRM)          Page 37 - Page 40

Page 105

1  a half millitorr and higher.
2      Now, there's a pressure and voltage discussion.
3  And what does it say? You got between 40 and a hundred
4  and more than two and a half millitorr? We have 2,460.
5  We're higher than two and a half millitorr by far, and we
6  are 50 to 120 volts. The only thing that the patent
7  discloses is if you do what we do, you can't practice the
8  invention. The only place pressure is discussed in
9  conjunction with voltage at the same time.
10      One owe one. The ion tunnel.
11      Next? This is the ion tunnel. This is not a
12  rod set, your Honor, but the plaintiffs accuse it of being.
13  It is our current product. The first two rod sets in the
14  Quattro Ultima have been replaced by this device.
15      Next?
16      The claim requires, the Claims both 1 and 14,
17  a first rod set, which are elongated rods. They have to
18  be elongated, spaced laterally apart, spaced laterally
19  apart.
20      Back one.
21      They are not elongated. I think they're about
22  a quarter of -- quarter of a centimeter? Millimeter? How
23  many? Okay. They are not elongated, your Honor. They're
24  very thin.
25      This is the whole length of the original rod

Page 106

1  set. These are very thin. They are not spaced laterally
2  apart. They are spaced longitudinally apart.
3      Now, 105 Schaff is an ion trap. The
4  plaintiffs admit, admitted in the Patent Office and
5  admitted in this case, the Schaff has electrodes. They
6  wanted to distinguish Schaff because it discloses
7  collisional focusing. What did they say? Schaff differs
8  from the invention in that, for instance, it does not
9  disclose the application of AC-only voltage to the first
10  rod set. But Schaff does apply AC-only voltage to its
11  electrodes, as they admit and the reference discloses.
12  The Schaff ion electrodes have AC-only voltage applied to
13  them and they use quite a high pressure and they collision
14  naturally focus the ions in order to trap them, the very
15  basis of this patent. So they want to distinguish it.
16  It doesn't disclose AC-only voltage to the first rod set.
17  Well, it does disclose AC-only voltage to the electrodes,
18  the rod sets to the electrodes.
19      This statement can only be true if the patent
20  requires that the only electrode that you apply AC-only
21  voltage to is a rod set, because if you could apply
22  AC-only voltage to something other than a rod set, and
23  infringe the patent, Schaff is prior art that can't be
24  distinguished on this basis.
25      They admit that they -- that Schaff has

Page 107

1  AC only voltage, but they say its electrode isn't a rod
2  set.
3      So in the re-exam, to get away from the ion
4  traps, they say we have rod sets. Well, we don't have rod
5  sets in the ion tunnel, your Honor.
6      And 107?
7      See what Dr Douglas has to say when you say
8  to him, talking about that statement about Schaff: You
9  understand, as one working in the field of mass
10  spectrometry, that that refers to the -- that, meaning
11  the Schaff statement, refers to the application of RF
12  voltages, RF or AC's, RF voltages to the trap electrodes;
13  correct?
14      Yes.
15      And you would agree with me that this
16  statement, then, at least the portion I am focusing on,
17  is incorrect?
18      Can we go back to that statement, Will? It's
19  No 105.
20      This is the statement. So you would agree
21  with me that this statement is incorrect? Okay. Forward
22  to 107.
23      No, I don't agree. Why not? Because it says
24  the application of AC-only voltage to a rod set. If
25  Schaff had a 3-D trap, it wouldn't have rods, it would he

Page 108

1  a different electrode structure.
2      We don't have rods. We have ion tunnels.
3      108? And here they are. This is what
4  plaintiffs say is our first rod set (indicating). By the
5  way, this is what is the second (indicating).
6      109. On top of that, not only is it not a rod
7  set, but the ion tunnel generates field in three
8  dimensions. Longitudinally, radially, upward. Both
9  radially, but horizontally and vertically.
10      Rod sets don't do that. Rod sets generate a
11  field in only two dimensions.
12      In their answering brief to our summary
13  judgment motion, with regard to the ion tunnel, the
14  plaintiffs make much of the fact that when they were
15  distinguishing Schaff, all they were really saying was
16  not that it was an electrode point, it was had a that
17  Schaff is an ion trap and, therefore, it generates fields
18  in three dimensions. When they said that in their
19  answering brief, they missed the fact that that is also
20  true for the ion tunnel.
21      So their explanation of what they were sayin~
22  about Schaff, even if it were true, would still exclue
23  the ion tunnel from being something that this claim
24  language can read on, because the ion tunnel has
25  three-dimensional electric field, just as Schaff does.

Court Hearing                 CondenseIt™                 Thursday, December 13, 2001

Page 137

1    I'm puzzled by the argument concerning the
2    interchamber orifice. They have said they initially took
3    the position that the interchamber orifice is in a wall.
4    the wall is stated as separating the first and second
5    vacuum chambers. We understood their position to be that
6    that meant that you could only have a wall in between the
7    first and second vacuum chambers and we made arguments
8    directed to that, as to why the claims say, don't say
9    they're separated only by a wall.
10   And in response to that, the defendant said
11   in their answering brief, that's not what we're saying at
12   all. They said, our arguments are misdirected, because
13   Micromass does not claim that the phrase separated by a
14   wall itself rules out inclusion of additional structure.
15   Well, it seems to me now, hearing the
16   argument today, that that phrase does rule out additional
17   structure, and that's just contrary to what they said in
18   their brief.
19   And on the issue of improved transmission of
20   ions, this really is -- it's an issue of fact. Our expert
21   witness, in our Interrogatory Answer, if you read it, it
22   says a way or the ion transmission may be measured by
23   measuring ion current in a manner described.
24   It didn't limit the way in which infringement
25   can be proven. In fact, Dr. Enke, in his expert report,

Page 138

1    addresses that issue and basically says there are --
2    there's evidence that shows that there's collisional
3    focusing in this stage and therefore, as a result of
4    that present, ion transmission is improved.
5    What you've heard today is simply an attempt
6    to raise an issue of fact which, you know, results in --
7    in denial of their motion, not the grant of their motion.
8    So, your Honor, we commend you to the briefs on
9    that point.
10   Now, one other point on this maintaining
11   kinetic energies at a low level. Mr Hunter referred to a
12   passage in the specification where in the inventors
13   explained that when they used DC difference voltages in
14   the range of 40 to a hundred, they had a loss of ions and
15   they went on and said, at 2.5 millitorr and higher, we had
16   this loss of ion significant, with a DC difference voltage
17   in that range.
18   What Mr. Hunter did not point out was the
19   highest pressure they tested was 70 millitorrs. The
20   inventors weren't saying if you go from 2.5 millitorr up
21   to infinity at these voltages, you'll get decreased ion
22   transmission. They were saying within the context of the
23   experiments we conducted, where we had a maximum pressure
24   of 70 millitorr, at that voltage range, we had a loss of
25   ion signal.

Page 139

1    In fact, the Quattro Ultima is at a pressure
2    that's much above the highest pressure the inventors
3    tested and, therefore, notwithstanding that they have a
4    higher range of voltages, their ion energy is low, as Mr.
5    Bateman explained in the deposition excerpt that they put
6    up on the screen earlier today.
7    In terms of the ion tunnel issue, it clearly
8    is an issue of fact. We don't contend that there is
9    literal infringement. We contend there's infringement by
10   equivalents.
11   The fact that the Schaff reference, which is
12   an ion trap reference, was distinguished, has no bearing
13   on this. They don't contend that their ion tunnel is an
14   ion trap, like Schaff. And it's not. It's an ion guide,
15   just like the ion guide of the invention. It simply uses
16   a different arrangement to provide the AC field than the
17   rods. The rings, center rings, is equivalent to the rod
18   set in what it does. It basically confines the ions to the
19   cylindrical space defined by the ring set, just as a rod
20   set confines ions to the cylindrical space defined by the
21   rod set. So it does the same thing.
22   It exerts a strong focusing effect.
23   Collisional focusing occurs and, therefore, we contend
24   that it infringes under the doctrine of equivalents.
25   Our expert has addressed that and the presentation in

Page 140

1    their briefs and today simply serves at most to raise an
2    issue of fact for trial.
3    Now, if the Court has any more time, I think
4    there's a couple points we'd like to address on
5    inequitable conduct or we're out of time, we'll simply
6    rest on the briefs.
7    THE COURT: I'm just going to read the briefs,
8    if that's okay. I appreciate it.
9    I'm sorry to bump people.
10   MR. HANLEY: Thank you.
11   THE COURT: Thank you for the presentations.
12   So you'll hear from me. We'll see people in late January.
13   (Court recessed at 6:05 p.m.)
14                - - -
15
16
17
18
19
20
21
22
23
24
25

Applera, et al. vs. Micromass, et al., CA No. 2000-105 (RRM)          Page 137 - Page 140

TB    42

APL 014085

# EXHIBIT K

PUBLIC COPY

Nos. 02-1434, 02-1459

# United States Court of Appeals
## FOR THE FEDERAL CIRCUIT

APPLERA CORPORATION, MDS INC. and APPLIED BIOSYSTEMS/MDS SCIEX,

*Plaintiffs-Appellees,*

MICROMASS UK LTD. and MICROMASS INC.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE, CASE NO. 00-CV-105,
JUDGE RODERICK R. McKELVIE

## BRIEF OF PLAINTIFFS-APPELLEES

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

OCT 1 2002

JAN HORBALY
CLERK

Walter E. Hanley, Jr.
James Galbraith
Lewis V. Popovski
Jeffrey S. Ginsberg
Mark A. Chapman
Huiya Wu
KENYON & KENYON
One Broadway
New York, New York 10004-1050
(212) 425-7200

*Attorneys for Plaintiffs-Appellees*

October 1, 2002

TB   43

reasoning that it would render the claim language "free of adhesive" superfluous.

*Id.* at 704. This Court disagreed, holding that:

> [T]he expression "integrally bonded . . . free of adhesive" operates as a single limitation . . . defining a state of affairs with multiple terms should help, rather than hinder understanding. Being "integrally bonded" and "free of adhesive" are mutually reinforcing definitions rather than being superfluous.

*Id.* at 707. *See also, e.g., Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1302-03 (Fed. Cir. 1997) (declining to find the word "conductive" in the claim element "conductive liquid-like medium" superfluous even though all liquids are conductive).

### B. The District Court's Constructions of "Separated by a Wall" and "Interchamber Orifice" Are Correct

The district court construed "separated by a wall" to mean that "there is at least a wall between the first and second vacuum chambers" and "interchamber orifice" to mean "an orifice in a wall that is between the first and second vacuum chambers." (A120.) Micromass argues that these limitations require that the first and second vacuum chambers be separated only by a single wall, and that the interchamber orifice interconnect the two chambers. (Br. 23-27.) Again, Micromass seeks improperly to limit the claims to the preferred embodiments.

Micromass did not dispute the construction of "separated by a wall" below. Micromass stated that it did not contend that "the phrase 'separated by a wall'

21

itself rules out the inclusion of additional structure." (A8567; A8695; A8718.)

Micromass cannot reverse course on appeal. *Interactive Gift Express, Inc. v.*

*Compuserve, Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001) (waiver doctrine

precludes "a party from adopting a new claim construction position on appeal").

Thus, Micromass's belated argument regarding the construction of "separated by a

wall" should be rejected.

   Moreover, Micromass's arguments are meritless.  First, Micromass contends

that because the abstract and description of the preferred embodiments contain no

explicit suggestion that additional structures may intervene between the first and

second vacuum chambers, the terms "separated by a wall" and "interchamber

orifice" must be construed to preclude them. (Br. 24-25.) Micromass relies on the

statement in reference to Figure 1 that "vacuum chamber 30 is *connected* by an

interchamber orifice in a separator plate 36 to a second vacuum chamber 38." (Br.

24; A357, 4:24-26 (emphasis added).)  This statement, however, merely describes

the preferred embodiment of Figure 1.  It does not purport to define all

architectures in which the invention may be implemented.  A patentee is not

required to disclose all conceivable embodiments of the invention. *CCS Fitness*,

288 F.3d at 1366 ("[Federal Circuit] case law makes clear that a patentee need not

'describe in the specification every conceivable and possible future embodiment of

established "improved transmission," any further evidence of "improved transmission" would have been unnecessary and would not have been presented. AB/Sciex in fact presented other evidence; indeed, Micromass devotes a substantial part of its brief to attacking it. (Br. 42-56.) With respect to prior art, Micromass mischaracterizes Prof. Enke's testimony regarding the absence of improved ion transmission in the prior art collision cells, *e.g.*, the device in the French application. (Br. 36, 41.) Prof. Enke testified that because such a cell does not include a wall with an interchamber orifice to limit the passage of ions between the collision cell rod set and the second mass filter, the gas pressure in the collision cell is immaterial. (A12549-50, A13739-46, A13876-80, A13890-92.) With no orifice to limit the passage of ions, focusing ions into a beam does not improve transmission. (*Id.*)

**B.    Micromass's Proposed Construction of "Improved Transmission of Ions" Is Premised on a Mischaracterization of the Invention of the '736 Patent**

Micromass has modified the construction it urged below by changing the benchmark of comparison from the number of ions that would be transmitted "without practicing the alleged invention" to the number transmitted "without practicing the PL product of the invention." (*Compare* A4537 *to* Br. 37.) The Court should not consider this new construction. *Interactive Gift Express, Inc.,*

33

**TB    46**

Viewing the record as a whole in the light most favorable to AB/Sciex, there

can be no doubt that substantial evidence supports the jury's finding that both

versions of the Quattro Ultima achieve improved transmission of ions through the

interchamber orifice. The evidence certainly is such "as might be accepted by a

reasonable mind as adequate to support the finding under review." *Perkin-Elmer*

*Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

## IV. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING THAT THE ION TUNNEL QUATTRO ULTIMA INFRINGES THE "ROD SET" LIMITATIONS UNDER THE DOCTRINE OF EQUIVALENTS

At trial, AB/Sciex proved that the ion tunnel Quattro Ultima literally meets

each limitation of claims 1 and 14 of the '736 patent except the limitations relating

to the "first rod set." (A13928; A14007-08.) The jury found, however, that the

stacked ring set, *i.e.*, the ion tunnel, is equivalent to the first rod set. (A14008-09.)

Micromass did not dispute, either before or after the verdict, that the ion tunnel

performs the same function as the first rod set. (A13165-67; A13413; A217.)

Micromass's JMOL motion contended that the evidence was insufficient to show

that the ion tunnel guides ions in substantially the same way and achieves

substantially the same result as the first rod set. (A14240-43; A217.) The district

court correctly denied the motion, holding that substantial evidence supported

47

findings that the "way" and "result" elements of the "triple identity" test were met. (A218.) *See Warner-Jenkinson Co., Inc. v. Hilton-Davis Chemical Co.*, 520 U.S. 17, 39-40 (1997).

Here, Micromass takes an entirely different tack. Instead of arguing "way" and "result," Micromass produces a bulleted list of five differences between the ion tunnel and the first rod set and asserts that they are "far more than insubstantial." (Br. 57-58.) Micromass then focuses on one of these differences — that "[w]hereas the claims require 'a plurality of elongated parallel rod means spaced laterally apart' and 'extending longitudinally,' the ion guide of the ion tunnel has a stack of separate ring-shaped electrodes having no lateral spacing and none of which individually extends longitudinally." (Br. 57.) Micromass for the first time asserts that AB/Sciex presented no evidence that the ion tunnel has the equivalent of these claim limitations. (Br. 58.)

First, Micromass did not seek JMOL on this basis; this theory was not presented to the district court, and it cannot be presented for the first time on appeal. *Sage Products*, 126 F.3d at 1426.

Second, Micromass's new theory is completely undercut by the trial record. The record contains ample evidence, which Micromass simply ignores, of the structural equivalence between the ion tunnel and the first rod set. The following

48

**TB   48**

chart shows the correspondence of the ion tunnel to the structure of the first rod

set:

### Claim 1

| | |
|---|---|
| "a plurality of elongated parallel rod means" | The ring set of the ion tunnel forms an elongated structure. (*See, e.g.*, A19733; A18450.) The length of the ring set is 12.5 cm, approximately the same as the length of the rod set in the hexapole Quattro Ultima for which the ring set was substituted. (A12466; A13164; A13259.) |
| "spaced laterally apart a short distance from each other to define an elongated space therebetween" | The rings of the ion tunnel are closely spaced and define an elongated space. (A18450; A12489-90.) Dr. March testified that the ion tunnel, like the first rod set, defines a space with cylindrical symmetry through which ions travel. (A13413.) |
| "extending longitudinally through such rod set" | The space defined by the rings of the ion tunnel extends longitudinally through the ring set. (A19733; A18450.) |

### Claim 14[9]

| | |
|---|---|
| "a plurality of rod means . . . defining [a] longitudinally extending . . . space[]" | The ion tunnel comprises a plurality of rings that define a longitudinally extending space. (A19733; A18450; A12489-90; A13413.) |

---

[9] Micromass does not differentiate between apparatus claim 1 and method claim 14. Claim 14 does not include the same recitations as claim 1 regarding the first rod set.

49

# EXHIBIT L



US00RE34000E

# United States Patent [19]

## Syka et al.

[11] E    Patent Number:    Re. 34,000

[45] Reissued    Date of Patent:    Jul. 21, 1992

[54] **METHOD OF OPERATING ION TRAP DETECTOR IN MS/MS MODE**

[75] Inventors: John E. P. Syka, Sunnyvale; John N. Louris, Santa Clara; Paul E. Kelley; George C. Stafford, both of San Jose; Walter E. Reynolds, Woodside, all of Calif.

[73] Assignee: Finnigan Corporation, San Jose, Calif.

[21] Appl. No.: 499,947

[22] Filed: Mar. 27, 1990

### Related U.S. Patent Documents

Reissue of:
[64] Patent No.: 4,736,101
    Issued: Apr. 5, 1988
    Appl. No.: 84,518
    Filed: Aug. 11, 1987

U.S. Applications:
[63] Continuation of Ser. No. 738.018, May 24, 1985.

[51] Int. Cl.5 .................................... H01J 49/42
[52] U.S. Cl. ............................ 250/292; 250/290; 250/282
[58] Field of Search ...... 250/292, 291, 290, 282

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2.939.952 | 6/1960 | Paul et al. | 250/292 |
| 3.527.949 | 9/1970 | Dawson et al. | 250/292 |
| 4.105.917 | 8/1978 | McIver et al. | 250/291 |
| 4.540.884 | 9/1985 | Stafford et al. | 250/282 |

### OTHER PUBLICATIONS

Fulford et al., *Journal of Vacuum Science and Technology*. 17(4) Jul./Aug. 1980, pp. 829-835.
Mather et al., *Dynamic Mass Spectrometry*, vol. 5, ed. Price et al., 1978, pp. 71-84.
Todd et al., "Quadrupole Ion Traps", *Quadrupole Mass Spectrometry and its Applications*, ed. Dawson, 1976, pp. 181-224.
Dawson, *Quadrupole Mass Spectrometry and its Applications*, 1976, pp. 4-6.
Rettinghaus Z. Angew Phys. 22 (1967), pp. 321-326.
Fischer, Z. Phys. 156 (1959), pp. 1-26.

*Primary Examiner*—Jack I. Berman
*Attorney, Agent, or Firm*—Flehr, Hohbach, Test, Albritton & Herbert

[57]    **ABSTRACT**

A simple and economical method of mass analyzing a sample by means of a quadrupole ion trap mass spectrometer in an MS/MS mode comprises the steps of forming ions within a trap structure, changing the RF and DC voltages in such a way that the ions with mass-to-charge ratios within a desired range will be and remain trapped within the trap structure, dissociating such ions into fragments by collisions and increasing the field intensity again so that the generated fragments will become unstable and exit the trap volume sequentially to be detected. A supplementary AC field may be applied additionally to provide various scan modes as well as dissociate the ions.

19 Claims, 7 Drawing Sheets





FIG.—I



FIG. —2

FIG. —3A

TB   52



## FIG. — 3B



## FIG. — 4



FIG. −5A



FIG. −5B



FIG. − 6A

TB   54



**FIG. — 6B**



**FIG. — 6C**



**FIG. — 6D**

TB    55



## FIG. −7



## FIG. −8A



FIG.—8B



FIG.—8C



FIG.—8D

Re. 34,000

1

## METHOD OF OPERATING ION TRAP DETECTOR IN MS/MS MODE

Matter enclosed in heavy brackets 【 】 appears in the 5 original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

This is a continuation of application Ser. No. 738,018 10 filed May 24, 1985.

The present invention relates to a method of using an ion trap in an MS/MS mode.

Ion trap mass spectrometers, or quadrupole ion stores, have been known for many years and described 15 by a number of authors. They are devices in which ions are formed and contained within a physical structure by means of electrostatic fields such as RF, DC and a combination thereof. In general, a quadrupole electric field provides an ion storage region by the use of a hyper- 20 bolic electrode structure or a spherical electrode structure which provides an equivalent quadrupole trapping field.

Mass storage is generally achieved by operating trap electrodes with values of RF voltage V and its fre- 25 quency f, DC voltage U and device size $r_0$ such that ions having their mass-to-charge ratios within a finite range are stably trapped inside the device. The aforementioned parameters are sometimes referred to as scanning parameters and have a fixed relationship to the mass-to- 30 charge ratios of the trapped ions. For trapped ions, there is a distinctive secular frequency for each value of mass-to-charge ratio. In one method for detection of the ions, these secular frequencies can be determined by a frequency tuned circuit which coupled to the oscillating 35 motion of the ions within the trap, and then the mass-to-charge ratio may be determined by use of an improved analyzing technique.

In spite of the relative length of time during which 40 ion trap mass spectrometers and methods of using them for mass analyzing a sample have been known they have not gained popularity until recently because these mass selection techniques are insufficient and difficult to implement and yield poor mass resolution and limited 45 mass range. A new method of ion trap operation (U.S. Pat. No. 2,939,952 and U.S. patent application Ser. No. 453,351 12- 2982) has overcome most of the past limitations an is gaining popularity as a product called the Ion Trap Detector. 50

It is an object of this invention to provide a new method of operating an ion trap in a mode of operation called MS/MS.

In accordance with the above object there is provided a new method of using an ion trap in an MS/MS 55 mode which comprises the steps of forming and storing ions in the ion trap, mass-selecting them by a mass analyzer, dissociating them by means of collisions with a gas or surfaces, and analyzing fragment ions by means of a mass or energy analyzer. *A supplementary AC field* 60 *may be applied additionally to provide various scan modes for mass detection as well as to dissociate the ions.*

FIG. 1 is a simplified schematic of a quadrupole ion trap along with a block diagram of associated electrical circuits adapted to be used according to the method 65 embodying the present invention.

FIG. 2 is a stability envelope for an ion store device of the type shown in FIG. 1.

2

FIGS 3(A) and 3(B) are spectrograms obtained by a series of experiments with a nitrobenzene sample by using the method of the present invention.

FIG. 4 shows a program that may be used for a notchfilter scan mode with a supplementary voltage.

FIGS. 5(A) and 5(B) are spectrograms obtained with a xenon sample by using the method of FIG. 4.

FIG 6(A) through FIG. 6(D) are spectrograms obtained with a nitrobenzene sample by using the method of FIG. 4.

FIG 7 shows another program for an ion scan mode of the present invention.

FIG. 8(A) through FIG. 8(D) are spectrograms obtained with an n-heptane sample by a series of experiments in which both the methods of FIGS. 4 and 7 are used.

There is shown in FIG. 1 at 10 a three-dimensional ion trap which includes a ring electrode 11 and two end caps 12 and 13 facing each other. A radio frequency voltage generator 14 is connected to the ring electrode 11 to supply a radio frequency voltage V sin ωt (the fundamental voltage) between the end caps and the ring electrode which provides the quadrupole field for trapping ions within the ion storage region or volume 16 having a radius $r_0$ and a vertical dimension $z_0$ ($z_0^2 = r_0^2/2$). The field required for trapping is formed by coupling the RF voltage between the ring electrode 11 and the two end cap electrodes 12 and 13 which are common mode grounded through coupling transformer 32 as shown. A supplementary RF generator 35 is coupled to the end caps 22, 23 to supply a radio frequency voltage $V_2$ sin $ω_2$t between the end caps to resonate trapped ions at their axial resonant frequencies. A filament 17 which is fed by a filament power supply 18 is disposed to provide an ionizing electron beam for ionizing the sample molecules introduced into the ion storage region 16. A cylindrical gate electrode and lens 19 is powered by a filament lens controller 21. The gate electrode provides control to gate the electron beam on and off as desired. End cap 12 includes an aperture through which the electron beam projects. The opposite end cap 13 is perforated 23 to allow unstable ions in the fields of the ion trap to exit and be detected by an electron multiplier 24 which generates an ion signal on line 26. An electrometer 27 converts the signal on line 26 from current to voltage. The signal is summed and stored by the unit 28 and processed in unit 29. Controller 31 is connected to the fundamental RF generator 14 to allow the magnitude and/or frequency of the fundamental RF voltage to be varied for providing mass selection. The controller 31 is also connected to the supplementary RF generator 35 to allow the magnitude and/or frequency of the supplementary RF voltage to be varied or gated. The controller on line 32 gates the filament lens controller 21 to provide an ionizing electron beam only at time periods other than the scanning interval. Mechanical details of ion traps have been shown, for example, U.S. Pat. No. 2,939,952 and more recently in U.S. patent application Ser. No. 454,351 12/29/82 assigned to the present assignee.

The symmetric fields in the ion trap 10 lead to the well known stability diagram shown in FIG. 2. The parameters a and q in FIG. 2 are defined as

$$a = -8 \ eU/mr_0^2\omega^2$$

$$q = 4 \ eV/mr_0^2\omega^2$$

Re. 34,000

3

where e and m are respectively charge on and mass of charged particle. For any particular ion, the values of a and q must be within the stability envelope if it is to be trapped within the quadrupole fields of the ion trap device.

The type of trajectory a charged particle has in a described three-dimensional quadrupole field depends on how the specific mass of the particle, m/e, and the applied field parameters, U, V, $r_0$ and $\omega$ combined to map onto the stability diagram. If the scanning parameters combine to map inside the stability envelope then the given particle has a stable trajectory in the defined field. A charged particle having a stable trajectory in a three-dimensional quadrupole field is constrained to a periodic orbit about the center of the field. Such particles can be thought of as trapped by the field. If for a particle m/e, U, V, $r_0$ and $\omega$ map outside the stability envelope on the stability diagram, then the given particle has an unstable trajectory in the defined field. Particles having unstable trajectories in a three-dimensional quadrupole field obtain displacements from the center of the field which approach infinity over time. Such particles can be thought of as escaping the field and are consequently considered untrappable.

For a three-dimensional quadrupole field defined by U, V, $r_0$ and $\omega$, the locus of all possible mass-to-charge ratios maps onto the stability diagram as a single straight line running through the origin with a slope equal to −2 U/V. (This locus is also referred to as the scan line.) That portion of the loci of all possible mass-to-charge ratios that maps within the stability region defines the region of mass-to-charge ratios particles may have if they are to be trapped in the applied field. By properly choosing the magnitude of U and V, the range of specific masses to trappable particles can be selected. If the ratio of U to V is chosen so that the locus of possible specific masses maps through an apex of the stability region (line A of FIG. 2) then only particles within a very narrow range of specific masses will have stable trajectories. However, if the ratio of U to V is chosen so that the locus of possible specific masses maps through the middle of the stability region (line B of FIG. 2) then particles of a broad range of specific masses will have stable trajectories.

According to the present invention, the ion trap of the type described above is operated as follows: ions are formed within the trap volume 16 by gating a burst of electrons from the filament 17 into the trap. The DC and RF voltages are applied to the three-dimensional electrode structure such that ions of a desired mass or mass range will be stable while all others will be unstable and expelled from the trap structure. This step may be carried out by using only the RF potential so that the trapped ions will lie on a horizontal line through the origin in the stability diagram of FIG. 2 (a=0). The electron beam is then shut off and the trapping voltages are reduced until U becomes 0 in such a way that the loci of all stably trapped ions will stay inside the stability region in the stability diagram throughout this process. The value of q must be reduced sufficiently low so that not only the ions of interest but any fragment ions which are formed therefrom in a subsequent dissociation process to be described below will also remain trapped (because a lower mass-to-charge ratio means a large q value).

In the dissociation step, the ions of interest are caused to collide with a gas so as to become dissociated into

4

fragments which will remain within the trap, or within the stability region of FIG. 2. Since the ions to be fragmented may or may not have sufficient energy to undergo fragmentation by colliding with a gas, it may be necessary to pump energy into the ions of interest or to cause them to collide with an energetic or excited neutral species so that the system will contain enough energy to cause fragmentation of the ions of interest. The fragment ions are then swept from the trap by the RF voltage along the horizontal line a=0 in FIG. 2 so as to be detected.

Any of the known ways of producing energetic neutral species may be used in the preceding step. Excited neutrals of argon or xenon may be introduced from a gun, pulsed at a proper time. A discharge source may be used alternatively. A laser pulse may be used to pump energy into the system, either through the ions or through the neutral species.

In what follows, there will be shown results of experiment for determining in the case of nitrobenzene ions (with molecular weight M=123 and degree of ionization Z=1) what fragment ions (daughter ions), what fragment ions of fragment ions (granddaughter ions), etc. will arise when dissociation of the parent ions is induced by collisions with a background gas such as argon and the resultant ions out of the ion trap are scanned to determine their mass spectrum.

FIG. 3(A) is an electron ionization mass spectrogram of nitrobenzene. Line M/Z=124 arises from an ion-molecule reaction which adds a proton to M/Z=123.

Operating in the mode with U=0 and with 1×10⁴ torr of Ar, the RF voltage was adjusted first such that only ions with M/Z greater than 120 would be stored in the ion trap at the end of sample ionization. The RF voltage was then lowered such that the cut-off value would be M/Z=20 so that ions with M/Z above this value would be trapped or stable in the ion trap. Parent ions with M/Z=123 which remained trapped in the ion trap after ionization collided with a background gas of argon and dissociated. Next the RF was scanned up and the mass spectrogram shown in FIG. 3(B) was obtained, representing the ions produced from the parent with M/Z=123.

A variety of new scan modes becomes possible with the superposition of an AC field such as an RF field. For any ion stored in the ion trap, the displacement in any space coordinate must be a composite of periodic function of time. If a supplementary RF potential is applied that matches any of the component frequencies of the motion for a particular ion species, that ion will begin to oscillate along the coordinate with increased amplitude. The ion may be ejected from the trap, strike an electrode, or in the presence of significant pressure of sample or inert damping gas may assume a stable trajectory within the trap of mean displacement greater than before the application of the supplementary RF potential. If the supplementary RF potential is applied for a limited time, the ion may assume a stable orbit, even under conditions of low pressure.

FIG. 4 illustrates a program that may be used for a notch-filter mode. Reference being made to this figure, ions of the mass range of interest are produced and stored in period A, and then the fundamental RF voltage applied to the ring electrode is increased to eject all ions of M/Z less than a given value. The fundamental RF voltage is then maintained at a fixed level which will trap all ions of M/Z greater than another given value (period D). A supplementary RF voltage of ap-

Re. 34,000

5

propriate frequency and magnitude is then applied between the end caps and all ions of a particular M/Z value are ejected from the trap. The supplementary voltage is then turned off and the fundamental RF voltage is scanned to obtain a mass spectrum of the ions that are still in the trap (period E).

FIG. 5(A) shows a spectrum of xenon in which the fundamental RF voltage is scanned as in FIG. 4 but in which a supplementary voltage is not used. FIG. 5(B) shows a spectrum obtained under similar conditions but a supplementary voltage of appropriate frequency and magnitude is used to eject ions of M/Z=131 during period D. FIG. 5(B) shows that these ions are largely removed from the trap. There are many ways of actually using the notch-filter mode. For example, the supplementary RF voltage might be turned on during the ionization period and turned off at all other times. An ion which is present in a large amount would be ejected to facilitate the study of ions which are present in lesser amounts.

Other useful scan modes are possible by using the supplementary field during periods in which the fundamental RF voltage or its associated DC component is scanned rather than maintained at a constant level. For example, if a supplementary voltage of sufficient amplitude and fixed frequency is turned on during period E (instead of during period D), ions will be successively ejected from the trap as the fundamental RF voltage successively produces a resonant frequency in each ion species which matches the frequency of the supplementary voltage. In this way, a mass spectrum over a specified range of M/Z values can be obtained with a reduced maximum magnitude of the fundamental RF voltage or a larger maximum M/Z value may be attained for a given maximum magnitude of the fundamental RF voltage. Since the maximum attainable value of the fundamental RF voltage limits the mass range in the ordinary scan mode, the supplementary RF voltage extends the mass range of the instrument.

Useful scan modes are also possible in which the frequency of the supplementary voltage is scanned. For example, the frequency of the supplementary voltage may be scanned while the fundamental RF voltage is fixed. This would correspond to FIG. 4 with period E absent and the frequency of the supplementary RF voltage being scanned during period D. A mass spectrum is obtained as ions are successively brought into resonance. Increased mass resolution is possible in this mode of operation. Also, an extended mass range is attainable because the fundamental RF voltage is fixed.

The presence of a supplementary RF voltage may induce fragmentation of ions at or near resonance. FIG. 6(A) shows a spectrum of nitrobenzene (with $1 \times 10^{-3}$ torr He) acquired with the scan program of FIG. 4 but without a supplementary RF voltage. All ions of M/Z less than 118 are ejected before and during period B so that the small peak at M/Z=93 must have been formed after period B and before the ejection of ions of M/Z=93 during period E. FIG. 6(B) shows a spectrum obtained under the same conditions except that a supplementary RF voltage at the resonant frequency of M/Z=123 was applied during interval D. The spectrum shows abundant fragment ions at M/Z=93 and 65. Similarly, FIG. 6(C) was acquired as was FIG. 6(A), except that all ions of M/Z less than 88 are ejected before and during period B. FIG. 6(D) was acquired under the same conditions as FIG. 6(C), except that a supplementary RF voltage at the resonant frequency of

6

M/Z=93 was applied during interval D. This spectrum shows an abundant fragment at M/Z=65.

Sequential experiments are possible in which daughter ions are produced with the supplementary RF field and granddaughter ions are then produced from those daughter ions by adjusting the conditions such as voltage or frequency of the fundamental RF field or the supplementary RF field so that the daughter ions are brought into resonance. FIG 7 shows a particular way in which daughter ions may be produced. The frequency of the supplementary RF voltage remains constant but the fundamental RF voltage is adjusted during period DA to bring a particular parent ion into resonance so that granddaughter ions are produced. During period DB, the fundamental RF voltage is adjusted to bring a particular daughter ion into resonance so that granddaughter ions will be produced. FIG. 8(A) shows a spectrum of n-heptane during the acquisition of which the scan program of FIG. 7 was used, except that no supplementary RF voltage was used. Since all ions of M/Z less than 95 were ejected before and during period B, the small peaks at M/Z=70 and 71 must be due to ions that were formed after period B. FIG. 8(B) was obtained by using the scan program shown in FIG 4 with a supplementary frequency at the resonant frequency of M/Z=100. Abundant daughter ions at M/Z=70 and 71 are seen, and less intense peaks at M/Z=55, 56 and 57 are evident. FIG. 8(C) was acquired with the scan program used for FIG. 8(A), except that a supplementary RF voltage was used. The fundamental RF voltage during periods DA and DB, and the frequency of the supplementary RF voltage were chosen so that M/Z=100 was in resonance during period DA so that daughter ions were produced. A particular daughter was M/Z=70 that was produced during period DA was brought into resonance during period DB so that granddaughter ions were produced. These granddaughter ions are evident in FIG. 8(C) as the increased intensities of the peaks at M/Z=55, 56 and 57. FIG. 8(D) is similar to FIG. 8(A) except that M/Z=100 was in resonance during DA, and M/Z=71 was in resonance during DB.

Many other schemes may be used to obtain sequential daughter scans. For example, the frequency of the supplemental RF field may be changed instead of changing the fundamental RF voltage. Also, the trap may be cleared of undesired ions after daughter ions have been produced but before granddaughter ions are produced. Of course, further fragmentation may be induced by sequentially changing the fundamental RF voltage or the frequency of the supplementary RF voltage to bring the products of successive fragmentations into resonance.

The present invention has been disclosed above in terms of only a limited number of examples but various modifications which may be made thereon are still considered within the purview of the present invention. For example, the applied RF voltage need not be sinusoidal but is required only to be periodic. A different stability diagram will result but its general characteristics are similar, including a scan line. In other words, the RF voltage could comprise square waves, triangular waves, etc. The quadrupole ion trap would nevertheless operate in substantially the same manner. The ion trap sides were described above as hyperbolic but the ion traps can be formed with cylindrical or circular trap sides. Any electrode structure that produces an approximate three-dimensional quadrupole field could be used. The

7

Re. 34,000

8

scope of the invention is limited only by the following claims.

What is claimed is:

1. A method of mass analyzing a sample comprising the steps of

defining a trap volume with a three-dimensional quadrupole field adapted to trap ions within a predetermined range of mass-to-charge ratio,

forming or injecting ions within said trap volume such that those within said predetermined mass-to-charge range are trapped within said trap volume,

changing said quadrupole field to eliminate ions having a mass-to-charge ratio other than that of the ions of desired charge-to-mass ratio to be analyzed,

readjusting said quadrupole field to capture daughter ions of said ions of desired charge-to-mass ratio

dissociating or reacting said trapped desired ions such that those of said ions and said daughters within a desired range of mass-to-charge ratio remain trapped within said trap volume, and

then charging the quadrupole field to cause ions of consecutive mass to escape said trap volume for detection.

2. The method of claim 1 wherein said quadrupole field is generated by an ion trap having a ring electrode and spaced end electrodes, said quadrupole field being defined by U=amplitude of a direct current voltage between said end electrodes and said ring electrode, V=magnitude of an RF voltage applied between said ring electrodes, and $\omega = 2\pi \times$ frequency of said RF voltage.

3. The method of claim 2 wherein said step of controlling said quadrupole field is effected by changing one or more of U, V and $\omega$.

4. The method of claim 3 wherein U is changed to 0.

5. The method of claim 1 wherein said step of forming ions is effected by gating a burst of electrons into said trap volume.

6. The method of claim 2 wherein said step of forming ions is effected with U=0.

7. The method of claim 1 further comprising the step of pumping energy into said trapped ions.

8. The method of claim 1 further comprising the step of causing said trapped ions to collide with energetic background particles.

9. The method of claim 1 wherein said step of controlling said quadrupole field and dissociating said trapped ions includes the step of superposing a supplementary AC field.

10. The method of claim 9 wherein said supplementary field is turned on while the intensity of said quadrupole field is fixed.

11. The method of claim 9 wherein said quadrupole field and supplementary field are controlled such that during a first period one of said trapped ions is in resonance and that during a subsequent second period one of fragments of said one ion is in resonance.

12. A method of scanning ions within a predetermined range of mass-to-charge ratio trapped within a trap volume with a three-dimensional quadrupole trap-

ping field, comprising the steps of applying a supplementary AC field superposing and trapping field to *provide a combined trapping field and changing the combined trapping field to successively* eject out of said trap volume those of said ions with particular mass-to-charge ratios, *and detecting said ions*[, and thereafter changing the intensity of said trapping field]

13. The method of claim 12 wherein *the frequency of* said supplementary field is [turned on] *scanned* while the intensity of said trapping field is fixed.

14. The method of claim 12 wherein said supplementary field is turned on while the intensity of said trapping field is [varied] *scanned.*

15. *A method of mass analyzing a sample comprising the steps of*

*defining a trap volume with a three-dimensional quadrupole field adapted to trap ions within a predetermined range of mass-to-charge ratio,*

*forming or injecting ions within said trap volume such that those within said predetermined mass-to-charge range are trapped within said trap volume,*

*applying a supplementary AC field superposing said three-dimensional quadrupole field to form combined fields, and*

*scanning said combined fields to cause ions to consecutive mass-to-charge ratio to escape said trap volume for detection.*

16. *The method of claim 15 wherein the frequency of said supplementary field is scanned while the intensity of said trapping field is fixed.*

17. *The method of claim 15 wherein said supplementary field is turned on while the intensity of said trapping field is scanned.*

18. *The method of claim 17 wherein the frequency of said supplementary field is constant*

19. *A method of mass analyzing a sample comprising the steps of*

*defining a trap volume with a three-dimensional quadrupole field adapted to trap ions within a predetermined range of mass-to-charge ratio, wherein said quadrupole field is generated by an ion trap having a ring electrode and spaced end electrodes, said quadrupole field being defined by U=amplitude of a direct current voltage between said end electrodes and said ring electrode, V=magnitude of an RF voltage applied to said electrodes, and $\omega = 2\pi \times$ frequency of said RF voltage,*

*forming or injecting ions within said trap volume such that those within said predetermined mass-to-charge range are trapped within said trap volume,*

*applying a supplementary AC field superposing said three-dimensional quadrupole field to form combined fields, wherein said supplementary field is defined by V2=magnitude of an RF voltage applied between said end cap electrodes, and $\omega_2 = 2\pi \times$ frequency of said AC field, and*

*controlling the combined fields by changing one or more of U, V, $\omega$ and $\omega_2$ to cause said ions of consecutive mass to escape said trap volume for detection.*

* * * * *

65

TB   61