Thermo's disclosures herein are made without in any way waiving (1) its right to object on the grounds of competency, privilege, relevancy, hearsay, or any other proper ground, (2) its right to object to the use of any information disclosed herein for any purpose, in whole or in part, in any subsequent proceeding in this action or in any other action, or (3) its right to object on any and all proper grounds to any other discovery request or proceeding involving or relating to the subject matter of these disclosures consistent with the Federal Rules of Civil Procedure and the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware.

Thermo's investigation is ongoing and, therefore, it reserves the right to supplement these initial disclosures if and when additional information becomes available.

## I.    Individuals Likely to Have Discoverable Information

Based upon information reasonably available to Thermo at the present time, the following individuals may have discoverable information relevant to disputed facts alleged with particularity in the pleadings:

Current and Former Thermo Employees

Clay Campbell
c/o Thermo Electron Corp.
81 Wyman Street
P.O. Box 9046
Waltham, MA  02454-9046
(781) 622-1000

-- Knowledgeable about the development of Thermo TSQ Quantum products

Alan Schoen
c/o Thermo Electron Corp.
81 Wyman Street
P.O. Box 9046
Waltham, MA  02454-9046
(781) 622-1000

RLF1-2872978-1

-- Knowledgeable about the development of Thermo TSQ Quantum products; named inventor of U.S. Patent No. 6,528,784 (the "'784 patent") and knowledgeable about the design, development, and operation of Thermo products that practice the invention of the '784 patent

> Iain Mylchreest
> c/o Thermo Electron Corp.
> 81 Wyman Street
> P.O. Box 9046
> Waltham, MA  02454-9046
> (781) 622-1000

-- Knowledgeable about the marketing, sales, and operation of Thermo TSQ Quantum products and Thermo products that practice the invention of the '784 patent

> Jean-Jacques Dunyach
> c/o Thermo Electron Corp.
> 81 Wyman Street
> P.O. Box 9046
> Waltham, MA  02454-9046
> (781) 622-1000

-- Named inventor of the '784 patent

> Keqi Tang
> Pacific Northwest National Laboratory
> EMSL, K8-98
> Battelle Boulevard
> P.O. Box 999
> Richland, WA 99352
> (509) 376-2124

-- Named inventor of the '784 patent

AB/Sciex Employees

-- Present and former employees of AB/Sciex knowledgeable about the design, development, construction, operation, sales, and marketing of the accused AB/Sciex products and of the '784 patent and AB/Sciex's actions with respect thereto

-3-

Other Parties

Donald Douglas
University of British Columbia
2329 West Mall
Office Chemistry A129
Vancouver, British Columbia, Canada V6T 1Z4
(604) 822-3057

-- Named inventor of U.S. Patent No. 4,963,736 (the "'736 patent")

John Barry French
Present address unknown

-- Named inventor of the '736 patent

Richard J. Parr
Bereskin & Parr
40 King Street West, 40th Floor
Toronto, Ontario, Canada
M5H 3Y2
(416) 957-1686

-- Prosecuting attorney for the '736 patent

John S. Pratt
Kilpatrick Stockton LLP
Suite 2800
1100 Peachtree Street
Atlanta, GA 30309-4530
(404) 815-6367

-- Prosecuting attorney for the '736 patent during re-examination

Geoff L. Sutcliffe
BellSouth Intellectual Property Management Corp.
1155 Peachtree St Ste 500
Atlanta, GA 30309
(404) 249-2790

-- Prosecuting attorney for the '736 patent during re-examination

Aldo J. Test

-4-

RLF1-2872978-1

Dorsey & Whitney LLP
850 Hansen Way
Suite 200
Palo Alto, CA 94304-1017
(650) 565-2258

-- Prosecuting attorney for the '784 patent


William J. Speranza
Wiggin and Dana
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325
(203) 363-7637

-- Prosecuting attorney for the '784 patent during re-issue proceedings

Waters Corporation
34 Maple Street
Milford, MA  01757
(508) 478-2000

-- Involved in prior litigation regarding the '736 patent in *Applera Corp. v. Micromass UK Ltd.*, Civ. No. 00-105-RRM (D. Del.)

Thermo does not consent to or authorize communication by AB/Sciex with Thermo's current or former employees or consultants.

Thermo reserves the right to seek discovery from, and relating to, other persons that may subsequently become known as persons likely to have discoverable information relevant to the disputed facts.  In addition, Thermo reserves the right to modify the foregoing list and to designate and/or call further witnesses at trial.

## II.     Relevant Documents and Tangible Things

Based upon information reasonably available to Thermo at the present time, Thermo expects that it may use the following categories of documents, data compilations, and tangible things that are in its possession, custody or control to support its claims or any defenses.  These

-5-

RLF1-2872978-1

disclosures do not constitute admissions as to the relevance or admissibility of the identified

materials or a waiver of any attorney-client privilege, work product protection or other applicable

protection or immunity. These documents are currently located at Thermo's offices in San Jose,

California, and at Wilmer Cutler Pickering Hale and Dorr LLP in Boston, Massachusetts.

After entry of a suitable protective order, at a time and place to be mutually agreed upon

by the parties, Thermo will make available the following categories of relevant, non-privileged

documents for inspection or copying:

> Documents relating to the design, manufacture, and operation of
> Thermo TSQ Quantum products.
>
> Documents relating to the sale and marketing of Thermo TSQ
> Quantum products.
>
> Documents relating to the design, manufacture, and operation of
> Thermo products that practice the invention of the '784 patent.
>
> Documents relating to the sale and marketing of Thermo products
> that practice the invention of the '784 patent.
>
> Documents relating to AB/Sciex's accused products and
> AB/Sciex's infringement of the '784 patent.
>
> Prior art to the '736 and '784 patents.
>
> The file history for the '784 patent.
>
> Documents relating to the conception and reduction to practice of
> the invention claimed in the '784 patent.

In addition to the foregoing documents, Thermo expects to discover documents, data

compilations, and tangible things within the possession, custody or control of others, including

AB/Sciex and third parties, upon which Thermo will rely to support its claims or defenses.

RLF1-2872978-1

### III.  Computation of Damages

For the '736 patent, Thermo has not made any claim for monetary damages to date. Thermo only seeks its costs, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

For the '784 patent, Thermo's damages claim is grounded in 35 U.S.C. § 284. At a minimum, Thermo is entitled to recover no less than a reasonable royalty on AB/Sciex's making, using, and selling the patented invention. Thermo will not be able to compute the exact amounts of the lost profits and reasonable royalties patent infringement damages alleged in the pleadings until after such time as it has obtained detailed information from AB/Sciex concerning, at a minimum, the nature, marketing, sales, and licensing of AB/Sciex's accused products. At an appropriate future date, Thermo expects to analyze such information and to prepare an expert report in which its damages computations will be fully disclosed.

Thermo further requests that the Court treble the amount of damages found or assessed in view of AB/Sciex's willful infringement. Thermo also claims interest on any damages awarded and its costs.

Thermo further claims attorneys' fees pursuant to 35 U.S.C. § 285.

### IV.  Insurance

Thermo is presently unaware of any relevant insurance agreements.

-7-

*Kelly E. Farnan*
Frederick L. Cottrell, III (#2555)
Cottrell@RLF.com
Kelly E. Farnan (#4395)
Farnan@RLF.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
Telephone: (302) 651-7700
Attorneys for Thermo Electron Corp.
and Thermo Finnigan LLC

OF COUNSEL:
William F. Lee
Wayne L. Stoner
Stephen M. Muller
Michael R. Dube
Lauren B. Fletcher
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

Dated:  May 6, 2005

-8-

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2005, copies of the foregoing document were

served on the following attorneys at the addresses and in the manner indicated:

**BY HAND DELIVERY**
Josy W. Ingersoll
Adam W. Poff
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19899

**BY FEDERAL EXPRESS**
Walter E. Hanley, Jr.
James Galbraith
Huiya Wu
Kenyon & Kenyon
One Broadway
New York, NY  10004

William G. James, II
Fred T. Grasso
Kenyon & Kenyon
1500 K Street N.W., Suite 700
Washington, DC  2003

*Kelly E. Farnan*
Kelly E. Farnan (#4395)
(Farnan@RLF.com)

DATED:  May 6, 2005

RLF1-2860904-1

# EXHIBIT C

# WILMER CUTLER PICKERING
## HALE AND DORR LLP

July 5, 2005

**By E-mail and Regular Mail**

Jeffrey S. Ginsberg
Kenyon & Kenyon
One Broadway
New York, NY 10004-1007

Stephen M. Muller

60 STATE STREET
BOSTON, MA 02109
+1 617 526 6157
+1 617 526 5000 fax
stephen.muller@wilmerhale.com

Re:    Applera et. al v. Thermo, Civil Action No. 04-1230 (GMS) and related cases

Dear Jeff:

In its interrogatory answers and otherwise, Applera et al. have disclosed prior art and other information allegedly material to the patentability of the Tang patent. Wilmer Hale intends to forward this information (and other information subsequently provided or cited by Applera et al. in this litigation) to Thermo's counsel who is prosecuting the re-issue, for disclosure to the PTO. Please let me know promptly if Applera objects to this course.

Sincerely,

Stephen M. Muller

BALTIMORE    BEIJING    BERLIN    BOSTON    BRUSSELS    LONDON
MUNICH    NEW YORK    NORTHERN VIRGINIA    OXFORD    WALTHAM    WASHINGTON

# EXHIBIT D

**REISSUE LITIGATION -- ART UNIT 2881**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicants | : | Keqi TANG, Alan E. SCHOEN, Jean-Jacques DUNYACH |
| Reissue Serial No. | : | 11/073394 |
| Reissue Filing Date | : | March 4, 2005 |
| For | : | MASS SPECTROMETER SYSTEM INCLUDING A DOUBLE ION GUIDE INTERFACE AND METHOD OF OPERATION |
| Group Art Unit | : | 2881 |
| Examiner | : | **[Unknown]** |

Assistant Commissioner
  for Patents
Washington D.C.  20231

### APPLERA CORPORATION'S PROTEST OF REISSUE APPLICATION SERIAL NO. 11/073394 UNDER 37 C.F.R. § 1.291(a)

S I R:

### INTRODUCTION

Applera Corporation ("Applera") hereby protests Reissue Application Serial No.

11/073394 ("the '394 application"), pursuant to 37 C.F.R. § 1.291(a).  The '394 application was

filed on March 4, 2005 for the reissue of United States Patent No. 6,528,784 B1 ("the '784

patent").  The '784 patent issued from application No. 09/715,815 ("the '815 application") filed

on November 16, 2000.  The '815 application is a continuation-in-part of application No.

09/454,273 filed on December 3, 1999 and now abandoned.  According to a Certificate of

Correction appended to the '784 patent, the '784 patent has been assigned to Thermo Finnigan

LLC ("Thermo").

On February 23, 2005, Thermo filed a lawsuit in the United States District Court for the District of Delaware against Applera, MDS, Inc. and Applied Biosystems/MDS Sciex Instruments alleging infringement of the '784 patent. Thermo asserts that "at least claim 4" of the '784 patent is infringed by the API 5000 mass spectrometer manufactured and sold by the defendants. In addition to asserting that the API 5000 does not infringe, the defendants contend that each claim of the '784 patent is invalid.

The instant reissue proceeding was published in the Official Gazette on May 31, 2005. Pursuant to MPEP §1901.04, Applera's protest is timely as it is being filed within two months after the date of publication in the Official Gazette and before an office action has been issued.

**TABLE OF CONTENTS**

I.    THE INVENTION DESCRIBED IN THE SPECIFICATION OF THE '784
      PATENT                                                                    4

II.   ALL CLAIMS ARE UNPATENTABLE OVER PRIOR ART                                5

      A.    Listing of Prior Art References Pursuant to 37 C.F.R. § 1.291(b)(1)  5

      B.    Explanation of The Relevance of Listed Prior Art References Pursuant
            to 37 C.F.R. § 1.291(b)(2)                                          7

            1.    The Conversion of Solvent Adduct Ions by Collisional
                  Dissociation by Applying a DC Offset Voltage Between Two
                  Electrodes Along the Ion Path Was Known Well Before 1999      8

            2.    The Implementation of Collisional Dissociation Using a
                  Multipole Ion Guide and a Preceding Lens as Electrodes Was
                  Well-Known as of 1999                                         13

            3.    Multistage Multipole Ion Guide Interfaces Were Well-Known
                  as of 1999                                                    16

      C.    Detailed Analysis of the Disclosure in the Prior Art of the Elements of
            the Claims                                                          19

            1.    Claims 1 and 2 Should Be Rejected as Obvious Over Lazar in
                  View of Smith, or Hager in View of Lazar, or Buchanan in
                  View of either Smith or Thomson                               20

            2.    Claim 3 Should Be Rejected as Anticipated by Any of Smith,
                  Kambara, Chowdhury, Kato, Klientop, Thomson, Tomany or
                  Hager                                                         26

            3.    Claims 4-8 Should Be Rejected as Obvious Over Lazar in View
                  of Smith, or Hager in View of Lazar, or Buchanan in View of
                  either Smith or Thomson                                       28

            4.    Claim 9 Should Be Rejected as Anticipated by Hager, or as
                  Obvious Over Lazar in View of Smith, or Buchanan in View of
                  either Smith or Thomson                                       34

III.  NEW CLAIMS 10 AND 17 ARE UNPATENTABLE UNDER THE
      WRITTEN DESCRIPTION REQUIREMENT OF 35 U.S.C. § 112, ¶ 1                   36

APPENDIX (Prior Art Analysis of New Claims 10-42)

3

I.    **THE INVENTION DESCRIBED IN THE SPECIFICATION OF THE '784 PATENT**

The '784 patent is entitled "Mass Spectrometer System Including A Double Ion Guide Interface And Method Of Operation."   Figure 1 depicts a preferred embodiment of the claimed mass spectrometer:



Figure 1 shows a mass spectrometer having an atmospheric pressure ion source in an atmospheric pressure chamber 11 followed by four vacuum chambers 13, 16, 17 and 12, respectively.  Vacuum chambers 16 and 17 each include a RF-only quadrupole ion guide.  A conical skimmer 24 separates vacuum chamber 16 from vacuum chamber 13.  An interchamber lens 18 separates vacuum chamber 16 from vacuum chamber 17.  A lens 36 separates vacuum chamber 17 from the mass analyzer chamber 12 which, in the case of Figure 1, houses a tandem

4

quadrupole mass spectrometer.

The '784 patent specifies the ranges of pressures used in the two ion guide chambers: "As will be explained in accordance with the present invention, the pressure in chamber 16 is below 500 mTorr . . . and the pressure in chamber 17 is below 1 mTorr. '784, col. 4:45-50.

The '784 patent identifies the problem to which the invention is directed:

> As discussed above, solvent adduct ions are formed in the high pressure regions ranging from the atmospheric pressure region to the quadrupole ion guide stages or regions. . . . The formation of adduct ions can significantly reduce the abundance of sample analyte ions which reach the analyzer. Consequently, effective conversion of the adduct ions can greatly enhance the sample ion current and the sensitivity of the mass spectrometer.

'784, col. 5:11-19. The inventors purport to have discovered "that the solvent adduct can be dissociated and converted into sample ions in the second ion guide 28 by applying a small DC offset voltage between the ion guide 28 and the lens 18 to increase the energy of the solvent adduct ions." '784, col. 5:20-24. As explained in the patent, solvent adduct ions are converted into sample ions in the second ion guide by controlling the kinetic energy of the ions such that they have enough kinetic energy in the second ion guide to dissociate the solvent molecules through collisions with neutral gas molecules in the second ion guide:

> A DC voltage source is connected to provide a potential difference between the first lens and the first multipole ion guide or between interchamber lens and the second multipole ion guide or both which defines the ion's translational kinetic energy as it enters the second multipole ion guide. The ion's translational kinetic energy is chosen such that at the vacuum pressure of the second interface chamber adduct ions are converted into sample ions by collision induced dissociation without fragmentation of sample ions . . . .

'784, col. 3:27-38.

## II.    ALL CLAIMS ARE UNPATENTABLE OVER PRIOR ART

### A.    Listing of Prior Art References Pursuant to 37 C.F.R. § 1.291(b)(1)

In accordance with 37 C.F.R. § 1.291(b)(1), Applera lists below the prior art references

on which it relies.  A copy of each reference accompanies this Protest as well as a list of the

references disclosed on Form PTO-1449.

| | |
|---|---|
| **Lazar** | J. M. Lazar et al, "Design of a Time-of-Flight Mass Spectrometer as a Detector for Capillary Electrophoresis," *Analytical Chemistry*, Vol. 69, pp. 3205-3211 (1997) |
| **Smith** | R. D. Smith et al., "Collisonal Activation and Collision-Activated Dissociation of Large Multiply Charged Polypetides and Proteins Produced by Electrospray Ionization," *J. Am. Soc. Mass Spectrom.*, Vol.1, pp. 53-65 (1990) |
| **Hager** | U.S. Patent No. 6,015,972 (J. W. Hager) |
| **Buchanan** | M. V. Buchanan et al., "Continuous Octapole Electrospray Introduction System for FTICR," *46th ASMS Conference on Mass Spectrometry and Allied Topics*, June 1998, at 518 |
| **Thomson** | B. Thomson, "Protein Charge Distribution Studies – From Droplet in Air to Ion in Vacuum," *44th ASMS Conference on Mass Spectrometry and Allied Topics*, 5/12-16/1996 at p. 1092 |
| **Kambara** | H. Kambara et al., "Collision-Induced Dissociation of Water Cluster Ions at High Pressure," *Int'l J. Mass Spectrom. and Ion Physics*, Vol. 25, pp. 129-136 (1977) |
| **Chowdhury** | U.S. Patent No. 4,977,320 (S. K. Chowdhury et al.) |
| **Klientop** | B.L. Kleintop et al., "Analyzing Thermally Labile Compounds in Electrospray Sources Using Heated Capillaries," *43rd ASMS Conference on Mass Spectrometry and Allied Topics*, 5/21-26/1995 at 905. |
| **Kato** | U.S. Patent No. 5,298,743 (Y. Kato) |
| **Tomany** | U.S. Patent No. 5,304,798 (M. J. Tomany et al.) |
| **Beu** | S. C. Beu et al., "Fourier-Transform Electrospray Instrumentation for Tandem High-Resolution Mass Spectrometry of Large Molecules," *J. Am. Soc. Mass Spec.*, Vol. 4, pp. 557-565, 1993 |
| **Jarvis** | S. A. Jarvis et al., "A New Atmospheric Pressure Ionization Orthogonal Acceleration Time of Flight Mass Spectrometer," *45th ASMS Conference on Mass Spectrometry and Allied Topics*, June 1997, at 1193 |

6

## B.     Explanation of The Relevance of Listed Prior Art References Pursuant to 37 C.F.R. § 1.291(b)(2)

The following discussion, and the element-by-element analysis and further discussion in part C and in the Appendix, will serve as Applera's explanation of the relevance of each prior art reference on which it relies in this Protest in accordance with 37 C.F.R. § 1.291(b)(2).  Applera also includes in the discussion references that are indicative of the state of the art and the level of skill of the person of ordinary skill in the art as of 1999.

The '784 patent relates generally to mass spectrometers employing atmospheric pressure ion ("API") sources such as electrospray ("ESI") or atmospheric pressure chemical ionization ("APCI") sources.  '784, col. 1:11-14.  It was well-known prior to December 1999 (the earliest possible effective filing date of claims of the '784 patent[1]) that in mass spectrometer systems using API sources, and in ESI sources in particular, solvent adduct ions -- sometimes called adducts, cluster ions or clusters -- are formed.  For example, a 1997 text edited by Cole explains that the problem exists and must be addressed in any API mass spectrometer:

> In *any* design of an API mass spectrometer, the problem of the formation of cluster ions is addressed.  Polar molecules that tend to cluster with ions are water and solvent vapor present in air or generated by the evaporation of the eluate from a liquid chromatograph or electrophoresis instrument connected to the API source.  *All* practical designs of API instruments are aimed at either prevention of clustering, or curing the problem by breaking the clusters.

A. P. Bruins, "Chapter 3: ESI Source design and Dynamic Range Considerations," in R. B. Cole,

---

[1]     In fact, many of the claims in the reissue application are not entitled to the December 3, 1999 filing date of the parent application.  For example the parent '273 application contains no disclosure of conversion of adduct ions to sample ions in the second ion guide chamber by any other method than applying a voltage between the interchamber lens and the second ion guide.  Therefore, claims that encompass the purported conversion of adduct ions to sample ions in the second ion guide chamber by adding to or defining the translational kinetic energy of adduct ions upstream of the second ion guide chamber (i.e., in the first ion guide chamber) are entitled to only the November 16, 2000 filing date of the '815 application.

*Electrospray Ionization Mass Spectrometry*, 1997 at 120 (emphasis added) ("Cole").

Thus, the inventors named on the '784 patent did not discover the problem of solvent adduct formation in API mass spectrometers. Nor did they discover the technique for conversion of solvent adduct ions to sample ions that is implemented in the mass spectrometer system described in the '784 patent. That technique – collisional dissociation by using an electric field to accelerate the adduct ions and collide them with neutral gas molecules – was well-known as of 1999.

      **1.**    **The Conversion of Solvent Adduct Ions by Collisional Dissociation by Applying a DC Offset Voltage Between Two Electrodes Along the Ion Path Was Known Well Before 1999**

In 1977, Kambara reported the results of an investigation of techniques for dissociating adduct ions in a mass spectrometer having an API source, specifically an ESI source. Kambara's instrument is depicted schematically in Figure 1 of his paper, reproduced below:



Fig. 1. Schematic diagram of the experimental apparatus: 1) needle electrode, 2) aperture slit (0.1-mm diam.), 3) collision region (intermediate pressure region), 4) aperture slit (0.2-mm diam.), 5) calibration ion source, 6) quadrupole mass analyzer, 7) electron multiplier.

Figure 1 depicts an API source, followed by an intermediate chamber in which the pressure is approximately 1 Torr. Kambara calls the area (3) between the aperture slit (2) and the skimmer (4) in the walls that bound this intermediate chamber the "collision region." Kambara

at 130. Each of the two walls is employed as an electrode through the application of voltages.

*Id.* at 130-131. Kambara explains that the electric field between the two electrodes provides the

ions with kinetic energy:

> The electrical potential of the second aperture electrode determines the ion
> acceleration energy which was fixed at 3V. The electrical field strength in the
> intermediate [collision] region was varied by changing the electric potential of the
> first aperture electrode between 3 and 31 V.

*Id.* at 131-132.

Kambara further explains that the additional kinetic energy provided by the electric field

produces collisions that dissociate cluster ions:

> the cluster ions are accelerated by the electric field in the intermediate region and
> collide with nitrogen molecules converting part of their kinetic energy into
> internal energy. Finally, the excited cluster ions attain enough internal energy to
> dissociate into simpler ions under a sufficiently large electric field.

*Id.* at 131. Kambara concludes that:

> [w]hether dissociation is caused by a single or multiple collision process depends
> on the collision energy of the cluster ions and the neutral molecules. The
> collision energy is determined by the electric field strength and the cluster mean
> free path. Assuming the cluster ions are in their ground energy states, the
> collision energy must be above the dissociation energy level for cluster ions to
> dissociate through a single collision.

*Id.* at 134.

Kambara, therefore, teaches the fundamental mechanism of collisional dissociation of

solvent adduct ions and the relationship between each of the variables that impact that process.

Simply put, an electric field produced by a DC offset voltage between electrodes along the ion

path will accelerate adduct ions and dissociate them through collisions with neutral gas

molecules. The magnitude of the offset voltage needed to dissociate the adduct ions will depend

on, among other factors, the mean free path of the adduct ions between collisions, which is

determined by the pressure in the collision region. *Id.* at footnote, p. 132.

9

Kambara's teachings have been implemented by numerous other workers since 1977.

For example, Chowdhury describes a mass spectrometer system with an electrospray ion source

in which "solvent molecules that adhere to the biomolecule ions of interest are removed by

collisional activation" by being subjected to an electrostatic field between the capillary tube from

which they emerge into the initial vacuum region of the instrument and a downstream skimmer.

*See* Chowdhury, col. 5:27-31. Chowdhury discusses adjustment of the field strength to produce

dissociation of solvent adduct ions without fragmenting the sample ions:

> [C]ollisional activation caused by an electrostatic field 32 in a region of reduced
> pressure brings about the removal of solvent molecules adhering to the
> biomolecule ions. *This electrostatic field 32 is easily variable and provides*
> *sufficiently fine control of the collisional activation so that at low fields complete*
> *desolvation of the molecule ions can be effected without fragmentation* . . . .

Chowdhury, col. 5:51-60 (emphasis added).

Kleintop likewise teaches dissociation of solvent adduct ions by placing a DC offset

voltage between two electrodes, such as a capillary and skimmer combination: "One method to

overcome the loss of desolvating power at low capillary temperatures is by using in-source CAD

to promote solvent declustering in the capillary/skimmer region of the interface." Kleintop

concludes that a tube lens voltage may be used "to promote solvent declustering . . . in the

capillary skimmer region of the interface." *Id.*

Kato teaches dissociation of solvent adduct ions prior to entry into a mass analyzer by

application of DC offset voltages to the first and second (3, 5), or the second and third (5, 7), or

both pairs, of three successive skimmers that define two serial vacuum chambers (4, 6) directly

preceding a mass analyzer (9), as illustrated in Fig. 8 from Kato below:

10



Kato, like Kambara, identifies pressure and applied voltage as "important factors" in dissociating or converting the adduct ions, and describes his method as "remarkably effective":

> *Important factors in the desolvation system are a vacuum degree and an intensity of the electric field in the case of the acceleration and collision.* Generally, as illustrated in Fig. 8, the electrical potential is applied between the first and second apertures **3, 5** or/and between the second and third apertures **5, 7** whereby the ions are accelerated and collide with the neutral molecules. A degree of the desolvation can be changed by controlling the applied voltages $V_1$, $V_2$. *This method is remarkably effective in the desolvation.*

Kato, col. 7:18-28, Fig. 8 (emphasis added).

Tomany, like Kato, teaches dissociation of solvent adduct ions in serial vacuum stages. Figure 1, reproduced below, shows a mass spectrometer system having an ESI ion source and four vacuum chambers 14, 17, 20 and 21, the last of which contains the mass analyzer (22):

11



*Fig. 1*

DC offset voltages are applied to produce electric fields between the structural components that define chambers 14 and 17, i.e., fields exist between housing 11 and skimmer 15, and between skimmer 15 and skimmer 18.  Tomany, col. 5: 8-11, 33-37.  Tomany explains that collisional dissociation is implemented in both chamber 14 and chamber 17:

> Because collisions between charged ion stream components (e.g., ions, charged droplets, charged clusters and solvated ions) and neutral molecules occur in region 14 as the ion stream traverses region 14 on its way to skimmer 15, additional desolvation, ion evaporation and declustering occur.  *The energy of these collisions can be affected by the potential difference between the housing 11 and skimmer 15.*
>
> * * *
>
>  Region 17 is maintained at a lower pressure, typically 0.1-3 Torr by another rotary pump 4.  Again, because collisions between the ion stream components (e.g. charged droplets, charged clusters and solvated ions) and neutral gas molecules occur in this region 17 as the ion stream traverses it on its way to skimmer 18, additional desolvation and ion evaporation occurs. *Because of the lower pressure in this region, the energy of these collision is considerably affected by the potential difference between skimmer 15 and skimmer 18 such that considerable desolvation and ion evaporation may occur.*

Tomany, col. 5:11-19, 26-37 (emphasis added).

12

**2.      The Implementation of Collisional Dissociation Using a Multipole Ion Guide and a Preceding Lens as Electrodes Was Well-Known as of 1999**

It was well-known as of 1999 to dissociate solvent adduct ions by applying a DC offset voltage between a multipole ion guide and a preceding lens. This implementation of the collisional dissociation technique was included in the commercially available TAGA 6000E instrument. In 1989, Smith reported on his experiments using both the commercial TAGA 6000E and a modified version. The commercial TAGA 6000E included a single cryogenically pumped vacuum chamber housing a quadrupole ion guide (Q0) preceding a typical triple quadrupole tandem mass analyzer (Q1, Q2, Q3). Smith 54, Figure 1 (showing modified version with additional vacuum stage). Ions were produced by an ESI source. *Id.* The pressure of the single cryogenically pumped vacuum chamber was in the range of $10^{-6} - 10^{-5}$ torr. *Id.* With regard to the commercial TAGA 6000E, Smith investigated the dissociation of solvent adduct ions produced by the offset voltage between the orifice (Or) and the quadrupole ion guide (Q0). Smith found that under typical operating condition, solvent adduct ions were essentially eliminated:

> Figure 3 gives ESI mass spectra of horse heart cytochrome c, a protein of Mr 12,360. The spectra were obtained with the unmodified TAGA 6000E ion-sampling orifice, with which the electric field in the atmosphere-vacuum region results only from the voltage difference between the orifice and the rf-only quadrupole lens, $\Delta$ (Or-Q0). As shown in Figure 3a, when $\Delta$(Or-Qo) = 0 V, the cytochrome c molecular ion peaks exhibit substantial tailing to higher m/z, which is attributed to unresolved adduction or solvent association. *Under typical operating conditions, with $\Delta$(Or-Q0) of typically +5-40 V chosen to optimize desolvated molecular ion intensity, solvent association is essentially eliminated....*

Smith, 56 (emphasis added).

The essentially complete conversion of adduct ions by collisional dissociation that Smith observed in the ion guide of the TAGA 6000E occurred under conditions that are within the

ranges of pressures and offset voltages specified for conversion of adduct ions in the second ion guide chamber in the '784 patent. The '784 patent states that the pressure in the second ion guide chamber is "more preferably below 0.5 mTorr" (col. 4:50) and that the "DC offset voltage range for efficient solvent adduction conversion should be ±10 to ± 30 Volts." '784, col. 4:50; col. 6:59-60. In the TAGA 6000E system, the pressure in the vacuum chamber housing the multipole ion guide (Q0) was of "the order of $10^{-6}$ to $10^{-5}$ torr," which is below 0.5 mTorr. Smith, 54. The DC offset voltage between the orifice (Or) and Q0 that was effective to convert adduct ions, which Smith characterized as "typical operating conditions," was 5-40 V, which encompasses the range in the '784 patent. Smith, 56.

There are numerous other instances of the use of a multipole ion guide as a counter-electrode for purposes of collisional dissociation prior to 1999. For example, Thomson describes a mass spectrometer system (sold commercially under the name API III) in which dissociation of adduct ions was accomplished by applying a DC offset voltage between the inlet orifice and a quadrupole ion guide. Thomson states that in the API III, "[t]he declustering region is between the orifice and the RF-only transfer rods ('Q0')," and that "[t]he potential between OR and Q0 controls declustering and fragmentation."

In addition to describing dissociation of adduct ions using a DC offset between an orifice and a quadrupole ion guide, Thomson also describes dissociation, without fragmentation, in the last of a series of three RF-only quadrupoles immediately preceding a quadrupole mass filter. He describes an experiment conducted with the API III, which was a triple quadrupole mass spectrometer (i.e., a mass spectrometer having a three stage mass analyzer consisting of a quadrupole mass filter (Q1), followed by an RF-only quadrupole collision cell (Q2), followed by a second quadrupole mass filter (Q3)). In the experiment, Q1 was operated in RF-only mode and

14

thus Q0 (the ion guide), Q1 and Q2 were RF-only quadrupoles. No declustering offset voltage was applied between the orifice and Q0, but instead declustering was accomplished in Q2 by virtue of the Q2 rod offset voltage. Thomson notes that adduct ions were dissociated without fragmentation: "for each charge state there is an optimum voltage for declustering without fragmentation." *Id.* Thus it was known prior to 1999 that in a mass spectrometer having more than one RF-only quadrupole, adduct ions could be dissociated by applying an appropriate DC offset voltage between any one or more of the RF-only quadrupoles and a preceding lens.

Hager also describes the application of a DC offset voltage between an inlet orifice (a skimmer in this instance) and a multipole ion guide for dissociating solvent adduct ions. In Hager's mass spectrometer system, as show in Figure 2 (reproduced below), two vacuum chambers precede the mass analyzer (Q1) chamber.



FIG. 2

15

In the first vacuum chamber (28), an offset voltage exists between the entrance orifice and the skimmer (defining chamber 28). In addition, another offset voltage exists between the skimmer and the quadrupole ion guide (Q0) in chamber 30. These offset voltages produce collisional dissociation in both chambers. Hager describes this method as "conventional":

> Various stages of declustering are commonly used to reduce this mixture of ionic species to a larger proportion of bare monomer ions to solvated ions. *Conventional declustering methodologies include ... collisional dissociation by acceleration of the ions through relatively high pressure regimes using voltage gradients between the orifice and skimmer and between the skimmer and Q0.*

Hager, col. 10:48-56 (emphasis added).

### 3. Multistage Multipole Ion Guide Interfaces Were Well-Known as of 1999

Mass spectrometers systems employing multiple ion guides in separate vacuum chambers to interface an API source with a mass analyzer were well-know as of 1999. Lazar describes such a mass spectrometer system, depicted in his Figure 1 (reproduced below):