# EXHIBIT E



# Maheu Publishing

*The Intellectual Property Book Store*

# TITLE 37

# CODE OF FEDERAL

# REGULATIONS

**THIS DATA CURRENT AS OF THE FEDERAL REGISTER DATED**

# JULY 18, 2005

*Local-703-426-0633  Fax-703-426-0833*
*WWW.MAHEUPUBLISHING.COM*

# Title 37
# Patents, Trademarks
# And Copyrights
(Information Current as of July 18, 2005)

## Table of Contents

**Chapter I** – United States Patent & Trademark Office, Department of Commerce............................................................................Page 1

**Chapter II** – Copyright Office, Library of Congress.............................Page 539

**Chapter IV** – Assistant Secretary for Technology Policy, Department of Commerce.....................................................................Page 843

**Chapter V** – Under Secretary for Technology Policy, Department of Commerce..................................................................Page 867

**Index I** – Rules Relating to Patents..........................................Page 872

**Index II** – Rules Relating to Trademarks......................................Page 892

**Index III** – Rules Relating to Practice before The Patent and Trademark Office..Page 916

**Index to Chapter II** - Copy Right Office, Library of Congress......................Page 923

**Editor's notes:** All information taken directly from the National Archives and Records Administration. And is current through July 18, 2005

proceeding (except for U.S. patent documents);

(ii) A list of such correspondence; and

(iii) A statement that the copy is a complete and accurate copy of the applicant's or patentee's record of all of the correspondence between the Office and the applicant or patentee for such application, patent, or other proceeding (except for U.S. patent documents), and whether applicant or patentee is aware of any correspondence between the Office and the applicant or patentee for such application, patent, or other proceeding that is not among applicant's or patentee's records.

(2) Applicant or patentee may comply with a notice under this section by:

(i) Producing the applicant's or patentee's record (if any) of all of the correspondence between the Office and the applicant or patentee for such application, patent, or other proceeding for the Office to copy (except for U.S. patent documents); and

(ii) Providing a statement that the papers produced by applicant or patentee are applicant's or patentee's complete record of all of the correspondence between the Office and the applicant or patentee for such application, patent, or other proceeding (except for U.S. patent documents), and whether applicant or patentee is aware of any correspondence between the Office and the applicant or patentee for such application, patent, or other proceeding that is not among applicant's or patentee's records.

(3) If applicant or patentee does not possess any record of the correspondence between the Office and the applicant or patentee for such application, patent, or other proceeding, applicant or patentee must comply with a notice under this section by providing a statement that applicant or patentee does not possess any record of the correspondence between the Office and the applicant or patentee for such application, patent, or other proceeding.

(b) With regard to a pending application, failure to comply with one of paragraphs (a)(1), (a)(2), or (a)(3) of this section within the time period set in the notice will result in abandonment of the application.

[65 FR 69451, Nov. 17, 2000]

**Protests and Public Use Proceedings**

§ 1.291  **Protests by the public against pending applications.**

(a) A protest may be filed by a member of the public against a pending application, and it will be matched with the application file if it adequately identifies the patent application. A protest submitted within the time frame of paragraph (b) of this section, which is not matched, or not matched in a timely manner to permit review by the examiner during prosecution, due to inadequate identification, may not be entered and may be returned to

the protestor where practical, or, if return is not practical, discarded.

(b) The protest will be entered into the record of the application if, in addition to complying with paragraph (c) of this section, the protest has been served upon the applicant in accordance with §1.248, or filed with the Office in duplicate in the event service is not possible; and, except for paragraph (b)(1) of this section, the protest was filed prior to the date the application was published under §1.211, or a notice of allowance under §1.311 was mailed, whichever occurs first.

(1) If a protest is accompanied by the written consent of the applicant, the protest will be considered if the protest is matched with the application in time to permit review during prosecution.

(2) A statement must accompany a protest that it is the first protest submitted in the application by the real party in interest who is submitting the protest; or the protest must comply with paragraph (c)(5) of this section. This section does not apply to the first protest filed in an application.

(c) In addition to compliance with paragraphs (a) and (b) of this section, a protest must include:

(1) A listing of the patents, publications, or other information relied upon;

(2) A concise explanation of the relevance of each item listed pursuant to paragraph (c)(1) of this section;

(3) A copy of each listed patent, publication, or other item of information in written form, or at least the pertinent portions thereof;

(4) An English language translation of all the necessary and pertinent parts of any non-English language patent, publication, or other item of information relied upon; and

(5) If it is a second or subsequent protest by the same real party in interest, an explanation as to why the issue(s) raised in the second or subsequent protest are significantly different than those raised earlier and why the significantly different issue(s) were not presented earlier, and a processing fee under §1.17(i) must be submitted.

(d) A member of the public filing a protest in an application under this section will not receive any communication from the Office relating to the protest, other than the return of a self-addressed postcard which the member of the public may include with the protest in order to receive an acknowledgment by the Office that the protest has been received. The limited involvement of the member of the public filing a protest pursuant to this section ends with the filing of the protest, and no further submission on behalf of the protestor will be considered, unless the submission is made pursuant to paragraph (c)(5) of this

section.

(e) Where a protest raising inequitable conduct issues satisfies the provisions of this section for entry, it will be entered into the application file, generally without comment on the inequitable conduct issues raised in it.

(f) In the absence of a request by the Office, an applicant has no duty to, and need not, reply to a protest.

(g) Protests that fail to comply with paragraphs (b) or (c) of this section may not be entered, and if not entered, will be returned to the protestor, or discarded, at the option of the Office.

[69 FR 56544, Sept. 21, 2004]

§ 1.292  Public use proceedings.

(a) When a petition for the institution of public use proceedings, supported by affidavits or declarations is found, on reference to the examiner, to make a prima facie showing that the invention claimed in an application believed to be on file had been in public use or on sale more than one year before the filing of the application, a hearing may be had before the Director to determine whether a public use proceeding should be instituted. If instituted, the Director may designate an appropriate official to conduct the public use proceeding, including the setting of times for taking testimony, which shall be taken as provided by part 41, subpart D, of this title. The petitioner will be heard in the proceedings but after decision therein will not be heard further in the prosecution of the application for patent.

(b) The petition and accompanying papers, or a notice that such a petition has been filed, shall be entered in the application file if:

(1) The petition is accompanied by the fee set forth in §1.17(j);

(2) The petition is served on the applicant in accordance with §1.248, or filed with the Office in duplicate in the event service is not possible; and

The petition is submitted prior to the date the application was published or the mailing notice of allowance under §1.311, whichever occurs first.

petition for institution of public use proceedings shall not be filed by a party to an rence as to an application involved in the interference. Public use and on sale issues interference shall be raised by a motion under §41.121(a)(1) of this title.

S.C. 6; 15 U.S.C. 1113, 1123)

# EXHIBIT F

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In Re Patent Of | : | TANG et al. |
| Patent No. | : | 6,528,784 |
| Issued | : | March 4, 2003 |
| Title | : | MASS SPECTROMETER SYSTEM INCLUDING A DOUBLE ION GUIDE INTERFACE AND METHOD OF OPERATION |
| Application Serial No. | : | 09/715,815 |
| Reissue Application No. | : | 11/073394 |
| Filed | : | November 16, 2000 |
| Requestor | : | Applera Corporation |

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## REQUEST FOR *EX PARTE* REEXAMINATION OF
## U.S. PATENT NO. 6,527,784 PURSUANT TO 37 C.F.R. § 1.510

Requester, Applera Corporation ("Applera"), hereby requests reexamination of claims 1

through 9 of U.S. Patent No. 6,528,784 ("the '784 patent") pursuant to the provisions of 37

C.F.R. § 1.510.

The '784 patent issued from Application No. 09/715,815 ("the '815 application") filed on

November 16, 2000. The '815 application is a continuation-in-part of Application No.

09/454,273 ("the '273 parent application"), filed on December 3, 1999 and now abandoned.

According to a Certificate of Correction appended to the '784 patent, the '784 patent has been

assigned to Thermo Finnigan LLC ("Thermo").

Pursuant to the provisions of 37 C.F.R. §1.510(b), this request for *ex parte* reexamination of the '784 patent is accompanied by or includes:

1.  A statement pointing out each substantial new question of patentability based on prior patents and printed publications.

2.  An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited prior art to every claim for which reexamination is requested.

3.  A copy of every patent or printed publication relied upon or referred to accompanied by an English language translation of all the necessary and pertinent parts of any non-English language patent or printed publication.

4.  A copy of the entire patent including the front face, drawings, and specification/claims (in double column format) for which reexamination is requested, and a copy of any disclaimer, certificate of correction, or reexamination certificate issued in the patent.

5.  A certification that a copy of the request has been served in its entirety on the patent owner at the address as provided for in 37 C.F.R. §1.33(c), with the name and address of the party served indicated.

This request for *ex parte* reexamination is also accompanied by a form PTO-1645 Request for *Ex Parte* Reexamination Transmittal, a form PTO-1449 Information Disclosure Statement listing the prior art cited in this request for reexamination, a copy of the '273 parent application, a copy of the '815 application and file wrapper, and copies of the prior art considered during earlier prosecution of the '784 patent.

On February 23, 2005, Thermo filed a lawsuit in the United States District Court for the

2

APL 067311

District of Delaware against Applera, MDS, Inc. and Applied Biosystems/MDS Sciex Instruments alleging infringement of the '784 patent. Thermo asserts that "at least claim 4" of the '784 patent is infringed by the API 5000 mass spectrometer manufactured and sold by the defendants. In addition to asserting that the API 5000 does not infringe, the defendants contend that each claim of the '784 patent is invalid.

Also, on March 4, 2005, Reissue Application Serial No. 11/073394 was filed for the reissue of the '784 patent. The reissue proceeding was published in the Official Gazette on May 31, 2005.

Substantial new questions of patentability are introduced by the cited references, as indicated in the claim charts and analysis set forth below. Reexamination is requested based on the following cited references, claims charts, and analysis.

3

APL 067312

## TABLE OF CONTENTS

I.   THE INVENTION DESCRIBED IN THE SPECIFICATION OF THE
     '784 PATENT .................................................................................................6

II.  SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY –
     ALL CLAIMS ARE UNPATENTABLE OVER PRIOR ART ....................................9

     A.   Introductory Statement Setting Forth Substantial New Questions
          of Patentability ................................................................................10

          1.   Substantial New Questions of Patentability for Claims 1 and 2 ..........11

          2.   Substantial New Questions of Patentability for Claim 3 ....................11

          3.   Substantial New Questions of Patentability for Claims 4-8 ...............11

          4.   Substantial New Questions of Patentability for Claim 9 ....................12

     B.   Detailed Explanation of the Pertinency of Cited Prior Art References ...........12

          1.   The Conversion of Solvent Adduct Ions by Collisional
               Dissociation by Applying a DC Offset Voltage Between Two
               Electrodes Along the Ion Path Was Well-Known Before 1999 ..........14

          2.   The Implementation of Collsional Dissociation Using Multipole
               Ion Guide and a Preceding Lens as Electrodes Was Well-Known
               as of 1999 .................................................................................19

          3.   Multistage Multipole Ion Guide Interfaces Were Well-Known
               as of 1999 .................................................................................22

     C.   Detailed Explanation of the Manner of Applying the Cited Prior Art
          to Every Claim ................................................................................25

          1.   Claims 1 and 2 are Unpatentable as Obvious Over Lazar in
               View of Smith, or Hager in View of Lazar, or Buchanan in
               View of either Smith or Thomson .................................................26

          2.   Claim 3 is Unpatentable as Anticipated by Any of Smith,
               Kambara, Chowdhury, Kato, Kleintop, Thomson, Tomany or
               Hager ........................................................................................32

          3.   Claims 4-8 are Unpatentable as Obvious Over Lazar in View of
               Smith, or Hager in View of Lazar, or Buchanan in View of either
               Smith or Thomson .......................................................................34

4

APL 067313

4.  Claim 9 is Unpatentable as Anticipated by Hager, or as Obvious
    Over Lazar in View of Smith, or Buchanan in View of either
    Smith or Thomson....................................................................................40

III.  CONCLUSION.......................................................................................................43

5

APL 067314

## I.    THE INVENTION DESCRIBED IN THE SPECIFICATION OF THE '784 PATENT

The '784 patent is entitled "Mass Spectrometer System Including A Double Ion Guide Interface And Method Of Operation."   Figure 1 depicts a preferred embodiment of the claimed mass spectrometer:



FIG_1

Figure 1 shows a mass spectrometer having an atmospheric pressure ion source in an atmospheric pressure chamber 11 followed by four vacuum chambers 13, 16, 17 and 12, respectively.  Vacuum chambers 16 and 17 each include a RF-only quadrupole ion guide.  A conical skimmer 24 separates vacuum chamber 16 from vacuum chamber 13.  An interchamber lens 18 separates vacuum chamber 16 from vacuum chamber 17.  A lens 36 separates vacuum chamber 17 from the mass analyzer chamber 12 which, in the case of Figure 1, houses a tandem quadrupole mass spectrometer.

6

APL 067315

The '784 patent specifies the ranges of pressures used in the two ion guide chambers: "As will be explained in accordance with the present invention, the pressure in chamber 16 is below 500 mTorr . . . and the pressure in chamber 17 is below 1 mTorr. '784, col. 4:45-50.

The '784 patent identifies the problem to which the invention is directed:

> As discussed above, solvent adduct ions are formed in the high pressure regions ranging from the atmospheric pressure region to the quadrupole ion guide stages or regions. . . . The formation of adduct ions can significantly reduce the abundance of sample analyte ions which reach the analyzer. Consequently, effective conversion of the adduct ions can greatly enhance the sample ion current and the sensitivity of the mass spectrometer.

'784, col. 5:11-19. The inventors purport to have discovered "that the solvent adduct can be dissociated and converted into sample ions in the second ion guide 28 by applying a small DC offset voltage between the ion guide 28 and the lens 18 to increase the energy of the solvent adduct ions." '784, col. 5:20-24. As explained in the patent, solvent adduct ions are converted into sample ions in the second ion guide by controlling the kinetic energy of the ions such that they have enough kinetic energy in the second ion guide to dissociate the solvent molecules through collisions with neutral gas molecules in the second ion guide:

> A DC voltage source is connected to provide a potential difference between the first lens and the first multipole ion guide or between interchamber lens and the second multipole ion guide or both which defines the ion's translational kinetic energy as it enters the second multipole ion guide. The ion's translational kinetic energy is chosen such that at the vacuum pressure of the second interface chamber adduct ions are converted into sample ions by collision induced dissociation without fragmentation of sample ions . . . .

'784, col. 3:27-38.

The Examiner's stated reason for allowing the pending patent claims over the cited prior art during the original prosecution of the '784 patent is set forth in the Notice of Allowability dated September 4, 2002. The Examiner stated that the cited prior art failed to teach or clearly suggest a mass spectrometer "in which sample ions and solvent molecules form adduct ions with

7

APL 067316

a reduction of sample ion current as disclosed in claims 1 and 9." File History at Tab 18 of the

Appendix to this Request, paper no. 9, pg. 3. With regard to the remaining independent claims 3

and 4, the Examiner provided much the same reason for allowance. Namely, the cited prior art

failed to teach or clearly suggest a method of mass analysis wherein "some sample ions and

solvent molecules combine to form adduct ion [sic] with a reduction of sample ions. . . ." *Id.*

## II.    SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY –
## ALL CLAIMS ARE UNPATENTABLE OVER PRIOR ART

Substantial new questions of patentability of claims 1 through 9 of the '784 patent under

35 U.S.C. § 102 and/or 35 U.S.C. § 103 are raised by the following prior art references.

Pursuant to 37 C.F.R. § 1.510 (b)(3), a copy of each reference as well as a listing of the

references on Form PTO-1449 accompanies this Request at Tab 3 of the Appendix.

| | |
|---|---|
| Lazar | J. M. LAZAR et al., "Design of a Time-of-Flight Mass Spectrometer as a Detector for Capillary Electrophoresis," *Analytical Chemistry*, 1997, vol. 69, no. 16, pp. 3205-3211. |
| Smith | R. D. SMITH et al., "Collisional Activation and Collision-Activated Dissociation of Large Multiply Charged Polypetides and Proteins Produced by Electrospray Ionization," *J. Am. Soc. Mass Spectrom.*, 1990, vol. 1, pp. 53-65. |
| Hager | U.S. Patent No. 6,015,972 (J. W. Hager). |
| Buchanan | M. V. BUCHANAN et al., "Continuous Octapole Electrospray Introduction System for FTICR," *46th ASMS Conference on Mass Spectrometry and Allied Topics*, May 31- June 4, 1998, p. 518. |
| Thomson | B. THOMSON, "Protein Charge Distribution Studies – From Droplet in Air to Ion in Vacuum," *44th ASMS Conference on Mass Spectrometry and Allied Topics*, May 12-16, 1996, p. 1092. |
| Kambara | H. KAMBARA et al, "Collision-Induced Dissociation of Water Cluster Ions at High Pressure," *Int'l J. Mass Spectrom. and Ion Physics*, 1977, vol. 25, pp. 129-136. |
| Chowdhury | U.S. Patent No. 4,977,320 (S. K. Chowdhury et al.) |

8

APL 067317

**Klientop**  B. L. KLEINTOP et al., "Analyzing Thermally Labile Compounds in Electrospray Sources Using Heated Capillaries," *43rd ASMS Conference on Mass Spectrometry and Allied Topics*, May 21-26, 1995, p. 905.

**Kato**  U.S. Patent No. 5,298,743 (Y. Kato)

**Tomany**  U.S. Patent No. 5,304,798 (M. J. Tomany et al.).

The following references are useful in so far as they provide a background for the technology at issue and the discussion of the references being relied.

**Beu**  S. C. BEU et al., "Fourier-Transform Electrospray Instrumentation for Tandem High-Resolution Mass Spectrometry of Large Molecules," *J. Am. Soc. Mass Spectrom.*, 1993, vol. 4, pp. 557-565.

**Jarvis**  S. A. JARVIS et al., "A New Atmospheric Pressure Ionization Orthogonal Acceleration Time of Flight Mass Spectrometer," *45th ASMS Conference on Mass Spectrometry and Allied Topics*, June 1-5, 1997, p. 1193.

**Cole**  A. P. BRUINS, "ESI Source Design and Dynamic Range Considerations," in *Electrospray Ionization Mass Spectrometry – Fundamentals, Instrumentation, and Applications*, (R. B. COLE ed., John Wiley & Sons, Inc., 1997), chp. 3, pp. 107-136.

### A.    Introductory Statement Setting Forth Substantial New Questions Of Patentability

The following statement is submitted pursuant to 37 C.F.R. § 1.510(b)(1). This Request for Reexamination of the '784 patent is based upon the foregoing references and presents the following substantial new questions of patentability based upon these references.[1]  As set forth in detail below, the forgoing references would have been considered important by a reasonable Examiner in deciding whether to allow the claims, particularly in view of the Examiner's stated reasons for allowance, and therefore these references raise a substantial new question of

---

[1]    With the exception of the Hagar '972 patent, none of the prior art references relied upon in this request were of record in the prosecution of the '784 patent.

APL 067318

patentability. M.P.E.P. § 2242 (Rev. 2, May 2004) at 2200-48.

     1.     Claims 1 and 2 are unpatentable under 35 U.S.C. § 103 as obvious over either Lazar in view of Smith or Hagar in view of Lazar. Neither Lazar nor Smith were cited during the prosecution of the '784 patent and, therefore, the invalidating combinations relied upon in this request for reexamination were not available to the Examiner during the prosecution of the '784 patent. These specific combinations of references provide teachings and disclosures that were not presented during the prosecution of the '784 patent. The additional teachings and disclosures of these references include subject matter closer to the subject matter of the claims than the prior art cited during the prosecution of the '784 patent. Moreover, each combination of references provides teachings and disclosures that show the existence in the prior art of the very subject matter that formed the basis for the Examiner's allowance of the claims. Further, because claims 1 and 2 are not patentable over these prior art documents, a substantial new question of patentability is raised.[2]

     2.     Claim 3 is unpatentable under 35 U.S.C. § 102 as anticipated by any one of Smith, Kambara, Chowdhury, Kato, Klientop, Thomson, Tomany, or Hager. Neither Smith, Kambara, Chowdhury, Kato, Klientop, Thomson, or Tomany were cited during the prosecution of the '784 patent and, therefore, their teachings and disclosures were not available to the Examiner at that time. These references provide teachings and disclosures that show the existence in the prior art of the very the subject matter that formed the basis for the Examiner's allowance of the claims in the original prosecution. With respect to Hager, while Hager was cited during the prosecution of the '784 patent, this request presents Hagar in a new light and in a

---

[2]     A substantial new question of patentability need only be established as to one claim to support an order for reexamination for all claims. M.P.E.P. § 2216 (Rev. 2, May 2004) at 2200-26.

APL 067319

different manner than that applied by the Examiner during prosecution. For example, this request sets forth that Hagar expressly discloses the subject matter that formed the basis for the Examiner's allowance of claim 3. Further, because claim 3 is not patentable over each of these prior art references, a substantial new question of patentability is raised.

3.    Claims 4-8 are unpatentable under 35 U.S.C. § 103 as obvious over either Lazar in view Smith, Hagar in view of Lazar, or Buchanan in view of Smith or Thomson. Lazar, Smith, Buchanan, or Thomson were not cited during the prosecution of the '784 patent and, therefore, the invalidating combinations being relied on were not available to the Examiner during the prosecution of the '784 patent. These specific combinations of references provide teachings and disclosures that were not presented during the prosecution of the '784 patent. The additional teachings and disclosures of these references include subject matter closer to the subject matter of the claims than the prior art cited during the prosecution of the '784 patent. Moreover, each combination of references provides teachings and disclosures that show the existence in the prior art of the very subject matter that formed the basis for the Examiner's allowance of the claims. Further, because claims 4-8 are not patentable over these prior art documents, a substantial new question of patentability is raised.

4.    Claim 9 is unpatentable under 35 U.S.C. § 102 as anticipated by Hagar and/or under 35 U.S.C. § 103 as obvious over either Lazar in view Smith or Buchanan in view of Smith or Thomson. Lazar, Smith, Buchanan or Thomson were not cited during the prosecution of the '784 patent and, therefore, the invalidating combinations being relied on were not available during the prosecution of the '784 patent. These specific combinations of references provide teachings and disclosures that were not presented during the prosecution of the '784 patent. The additional teachings and disclosures of these references include subject matter closer to the

11

APL 067320

subject matter of the claim than the prior art cited during the prosecution of the '784 patent. Moreover, each combination of references provides teachings and disclosures that show the existence in the prior art of the very subject matter that formed the basis for the Examiner's allowance of the claim. Further, because claim 9 is not patentable over these prior art references, a substantial new question of patentability is raised.

### B.    Detailed Explanation of the Pertinency of Cited Prior Art References

The following discussion, and the element-by-element analysis and further discussion in part C, will serve as Applera's detailed explanation of the pertinence of each prior art reference on which Applera relies in this Request. Applera also includes in the discussion references that are indicative of the state of the art and the level of skill of the person of ordinary skill in the art as of 1999.

The '784 patent relates generally to mass spectrometers employing atmospheric pressure ion ("API") sources such as electrospray ("ESI") or atmospheric pressure chemical ionization ("APCI") sources. '784, col. 1:11-14. It was well-known prior to December 1999 (the earliest possible effective filing date of claims of the '784 patent[3]) that in mass spectrometer systems using API sources, and in ESI sources in particular, solvent adduct ions -- sometimes called adducts, cluster ions or clusters -- are formed. For example, a 1997 text edited by Cole explains that the problem exists and must be addressed in any API mass spectrometer:

---

[3]    In fact, with the exception of claim 3, none of the claims in the '784 patent are entitled to the December 3, 1999 filing date of the parent application. For example, the parent '273 application (at Tab 17 of the Appendix) contains no disclosure of conversion of adduct ions to sample ions in the second ion guide chamber by any other method than applying a voltage between the interchamber lens and the second ion guide. Therefore, claims that encompass the purported conversion of adduct ions to sample ions in the second ion guide chamber by adding to or defining the translational kinetic energy of adduct ions upstream of the second ion guide chamber (i.e., in the first ion guide chamber) are entitled to only the November 16, 2000 filing date of the '815 application.

12

APL 067321

> In *any* design of an API mass spectrometer, the problem of the formation of
> cluster ions is addressed. Polar molecules that tend to cluster with ions are water
> and solvent vapor present in air or generated by the evaporation of the eluate from
> a liquid chromatograph or electrophoresis instrument connected to the API
> source. *All* practical designs of API instruments are aimed at either prevention of
> clustering, or curing the problem by breaking the clusters.

A. P. Bruins, "Chapter 3: ESI Source design and Dynamic Range Considerations," in R. B. Cole,

*Electrospray Ionization Mass Spectrometry*, 1997 at 120 (emphasis added) ("Cole").

Thus, the inventors named on the '784 patent did not discover the problem of solvent

adduct formation in API mass spectrometers. Nor did they discover the technique for conversion

of solvent adduct ions to sample ions that is implemented in the mass spectrometer system

described in the '784 patent. That technique – collisional dissociation by using an electric field

to accelerate the adduct ions and collide them with neutral gas molecules – was well-known as of

1999.

1. **The Conversion of Solvent Adduct Ions by Collisional Dissociation by
   Applying a DC Offset Voltage Between Two Electrodes Along the Ion
   Path Was Known Well Before 1999**

In 1977, Kambara reported the results of an investigation of techniques for dissociating

adduct ions in a mass spectrometer having an API source, specifically an ESI source. Kambara's

instrument is depicted schematically in Figure 1 of his paper, reproduced below:

13

APL 067322



Fig. 1. Schematic diagram of the experimental apparatus: 1) needle electrode, 2) aperture slit (0.1-mm diam.), 3) collision region (intermediate pressure region), 4) aperture slit (0.2-mm diam.), 5) calibration ion source, 6) quadrupole mass analyzer, 7) electron multiplier.

Figure 1 depicts an API source, followed by an intermediate chamber in which the pressure is approximately 1 Torr. Kambara calls the area (3) between the aperture slit (2) and the skimmer (4) in the walls that bound this intermediate chamber the "collision region." Kambara at 130. Each of the two walls is employed as an electrode through the application of voltages. *Id.* at 130-131. Kambara explains that the electric field between the two electrodes provides the ions with kinetic energy:

> The electrical potential of the second aperture electrode determines the ion acceleration energy which was fixed at 3V. The electrical field strength in the intermediate [collision] region was varied by changing the electric potential of the first aperture electrode between 3 and 31 V.

*Id.* at 131-132.

Kambara further explains that the additional kinetic energy provided by the electric field produces collisions that dissociate cluster ions:

> the cluster ions are accelerated by the electric field in the intermediate region and collide with nitrogen molecules converting part of their kinetic energy into internal energy. Finally, the excited cluster ions attain enough internal energy to dissociate into simpler ions under a sufficiently large electric field.

14

APL 067323

*Id.* at 131. Kambara concludes that:

> [w]hether dissociation is caused by a single or multiple collision process depends on the collision energy of the cluster ions and the neutral molecules. The collision energy is determined by the electric field strength and the cluster mean free path. Assuming the cluster ions are in their ground energy states, the collision energy must be above the dissociation energy level for cluster ions to dissociate through a single collision.

*Id.* at 134.

Kambara, therefore, teaches the fundamental mechanism of collisional dissociation of solvent adduct ions and the relationship between each of the variables that impact that process. Simply put, an electric field produced by a DC offset voltage between electrodes along the ion path will accelerate adduct ions and dissociate them through collisions with neutral gas molecules. The magnitude of the offset voltage needed to dissociate the adduct ions will depend on, among other factors, the mean free path of the adduct ions between collisions, which is determined by the pressure in the collision region. *Id.* at footnote, p. 132.

Kambara's teachings have been implemented by numerous other workers since 1977. For example, Chowdhury describes a mass spectrometer system with an electrospray ion source in which "solvent molecules that adhere to the biomolecule ions of interest are removed by collisional activation" by being subjected to an electrostatic field between the capillary tube from which they emerge into the initial vacuum region of the instrument and a downstream skimmer. *See* Chowdhury, col. 5:27-31. Chowdhury discusses adjustment of the field strength to produce dissociation of solvent adduct ions without fragmenting the sample ions:

> [C]ollisional activation caused by an electrostatic field 32 in a region of reduced pressure brings about the removal of solvent molecules adhering to the biomolecule ions. *This electrostatic field 32 is easily variable and provides sufficiently fine control of the collisional activation so that at low fields complete desolvation of the molecule ions can be effected without fragmentation . . . .*

Chowdhury, col. 5:51-60 (emphasis added).

15

APL 067324

Kleintop likewise teaches dissociation of solvent adduct ions by placing a DC offset voltage between two electrodes, such as a capillary and skimmer combination: "One method to overcome the loss of desolvating power at low capillary temperatures is by using in-source CAD to promote solvent declustering in the capillary/skimmer region of the interface." Kleintop concludes that a tube lens voltage may be used "to promote solvent declustering . . . in the capillary skimmer region of the interface." Kleintop at 905.

Kato teaches dissociation of solvent adduct ions prior to entry into a mass analyzer by application of DC offset voltages to the first and second (3, 5), or the second and third (5, 7), or both pairs, of three successive skimmers that define two serial vacuum chambers (4, 6) directly preceding a mass analyzer (9), as illustrated in Fig. 8 from Kato below:



Kato, like Kambara, identifies pressure and applied voltage as "important factors" in

16

APL 067325

dissociating or converting the adduct ions, and describes his method as "remarkably effective":

> *Important factors in the desolvation system are a vacuum degree and an intensity of the electric field in the case of the acceleration and collision.* Generally, as illustrated in Fig. 8, the electrical potential is applied between the first and second apertures 3, 5 or/and between the second and third apertures 5, 7 whereby the ions are accelerated and collide with the neutral molecules. A degree of the desolvation can be changed by controlling the applied voltages $V_1$, $V_2$. *This method is remarkably effective in the desolvation.*

Kato, col. 7:18-28, Fig. 8 (emphasis added).

Tomany, like Kato, teaches dissociation of solvent adduct ions in serial vacuum stages.

Figure 1, reproduced below, shows a mass spectrometer system having an ESI ion source and

four vacuum chambers 14, 17, 20 and 21, the last of which contains the mass analyzer (22):



*Fig. 1*

DC offset voltages are applied to produce electric fields between the structural

components that define chambers 14 and 17, i.e., fields exist between housing 11 and skimmer

17

APL 067326

15, and between skimmer 15 and skimmer 18. Tomany, col. 5: 8-11, 33-37. Tomany explains

that collisional dissociation is implemented in both chamber 14 and chamber 17:

> Because collisions between charged ion stream components (e.g., ions, charged
> droplets, charged clusters and solvated ions) and neutral molecules occur in
> region 14 as the ion stream traverses region 14 on its way to skimmer 15,
> additional desolvation, ion evaporation and declustering occur. *The energy of
> these collisions can be affected by the potential difference between the housing 11
> and skimmer 15.*

> \* \* \*

> Region 17 is maintained at a lower pressure, typically 0.1-3 Torr by another
> rotary pump 4. Again, because collisions between the ion stream components
> (e.g. charged droplets, charged clusters and solvated ions) and neutral gas
> molecules occur in this region 17 as the ion stream traverses it on its way to
> skimmer 18, additional desolvation and ion evaporation occurs. *Because of the
> lower pressure in this region, the energy of these collision is considerably
> affected by the potential difference between skimmer 15 and skimmer 18 such that
> considerable desolvation and ion evaporation may occur.*

Tomany, col. 5:11-19, 26-37 (emphasis added).

### 2. The Implementation of Collisional Dissociation Using a Multipole Ion Guide and a Preceding Lens as Electrodes Was Well-Known as of 1999

It was well-known as of 1999 to dissociate solvent adduct ions by applying a DC offset

voltage between a multipole ion guide and a preceding lens. This implementation of the

collisional dissociation technique was included in the commercially available TAGA 6000E

instrument. In 1989, Smith reported on his experiments using both the commercial TAGA

6000E and a modified version. The commercial TAGA 6000E included a single cryogenically

pumped vacuum chamber housing a quadrupole ion guide (Q0) preceding a typical triple

quadrupole tandem mass analyzer (Q1, Q2, Q3). Smith 54, Figure 1 (showing modified version

with additional vacuum stage). Ions were produced by an ESI source. *Id.* The pressure of the

single cryogenically pumped vacuum chamber was in the range of $10^{-6} - 10^{-5}$ torr. *Id.* With

regard to the commercial TAGA 6000E, Smith investigated the dissociation of solvent adduct

18

ions produced by the offset voltage between the orifice (Or) and the quadrupole ion guide (Q0).

Smith found that under typical operating condition, solvent adduct ions were essentially

eliminated:

> Figure 3 gives ESI mass spectra of horse heart cytochrome c, a protein of Mr 12,360. The spectra were obtained with the unmodified TAGA 6000E ion-sampling orifice, with which the electric field in the atmosphere-vacuum region results only from the voltage difference between the orifice and the rf-only quadrupole lens, Δ (Or-Q0). As shown in Figure 3a, when Δ(Or-Qo) = 0 V, the cytochrome c molecular ion peaks exhibit substantial tailing to higher m/z, which is attributed to unresolved adduction or solvent association. *Under typical operating conditions, with Δ(Or-Q0) of typically +5-40 V chosen to optimize desolvated molecular ion intensity, solvent association is essentially eliminated....*

Smith at 56 (emphasis added).

The essentially complete conversion of adduct ions by collisional dissociation that Smith

observed in the ion guide of the TAGA 6000E occurred under conditions that are within the

ranges of pressures and offset voltages specified for conversion of adduct ions in the second ion

guide chamber in the '784 patent. The '784 patent states that the pressure in the second ion

guide chamber is "more preferably below 0.5 mTorr" (col. 4:50) and that the "DC offset voltage

range for efficient solvent adduction conversion should be ±10 to ± 30 Volts." '784, col. 4:50;

col. 6:59-60. In the TAGA 6000E system, the pressure in the vacuum chamber housing the

multipole ion guide (Q0) was of "the order of $10^{-6}$ to $10^{-5}$ torr," which is below 0.5 mTorr.

Smith, 54. The DC offset voltage between the orifice (Or) and Q0 that was effective to convert

adduct ions, which Smith characterized as "typical operating conditions," was 5-40 V, which

encompasses the range in the '784 patent. Smith at 56.

There are numerous other instances of the use of a multipole ion guide as a counter-

electrode for purposes of collisional dissociation prior to 1999. For example, Thomson describes

a mass spectrometer system (sold commercially under the name API III) in which dissociation of

19

adduct ions was accomplished by applying a DC offset voltage between the inlet orifice and a quadrupole ion guide. Thomson states that in the API III, "[t]he declustering region is between the orifice and the RF-only transfer rods ('Q0')," and that "[t]he potential between OR and Q0 controls declustering and fragmentation." Thomson at 1092.

In addition to describing dissociation of adduct ions using a DC offset between an orifice and a quadrupole ion guide, Thomson also describes dissociation, without fragmentation, in the last of a series of three RF-only quadrupoles immediately preceding a quadrupole mass filter. He describes an experiment conducted with the API III, which was a triple quadrupole mass spectrometer (i.e., a mass spectrometer having a three stage mass analyzer consisting of a quadrupole mass filter (Q1), followed by an RF-only quadrupole collision cell (Q2), followed by a second quadrupole mass filter (Q3)). In the experiment, Q1 was operated in RF-only mode and thus Q0 (the ion guide), Q1 and Q2 were RF-only quadrupoles. No declustering offset voltage was applied between the orifice and Q0, but instead declustering was accomplished in Q2 by virtue of the Q2 rod offset voltage. Thomson notes that adduct ions were dissociated without fragmentation: "for each charge state there is an optimum voltage for declustering without fragmentation." *Id.* Thus it was known prior to 1999 that in a mass spectrometer having more than one RF-only quadrupole, adduct ions could be dissociated by applying an appropriate DC offset voltage between any one or more of the RF-only quadrupoles and a preceding lens.

Hager also describes the application of a DC offset voltage between an inlet orifice (a skimmer in this instance) and a multipole ion guide for dissociating solvent adduct ions. In Hager's mass spectrometer system, two vacuum chambers precede the mass analyzer (Q1) chamber, as shown in Figure 2 (reproduced below).

20

APL 067329



FIG. 2

In the first vacuum chamber (28), an offset voltage exists between the entrance orifice and the skimmer (defining chamber 28). In addition, another offset voltage exists between the skimmer and the quadrupole ion guide (Q0) in chamber 30. These offset voltages produce collisional dissociation in both chambers. Hager describes this method as "conventional":

> Various stages of declustering are commonly used to reduce this mixture of ionic species to a larger proportion of bare monomer ions to solvated ions. *Conventional declustering methodologies include . . . collisional dissociation by acceleration of the ions through relatively high pressure regimes using voltage gradients between the orifice and skimmer and between the skimmer and Q0.*

Hager, col. 10:48-56 (emphasis added).

### 3. Multistage Multipole Ion Guide Interfaces Were Well-Known as of 1999

Mass spectrometers systems employing multiple ion guides in separate vacuum chambers to interface an API source with a mass analyzer were well-known as of 1999. Lazar describes such a mass spectrometer system, depicted in his Figure 1 (reproduced below):

21

APL 067330



**Figure 1.** Schematic diagram of the TOFMS system. (1) Electro-spray needle, (2) interface plate, (3) nozzle, (4) skimmer, (5) and (7) rf-only quadrupoles, (6) interquad lens, (8) slit/lens, (9) pulser, (10) grids, (11) flight tube, (12) deflection plates, (13) reflectron, (14) electron multiplier, (15) ion source, (16) body I, (17) body II, (18) base cube, (19) fourth stage housing, (20) and (21) turbo pumps, (22) rotary pump, and (23) vacuum gauge.

Lazar's Figure 1 shows a mass spectrometer having an ESI source (1), an interface plate (2), a nozzle (3), a skimmer (4) and two consecutive RF-only ion guides (5) and (7) separated by an interquad lens (6). The second ion guide (7) is followed by a lens (8). Lazar, Figure 1, at 3206. The Lazar mass spectrometer includes four vacuum regions: "The first and second

22

APL 067331