vacuum stages are separated by a skimmer (4)." *Id.* at 3206. The second stage includes the first RF-only ion guide (5). *Id.* "The third vacuum stage . . . houses the second set of rf-only quadrupole rods" and the fourth stage houses the time of flight ("TOF") mass analyzer. *Id.*

      Lazar attempted to find optimal pressures for operation of the ion guides, including a configuration that yielded pressures of "3 Torr in the first stage, $1.5 \times 10^{-1}$ Torr in the second stage, $7 \times 10^{-6}$ Torr in the third stage, and (3-4) $\times 10^{-7}$ Torr in the fourth stage." *Id.* at 3207. Lazar also experimented with voltages along the ion path, including the voltages between skimmer (4) and the first RF-only ion guide and the interquad lens (6) and the second RF-only ion guide to optimize the intensity of the ion signal:

> We also monitored the signal intensity as a function of the voltage applied to each ion optics element. A very strong dependence was found for the skimmer, rods offset, and interquad lens voltage. These elements control the ion energy in the high pressure collisional focusing region of the first set of rods. . . . Maximum intensity signals are observed for each compound at different voltage settings.

*Id.* at 3208, col. 2 (emphasis added). *See also*, Figure 2 at p. 3208 depicting the DC offset voltage in the second ion guide.

      Thus, Lazar discloses:

- two sequential multipole ion guides, with each ion guide in its own vacuum chamber;

- variable DC voltage lenses which precede each ion guide;

- a pressure of $1.5 \times 10^{-1}$ Torr in the first ion guide chamber (second vacuum stage); and

- a lower pressure of and $7 \times 10^{-6}$ Torr in the second ion guide chamber (third vacuum stage).

      There are numerous other examples of mass spectrometers having two or more multipole ion guides in separate vacuum chambers at different pressures in the art prior to 1999. For example, Buchanan describes a mass spectrometer system including an electrospray ion source at

23

APL 067332

atmospheric pressure, three octapole ion guides, and a Fourier transform ion cyclotron resonance (FTICR) mass analyzer. The octapole ion guides are in separate differentially pumped vacuum chambers. The second and third octapoles have variable "independent DC offset voltages." Buchanan at 518. Buchanan reports on tests to establish "initial operating conditions to allow the system to be optimized" in which it was found that "a small positive DC offset applied to octapole #2 (behind the skimmer) and a small negative dc offset on octapole #3 has yielded the best signal." *Id.*

Similarly, Beu describes a mass spectrometer employing electrospray ionization and having three quadrupole ion guides, each in a separately pumped vacuum chamber. Potentials are applied along the ion path defined by the ion guides "to provide acceleration of ions between quadrupoles." Beu at 559.

A mass spectrometer having a double ion guide consisting of hexapoles in separate differentially pumped vacuum chambers is disclosed by Jarvis. The double ion guide interfaces an electrospray ion source with a time of flight mass analyzer. Jarvis at 1193.

### C.    Detailed Explanation of the Manner of Applying the Cited Prior Art to Every Claim

Applera submits that each of the claims of the '784 patent is unpatentable either because its subject matter is anticipated by prior art or would have been obvious to the person of ordinary skill in the art in view of the teachings of the prior art.

The claims are directed to the mere use of a well-known technique for converting solvent adduct ions to sample ions in a well-known mass spectrometer system architecture. Mass spectrometer systems in which an API source is coupled to a mass analyzer using multiple differentially pumped vacuum chambers each including a multipole ion guide were well-known in the art as of 1999. The application of a variable DC offset voltage between each ion guide and

24

APL 067333

the preceding lens in such systems was also well-known. The double ion guide TOF mass spectrometer system of Lazar exemplifies such systems.

The phenomenon of solvent adduct ion formation in mass spectrometer systems using an API source, particularly electrospray, was well-known prior to 1999. The technique of converting adduct ions to sample ions by collisional dissociation was also well-known by 1999. In 1977, Kambara described conversion of cluster ions by collisional dissociation, and the parameters (primarily pressure and voltage) that affect the outcome. Others in the field had described the conversion of adduct ions by collisional dissociation through application of a DC offset voltage between a lens element and a multipole ion guide prior to 1999. Indeed, in 1989, Smith reported the conversion of adduct ions by collisional dissociation in the ion guide of a commercially available mass spectrometer system (TAGA 6000E) under conditions that are within the ranges of pressures and offset voltages specified for conversion of adduct ions in the second ion guide chamber in the '784 patent.

In the charts set forth below, Applera demonstrates how the prior art teaches each and every element of the claims of the '784 patent. Applera primarily cites Lazar, Smith and Hager in the charts, but numerous other prior art references, discussed above and below, render the claims unpatentable as well.

1. **Claims 1 and 2 Are Unpatentable as Obvious Over Lazar in View of Smith, or Hager in View of Lazar, or Buchanan in View of either Smith or Thomson**

| Claim 1 | Lazar/Smith |
|---|---|
| A mass spectrometer system including a mass analyzer disposed in a high vacuum chamber for analyzing sample ions formed at atmospheric pressure and directed to the analyzer through intermediate vacuum chambers in which sample ions and solvent molecules form adduct ions with a reduction of | Lazar discloses a mass spectrometer system including a time of flight ("TOF") mass analyzer disposed in its fourth vacuum stage at a high vacuum pressure of $3–4 \times 10^{-7}$ Torr. (Figure 1; 3207). The mass spectrometer system is used to analyze sample ions formed at atmospheric pressure by an ESI source |

25

APL 067334

| | |
|---|---|
| sample ion current including: | (Figure 1, items 1 and 15 at p. 3206). The ions are directed from the ion source to the TOF mass analyzer through three intermediate vacuum chambers. (3206, 3207). Sample ions and solvent molecules form adduct ions with a reduction of ion current. Lazar specifically notes the formation of adducts in one of his experiments: "However, the paraquat spectrum was mainly composed of a series of *ion clusters*. The signal intensity at 93 *m/z* was extremely weak and dependent on the first quadrupole offset voltage." (3208; emphasis added). |
| first and second evacuated chambers directly preceding the mass analyzer chamber with the first chamber being at a higher pressure than the second chamber, | In Lazar's system, two vacuum chambers, denominated the "second vacuum stage" and the "third vacuum stage" directly precede the TOF mass analyzer chamber. (Figure 1; 3206-3207). The first of these two chambers is at a higher pressure ($1.5 \times 10^{-1}$ Torr) than the second of them ($7 \times 10^{-6}$ Torr). (3207). |
| a first multipole ion guide in the first chamber for guiding ions into said second chamber, | Lazar's system includes a first multipole ion guide in the first chamber for guiding ions into the second chamber. (See, e.g., 3206 ("The ion beam entering the second stage is subsequently passed through the first set of rf-only quadrupoles (5).") and 3207 ("ions are pulled out from the first set of rods and introduced into the third vacuum stage, which houses the second set of rf-only quadrupole rods (7).")). |
| a second multipole ion guide in the second chamber for guiding ions from the first chamber into the high vacuum chamber for mass analysis, and | Lazar's system includes a second multipole ion guide in a second chamber ("third vacuum stage") for guiding ions from the first chamber into the high vacuum chamber ("fourth vacuum stage") for mass analysis. (See, e.g., Figure 1; 3207 ("The third vacuum stage was necessary since the direct passage from the high-pressure region ($10^{-1} - 10^{-3}$ Torr) of the second stage to the desired low-pressure region of the fourth stage ($10^{-7}$ Torr) was not possible with the current pumping system."). The "fourth vacuum stage" houses the TOF mass analyzer. (Figure 1). |
| means associated with one or both of said first and second multipole ion guides for increasing the translational kinetic energy of the adduct ions so that at the vacuum pressure of the | There is an adjustable DC offset voltage between each of the two multipole ion guides and the preceding lens in Lazar's system, each of which can increase the translational kinetic |

26

APL 067335

| | |
|---|---|
| second interface chamber adduct ions traveling into the chamber are converted into sample ions without fragmentation of sample ions whereby to increase the sample ion current and therefore the sensitivity of the mass spectrometer system. | energy of adduct ions. (3208: "We also monitored the signal intensity as a function of the voltage applied to each ion optics element. A very strong dependence was found for the skimmer, *rods offset*, and interquad lens voltage." (Emphasis added). See also Figure 2 at 3208 (showing the offset voltage of the second ion guide ("Off2") as 30 V.) Thus, Lazar employs the "means" described in the specification of the '784 patent.<br><br>**Smith** describes conversion of solvent adduct ions by application of a DC offset voltage between an orifice and an ion guide in the range of 5-40 V in a pressure environment similar to that in the second ion guide chamber of Lazar. (Smith at 56 (1st col.)). The pressure of Smith's chamber is of "the order of $10^{-6}$ to $10^{-5}$ torr" and the pressure of Lazar's second ion guide chamber is $7 \times 10^{-6}$ torr. (Smith at 54 (2nd col.); Lazar at 3207). |
| **Claim 2** | **Lazar/Smith** |
| A mass analyzer as in claim 1 including ion lenses preceding each said multipole ion guide and a DC voltage is applied between a selected lens and its associated ion guide to increase the translational kinetic energy of the adduct ions entering the second interface chamber. | Skimmer (4) precedes the first ion guide and "interquad lens" (6) precedes the second ion guide. There is an adjustable DC offset voltage between each of the two multipole ion guides and the preceding lens in **Lazar's** system, each of which can increase the translational kinetic energy of adduct ions. (3208; Figure 2). |

The charts show that Lazar discloses each of the elements of claims 1 and 2, except the

adjustment of the DC offset voltage in his second ion guide chamber specifically to convert

solvent adduct ions to sample ions. It was well-known to those skilled in the art to convert

solvent adduct ions to sample ions in ion guide chambers at various pressures by adjusting the

DC offset voltage appropriately. It would have been obvious in view of Smith to adjust the DC

offset voltage of Lazar's second ion guide appropriately to convert adduct ions where present to

sample ions at the similar pressure of Lazar's second ion guide chamber without fragmentation

of the sample ions. The person of ordinary skill in the art as of 1999 would have been motivated

APL 067336

to do so and would have expected success on the basis of his understanding of the collisional

dissociation technique for converting adduct ions to sample ions and the well-known

implementation of the technique using a DC offset voltage between a multipole ion guide and a

preceding lens.  Therefore, claims 1 and 2 are unpatentable over Lazar in view of Smith under 35

U.S.C. § 103.

　　　　Claim 1 and 2 are unpatentable based on the combined teachings of other references as

well.  As shown in the following chart, Hager discloses each element of claims 1 and 2 except

the inclusion of an ion guide in the first of the two successive vacuum chambers that precede the

mass analyzer.  However, Lazar discloses two successive ion guide stages preceding a mass

analyzer.

| Claim 1 | Hager/Lazar |
|---|---|
| A mass spectrometer system including a mass analyzer disposed in a high vacuum chamber for analyzing sample ions formed at atmospheric pressure and directed to the analyzer through intermediate vacuum chambers in which sample ions and solvent molecules form adduct ions with a reduction of sample ion current including: | Hager discloses a mass spectrometer system (Fig. 2 or Fig. 10a) including a mass analyzer (quadrupole mass analyzer Q1 in Fig. 2; triple quadrupole analyzer in Fig. 10a) in a high vacuum chamber for analyzing sample ions formed at atmosphere (col. 5: 47-5: ESI source or ion spray source) and directed through intermediate vacuum chambers (col. 5: 53-58: chamber 28 pumped by pump 29 to a pressure of 2 torr and chamber 30 pumped by pump 31 to   a pressure of $8 \times 10^{-3}$ torr).  Hager states that "[i]ons generated by electrospray ionization techniques may enter the vacuum chamber as monomers, monomers clustered with solvent molecules, and possibly multimers with and without solvent molecules attached." (Col. 10:45-48). |
| first and second evacuated chambers directly preceding the mass analyzer chamber with the first chamber being at a higher pressure than the second chamber, | In Hager's system, two vacuum chambers (chamber 28 and chamber 30) directly precede the analyzer chamber, with chamber 28 at a higher pressure than chamber 30 (2 torr versus $8 \times 10^{-3}$ torr).

Lazar's system also includes two vacuum chambers directly preceding an analyzer, the |

28

APL 067337

| | first of which is at a higher pressure than the second (1.5 x $10^{-1}$ Torr versus 7 x $10^{-6}$ torr (which is below the pressure of 1 mTorr specified in the '784 patent)). |
|---|---|
| a first multipole ion guide in the first chamber for guiding ions into said second chamber, | **Lazar's** system includes a first ion guide (5) in a first chamber for guiding ions into a second chamber that includes a second ion guide (7). |
| a second multipole ion guide in the second chamber for guiding ions from the first chamber into the high vacuum chamber for mass analysis, and | In **Hager's** system, chamber 30 includes quadrupole ion guide Q0 for guiding ions from chamber 28 to the analyzer chamber. (Col. 5:53-58). |
| means associated with one or both of said first and second multipole ion guides for increasing the translational kinetic energy of the adduct ions so that at the vacuum pressure of the second interface chamber adduct ions traveling into the chamber are converted into sample ions without fragmentation of sample ions whereby to increase the sample ion current and therefore the sensitivity of the mass spectrometer system. | **Hager** discloses adding translational kinetic energy to the adduct ions as they travel through the chambers 28 and 30 by applying DC offset voltages between the orifice and skimmer in chamber 28 and between the skimmer and Q0 in chamber 30 such that adduct ions are dissociated in the chamber 30. **Hager** states: "Various stages of declustering are commonly used to reduce this mixture of ionic species to a larger proportion of bare monomer ions to solvated ions. Conventional declustering methodologies include . . . collisional dissociation by acceleration of the ions through relatively high pressure regimes using voltage gradients between the orifice and skimmer and between the skimmer and Q0." (Col. 10:51-56). |
| **Claim 2** | **Hager/Lazar** |
| A mass analyzer as in claim 1 including ion lenses preceding each said multipole ion guide and a DC voltage is applied between a selected lens and its associated ion guide to increase the translational kinetic energy of the adduct ions entering the second interface chamber. | In **Hager's** system, an ion lens precedes a skimmer in the first vacuum stage and a DC voltage is applied between the lens and the skimmer, and an ion lens (the skimmer) precedes a quadrupole ion guide in the second vacuum stage and a DC voltage is applied between lens and the ion guide. The DC voltage between the skimmer and the quadrupole ion guide increases the translational kinetic energy of adduct ions entering the second chamber. (Fig. 2; Col. 10:51-56).<br><br>In **Lazar's** system, skimmer (4) precedes the first ion guide and "interquad lens" (6) precedes the second ion guide. There is an adjustable DC offset voltage between each of |

APL 067338

|  | the two multipole ion guides and the preceding lens, each of which can increase the translational kinetic energy of adduct ions. (Fig. 1; 3208). |
|---|---|

It would have been obvious to a person skilled in the art as of 1999 in view of Lazar's teaching of a double ion guide interface to add a multipole ion guide to the first vacuum chamber of Hager and apply the DC voltage between the entrance orifice (lens) and the ion guide, as in the first ion guide chamber of Lazar. The person skilled in the art would have been motivated to do so and would have expected success based on his knowledge of the well-known advantages of multipole ion guides for containing and transmitting ions through differentially pumped vacuum stages in a multistage interface, as exemplified by Lazar.

Claims 1 and 2 are also unpatentable over the combined teachings of Buchanan and either Smith or Thomson. Like Lazar, Buchanan discloses a mass spectrometer system in which multiple vacuum chambers each containing a multipole ion guide (octapoles 1, 2, 3) provide the interface between an atmospheric pressure ion source (ESI) and a mass analyzer (FTICR mass analyzer disposed in a vacuum chamber at $10^{-8}$ and $10^{-9}$ torr). The ions and solvent molecules form adducts upon entering in the vacuum region which can reduce sample ion current. The two vacuum chambers in which octapoles #2 and #3 are present immediately precede the mass analyzer chamber, and the pressure in the octapole #2 chamber ($10^{-4}$ torr) is higher than the pressure of the octapole #3 chamber ($10^{-6}$ torr). Octapole #2 guides ions into the vacuum chamber containing octapole #3. Octapole #3 guides ions from the chamber containing octapole #2 into the high vacuum chamber for mass analysis. Octapoles #2 and #3 each have variable DC offset voltages that can be set to increase the translational kinetic energy of adduct ions. Buchanan thus discloses each of the elements of claim 1 except that Buchanan does not explicitly state that DC offset voltage in the octapole #3 ion guide chamber may be adjusted

30

APL 067339

appropriately to convert any adduct ions present to sample ions.

As noted above, Smith describes conversion of adduct ions by application of a DC offset voltage between an orifice and an ion guide in the range of 5-40 V in a pressure environment similar to that in the octapole #3 ion guide chamber of Buchanan. (Smith at 56 (1st col.)). The pressure of Smith's chamber is of "the order of $10^{-6}$ to $10^{-5}$ torr" and the pressure of octapole #3 ion guide chamber is $10^{-6}$ torr. (Smith at 54 (2nd col.); Buchanan at 518). Alternatively, Thomson teaches that in a mass spectrometer having more than one multipole ion guide, adduct ions can be converted to sample ions by applying an appropriate DC offset voltage between any one or more of the RF-only quadrupoles and its preceding lens. Thomson specifically described declustering solvent adducts, without fragmentation, in the last of a series of RF-only quadrupoles that immediately precedes a mass analyzer. The person of ordinary skill in the art as of 1999 would have been motivated to combine the teachings of Buchanan and either Smith or Thomson to adjust the DC offset voltage in the octapole #3 ion guide chamber appropriately to convert any adduct ions present to sample ions and would have expected success on the basis of his understanding of the collisional dissociation technique for converting adduct ions to sample ions and the well-known implementation of the technique using a DC offset voltage between a multipole ion guide and a preceding lens. Therefore, claims 1 and 2 are unpatentable over Buchanan in view of either Smith or Thomson under 35 U.S.C. § 103.

2.    Claim 3 is Unpatentable as Anticipated by Any of Smith, Kambara, Chowdhury, Kato, Klientop, Thomson, Tomany or Hager

| Claim 3 | Smith |
|---|---|
| A method of mass analyzing sample ions produced at atmospheric pressure and introduced into a mass analyzer disposed in a vacuum chamber, and in which some sample ions and solvent molecules combine to form adduct ions with a reduction of sample ions | Smith describes a method of mass analyzing sample ions in the TAGA 6000 mass spectrometer system, in which ions are produced at atmospheric pressure by an electrospray ion source and introduced into a mass analyzer (Q1 and/or Q3 mass analyzing |

31

APL 067340

| | |
|---|---|
| comprising the step of | quadrupoles) disposed in a vacuum chamber (vacuum chamber at $10^{-6}$ to $10^{-5}$ torr). Smith describes the existence of solvent adduct ions in the TAGA 6000 mass spectrometer system with the DC offset voltage between the multipole ion guide (Q0) and preceding lens (Or) set to 0, and the consequent reduction of sample ions. (56 (1st col.): "when $\Delta$(Or-Q0) = 0 V, the cytochrome c molecular ion peaks exhibit substantial tailing to higher m/z, which is attributed to unresolved adduction or solvent association.") |
| dissociating the adduct ions prior to entry into the mass analyzer to form sample ions to increase the sample ion current entering into the mass analyzer. | Smith describes dissociation of the adduct ions prior to entry into the mass analyzer when the DC offset voltage is adjusted to 5-40 V. ((56 (1st col.): "Under typical operating conditions, with $\Delta$(Or-Q0) of typically +5-40 V chosen to optimize desolvated molecular ion intensity, solvent association is essentially eliminated. . . .") |

Smith anticipates the single step method of claim 3. Other references likewise anticipate claim 3. Each of Kambara, Chowdhury, Kato, Klientop, Thomson, Tomany and Hager discloses use of a mass analyzer housed in vacuum chamber for the mass analysis of sample ions produced at atmospheric pressure. Kambara, 130, Fig. 1; Chowdhury, col. 5:39-45, Fig. 1 (31); Kato, col. 7: 34-36, Fig. 8 (8); Klientop, 905, Fig. 1; Thomson, 1092; Tomany, col. 5: 54-63, Fig. 1 (21, 22); Hager, col. 5: 63-67, Fig. 2. Each of these references discloses the well-known problem of solvent adduct ion formation. Kambara, 130; Chowdhury, col. 2: 19-24, col. 5: 27-31; Kato, col. 4:61 – col. 5: 6, col. 5: 20-22; Klientop, 905; Thomson, 1092; Tomany, col. 5: 11-16; Hager, col. 10: 45-51. Each of these references discloses dissociation of adduct ions prior to entry into the mass analyzer to increase the sample ion current entering the mass analyzer. Kambara, 135 (discussing dissociation of cluster ions to "molecular or quasi-molecular ions" prior to entering the mass analyzer); Chowdhury, col. 3: 54-58 ("The ions exit into a vacuum chamber where solvent is further removed by collisional activation and then the charged ions pass through the

32

APL 067341

hole in the skimmer, through the holes in the lenses and baffle and into the analyzer."); col. 5:

49-63; Kato, col. 7:18-28 and Fig. 8; Klientop, 905 (under "Results": "The mass spectra of

Figures 2b demonstrate a significant increase in molecular ion production using . . . higher tube

lens voltages . . ."); Thomson, 1092 (col. 2: "Thus for each charge state there is an optimum

voltage for declustering without fragmentation"); Tomany, col. 5: 11-19, 26-37 (discussing the

desolvation that occurs in chambers 14 and 17); Hager, col. 10: 51-58 ("ion acceleration

techniques . . . often result in spectra dominated by predominantly declustered ions").

      Therefore, claim 3 is unpatentable as anticipated by any one of Smith, Kambara,

Chowdhury, Kato, Klientop, Thomson, Tomany or Hager.

      **3.**    **Claims 4-8 are Unpatentable as Obvious Over Lazar in View of Smith, or Hager in View of Lazar, or Buchanan in View of either Smith or Thomson**

| Claim 4 | Lazar/Smith |
|---|---|
| The method of operating a mass spectrometer system including a mass analyzer which analyzes sample ions formed at atmospheric pressure, and in which some sample ions and solvent molecules combine to form adduct ions with a reduction of sample ions, said system including first and second multipole ion guides disposed in serial first and second evacuated chambers separated by an ion lens for guiding analyte ions into said mass analyzer and an ion lens defining the first evacuated chamber which comprises | Lazar discloses a method of operating a mass spectrometer system including a time of flight ("TOF") mass analyzer (Figure 1, items 9-14; 3206-07) which analyzes sample ions formed at atmospheric pressure by an ESI source (Figure 1, items 1, 15; 3206). Sample ions and solvent molecules form adduct ions with a reduction of ion current. Lazar specifically notes the formation of adduct ions: "However, the paraquat spectrum was mainly composed of a series of ion clusters. The signal intensity at 93 *m/z* was extremely weak and dependent on the first quadrupole offset voltage." (3208). Lazar's system includes two serial vacuum chambers separated by an ion lens ("interquad lens" 6 in Fig. 1) each of which contains an RF-only quadrupole ion guide (5,7 in Fig. 1) for guiding ions into the mass analyzer. An ion lens (skimmer 4 in Fig. 1) defines the first of the two ion guide chambers. (Figure 1; 3206-3207). |
| applying a DC offset voltage between a selected one or both lenses and the succeeding | An adjustable DC offset voltage is applied between each of the two multipole ion guides |

33

APL 067342

| | |
|---|---|
| multipole ion guide having an amplitude so as to provide translational kinetic energy to said adduct ions to dissociate the adduct ions without dissociating sample ions at the pressure of the second chamber to increase the sample ion current and the sensitivity of the mass spectrometer system. | and the preceding lens in **Lazar's** system, each of which can provide translational kinetic energy to adduct ions.   (3208: "We also monitored the signal intensity as a function of the voltage applied to each ion optics element. A very strong dependence was found for the skimmer, *rods offset,* and interquad lens voltage."  See also Figure 2 at 3208 (showing the offset voltage of the second ion guide ("Off2") as 30 V.) |
| | **Smith** describes dissociation of adduct ions without dissociating sample ions by application of a DC offset voltage between an orifice and an ion guide in the range of 5-40 V in a pressure environment similar to that in the second ion guide chamber of Lazar.  (Smith at 56 (1st col.)).  The pressure of Smith's chamber is of "the order of $10^{-6}$ to $10^{-5}$ torr" and the pressure of Lazar's second ion guide chamber is 7 x $10^{-6}$ torr.  (Smith at 54 (2nd col.); Lazar at 3207). |
| **Claim 5** | **Lazar/Smith** |
| A mass spectrometer system as in claim 4 in which the pressure in the first chamber is below 500 mTorr, and in the second chamber is below 1 mTorr, and the offset voltage applied between the interchamber lens and the second multipole ion guide is between ±10 volts and ±30 volts. | The pressure in **Lazar's** first chamber ("second vacuum stage") is below 500 mTorr (1.5 x 10$^{-1}$ Torr) and the pressure in the second chamber ("third vacuum stage") is below 1 mTorr (7 x 10$^{-6}$ Torr).  There is an adjustable DC offset voltage between the "interquad lens" (6) and the second quadrupole ion guide.  (Fig. 1, 3206, 3297, 3208). |
| | **Smith** describes conversion of adduct ions by application of a DC offset voltage between an orifice and an ion guide in the range of 5-40 V in a pressure environment similar to that in the second ion guide chamber of Lazar.  (56 (1st col.)) |
| **Claim 6** | **Lazar/Smith** |
| A mass spectrometer system as in claim 5 in which the pressure in the first chamber is less than 250 mTorr, and in the second chamber is less than 0.7 mTorr. | The pressure in **Lazar's** first chamber is below 250 mTorr (1.5 x 10$^{-1}$ Torr) and the pressure in the second chamber is below 0.7 mTorr (7 x 10$^{-6}$ Torr.  (Fig. 1, 3206, 3207). |
| **Claim 7** | **Lazar/Smith** |
| A mass spectrometer system as in claim 5 in which the pressure in the first chamber less | The pressure in **Lazar's** first chamber is below 175 mTorr (1.5 x 10$^{-1}$ Torr) and the pressure in |

34

APL 067343

| than 175 mTorr, and in the second chamber is less than 0.5 mTorr. | the second chamber is below 0.5 mTorr (7 x $10^{-6}$ Torr. (Fig. 1, 3206, 3207). |
|---|---|
| **Claim 8** | **Lazar/Smith** |
| A mass spectrometer as in claim 6 or 7 in which the offset voltage is ±10 volts. | In **Lazar's** system, there is an adjustable DC offset voltage between the "interquad lens" (6) and the second quadrupole ion guide. (Fig. 1, 3206, 3297, 3208).<br><br>**Smith** describes conversion of adduct ions by application of a DC offset voltage between an orifice and an ion guide in the range of 5-40 V in a pressure environment similar to that in the second ion guide chamber of Lazar. (56 (1st col.)) |

The charts above shows that Lazar discloses each of the elements of claims 4-8, except

that Lazar does not state that the DC offset voltage in his second ion guide is adjusted

specifically to convert solvent adduct ions to sample ions in his second ion guide chamber. It

was well-known to those skilled in the art to dissociate adduct ions without dissociating sample

ions in ion guide chambers at various pressures by adjusting the DC offset voltage appropriately.

It would have been obvious in view of Smith to adjust the DC offset voltage of Lazar's second

ion guide appropriately to convert adduct ions where present to sample ions at the similar

pressure of Lazar's second ion guide chamber without fragmentation of the sample ions. The

person of ordinary skill in the art as of 1999 would have been motivated to do so and would have

expected success on the basis of his understanding of the collisional dissociation technique for

converting adduct ions to sample ions and the well-known implementation of the technique using

a DC offset voltage between a multipole ion guide and a preceding lens.

Therefore, claims 4-8 are unpatentable over Lazar in view of Smith under 35 U.S.C. §

103.

APL 067344

| Claim 4 | Hager/Lazar |
|---|---|
| The method of operating a mass spectrometer system including a mass analyzer which analyzes sample ions formed at atmospheric pressure, and in which some sample ions and solvent molecules combine to form adduct ions with a reduction of sample ions, said system including first and second multipole ion guides disposed in serial first and second evacuated chambers separated by an ion lens for guiding analyte ions into said mass analyzer and an ion lens defining the first evacuated chamber which comprises | Hager discloses a method of operating a mass spectrometer system including a quadrupole mass analyzer (Fig. 1 (Q1); col. 3:63-66) which analyzer ions formed at atmospheric pressure by an ESI or ion spray source (col. 5:47-50). Sample ions and solvent molecules form adduct ions with a reduction of ion current. Hager states that "[i]ons generated by electrospray ionization techniques may enter the vacuum chamber as monomers, monomers clustered with solvent molecules, and possibly multimers with and without solvent molecules attached." (Col. 10:45-48). Hager's system includes serial first and second evacuated chambers (Fig. 1: 28, 30) separated by an ion lens (skimmer). Ions are guided through chamber 28 and chamber 30, which contains an RF-only quadrupole ion guide Q0. (Col. 5:53-58).

Lazar's system includes two serial vacuum chambers separated by an ion lens ("interquad lens" 6 in Fig. 1) each of which contains an RF-only quadrupole ion guide (5,7 in Fig. 1) for guiding ions into the mass analyzer. An ion lens (skimmer 4 in Fig. 1) defines the first of the two ion guide chambers. (Figure 1; 3206-3207). |
| applying a DC offset voltage between a selected one or both lenses and the succeeding multipole ion guide having an amplitude so as to provide translational kinetic energy to said adduct ions to dissociate the adduct ions without dissociating sample ions at the pressure of the second chamber to increase the sample ion current and the sensitivity of the mass spectrometer system. | Hager discloses adding translational kinetic energy to the adduct ions as they travel through the chambers 28 and 30 by applying DC offset voltages between the orifice and skimmer in chamber 28 and between the skimmer and Q0 in chamber 30 such that adduct ions are dissociated in the chamber 30. Hager states:

"Various stages of declustering are commonly used to reduce this mixture of ionic species to a larger proportion of bare monomer ions to solvated ions. Conventional declustering methodologies include . . . collisional dissociation by acceleration of the ions through relatively high pressure regimes using voltage gradients between the orifice and skimmer and between the skimmer and Q0." (Col. 10:51- |

36

APL 067345

|  | 56). |
| --- | --- |
| **Claim 5** | **Hager/Lazar** |
| A mass spectrometer system as in claim 4 in which the pressure in the first chamber is below 500 mTorr, and in the second chamber is below 1 mTorr, and the offset voltage applied between the interchamber lens and the second multipole ion guide is between ±10 volts and ±30 volts. | The pressures in **Hager's** first and second vacuum chambers are above 500 mTorr (2000 mTorr in Hager's first chamber) and 1 mTorr (8 mTorr in Hager's second chamber). However, it would have been obvious to use pumps that would achieve slightly lower pressures in these chambers.   Hager states that "[c]onventional DC offsets are also applied to the various rods and to the interface plates from the DC power supply 38." (Col. 6:11-12).

The pressure in **Lazar's** first chamber ("second vacuum stage") is below 500 mTorr (150 mTorr) and the pressure in the second chamber ("third vacuum stage") is below 1 mTorr (0.007 mTorr).  There is an adjustable DC offset voltage between the "interquad lens" (6) and the second quadrupole ion guide.  (Fig. 1, 3206, 3297, 3208). |
| **Claim 6** | **Hager/Lazar** |
| A mass spectrometer system as in claim 5 in which the pressure in the first chamber is less than 250 mTorr, and in the second chamber is less than 0.7 mTorr. | The pressures in **Hager's** first and second vacuum chambers are above 500 mTorr (2000 mTorr in Hager's first chamber) and 1 mTorr (8 mTorr in Hager's second chamber). However, it would have been obvious to use pumps that would achieve slightly lower pressures in these chambers.

The pressure in **Lazar's** first chamber is below 250 mTorr ($1.5 \times 10^{-1}$ Torr) and the pressure in the second chamber is below 0.7 mTorr ($7 \times 10^{-6}$ Torr.  (Fig. 1, 3206, 3207). |
| **Claim 7** | **Hager/Lazar** |
| A mass spectrometer system as in claim 5 in which the pressure in the first chamber is less than 175 mTorr, and in the second chamber is less than 0.5 mTorr. | The pressures in **Hager's** first and second vacuum chambers are above 500 mTorr (2000 mTorr in Hager's first chamber) and 1 mTorr (8 mTorr in Hager's second chamber). However, it would have been obvious to use pumps that would achieve slightly lower pressures in these chambers.

The pressure in **Lazar's** first chamber is below 175 mTorr ($1.5 \times 10^{-1}$ Torr) and the pressure in |

37

APL 067346

| | |
|---|---|
| | the second chamber is below 0.5 mTorr (7 x $10^{-6}$ Torr. (Fig. 1, 3206, 3207). |
| **Claim 8** | **Hager/Lazar** |
| A mass spectrometer as in claim 6 or 7 in which the offset voltage is ±10 volts. | **Hager** states that "[c]onventional DC offsets are also applied to the various rods and to the interface plates from the DC power supply 38." (Col. 6:11-12). In **Lazar's** system, there is an adjustable DC offset voltage between the "interquad lens" (6) and the second quadrupole ion guide. (Fig. 1, 3206, 3297, 3208). |

As shown in the charts, Hager discloses each element of claims 4-8 except the inclusion of an ion guide in the first of the two successive vacuum chambers the precede the mass analyzer and the pressure ranges recited in dependent claims 5-7. However, Lazar teaches the benefits of two successive ion guide stages preceding a mass analyzer, and Lazar teaches the pressure ranges recited in claims 5-7. It would have been obvious to a person skilled in the art as of 1999 in view of Lazar's teaching of a double ion guide interface to add a multipole ion guide to the first vacuum chamber of Hager and apply the DC voltage between the entrance orifice (lens) and the ion guide, as in the first ion guide chamber of Lazar. The person skilled in the art would have been motivated to do so and would have expected success based on the well-known advantages of multipole ion guides for containing and transmitting ions through differentially pumped vacuum stages in a multistage interface, as exemplified by Lazar. It would also have been obvious to use pumps in the system of Hager that would achieve slightly lower pressures within the ranges claimed in claims 5-7 in the first and second vacuum chambers.

Therefore claims 4-8 are unpatentable over Hager in view of Lazar under 35 U.S.C. § 103.

Claims 4-8 are also unpatentable over Buchanan in view of either Smith or Thomson for the reasons discussed above with regard to claim 1 on pages 31-32.

APL 067347

4.   **Claim 9 Is Unpatentable as Anticipated by Hager, or as Obvious Over Lazar in View of Smith, or Buchanan in View of either Smith or Thomson**

| Claim 9 | Hager |
|---|---|
| The method of analyzing ions in a mass analyzer which includes a first chamber maintained at a first pressure and a second chamber maintained at a lower pressure comprising the steps of: | Hager discloses a method of analyzing ions in a mass analyzer (quadrupole mass analyzer). The system includes a chamber (region 28 pumped by pump 29) at a pressure of 2 torr and a chamber (chamber 30 pumped by pump 31) at lower pressure of $8 \times 10^{-3}$ torr. Col. 5:53-58. |
| forming sample ions at atmospheric pressure with some of the sample ions combining with solvent ions to form adduct ions, | Hager states that "[i]ons generated by electrospray ionization techniques may enter the vacuum chamber as monomers, monomers clustered with solvent molecules, and possibly multimers with and without solvent molecules attached." Col. 10:45-48. |
| guiding said sample ions and adduct ions through at least a first chamber maintained at a first pressure and a second chamber maintained at a lower pressure, | Hager states that ions are guided through chamber 28 and chamber 30, which contains an RF-only quadrupole ion guide Q0. Col. 5:53-58. |
| adding translational kinetic energy to said adduct ions as they travel through said chambers such that in the second chamber the adduct ions are dissociated without fragmenting the sample ions prior to entering the mass analyzer. | Hager discloses adding translational kinetic energy to the adduct ions as they travel through the chambers 28 and 30 by applying DC offset voltages between the orifice and skimmer in chamber 28 and between the skimmer and Q0 in chamber 30 such that adduct ions are dissociated in the chamber 30. Hager states:<br><br>"Various stages of declustering are commonly used to reduce this mixture of ionic species to a larger proportion of bare monomer ions to solvated ions. Conventional declustering methodologies include . . . collisional dissociation by acceleration of the ions through relatively high pressure regimes using voltage gradients between the orifice and skimmer and between the skimmer and Q0." Col. 10:51-56. |

Hager discloses each element of claim 9. The collisional dissociation of adduct ions in chamber 30 occurs as a consequence of the acceleration provided by voltage gradient between the skimmer and Q0. Therefore, claim 9 is unpatentable as anticipated by Hager.

39

APL 067348

Claim 9 is also unpatentable because its method would have been obvious over Lazar in

view of Smith as set forth in the claim charts below:

| Claim 9 | Lazar/Smith |
|---|---|
| The method of analyzing ions in a mass analyzer which includes a first chamber maintained at a first pressure and a second chamber maintained at a lower pressure comprising the steps of: | Lazar discloses a method of analyzing ions in a mass analyzer (TOF mass analyzer) in a mass spectrometer system that includes a first chamber maintained at a pressure of $1.5 \times 10^{-1}$ Torr and a second maintained at a lower pressure of $7 \times 10^{-6}$ Torr. (3206-07; Fig. 1.) |
| forming sample ions at atmospheric pressure with some of the sample ions combining with solvent ions to form adduct ions, | Lazar specifically notes the formation of adduct ions: "However, the paraquat spectrum was mainly composed of a series of ion clusters. The signal intensity at 93 *m/z* was extremely weak and dependent on the first quadrupole offset voltage." (3208.)<br><br>Sample ions are formed at atmospheric pressure using an ESI source, which, as Smith observes, gives rise to formation of adduct ions: "Residual association of solvent (or other neutral species) at typical ESI source conditions is likely ubiquitous."[4] (56.) |
| guiding said sample ions and adduct ions through at least a first chamber maintained at a first pressure and a second chamber maintained at a lower pressure, | In device disclosed by Lazar, ions are guided through the first and second (lower pressure) chambers by multipole ion guides. (3206; Fig. 1.) |
| adding translational kinetic energy to said adduct ions as they travel through said chambers such that in the second chamber the adduct ions are dissociated without fragmenting the sample ions prior to entering the mass analyzer. | Lazar discloses that translational kinetic energy is added to any adduct ions as they travel through the chambers by DC offset voltages between the multipole ion guides and their respective preceding lenses: "We also monitored the signal intensity as a function of the voltage applied to each ion optics element. A very strong dependence was found for the skimmer, *rods offset*, and interquad lens voltage." (3208.)<br><br>While Lazar does not observe that dissociation of adduct ions occurs in the second chamber, |

---

[4]      *See also* Cole at 120 ("In any design of an API mass spectrometer, the problem of the formation of cluster ions is addressed.  Polar molecules that tend to cluster with ions are water and solvent vapor present in air or generated by the evaporation of the elute . . .").

40

APL 067349

| | **Smith** describes dissociation of adduct ions without fragmenting sample ions by application of a DC offset voltage between an orifice and an ion guide in the range of 5-40 V in a pressure environment similar to that in the second ion guide chamber of Lazar. (Smith at 56, 1st col.)  The pressure of Smith's chamber is of "the order of $10^{-6}$ to $10^{-5}$ torr" and the pressure of Lazar's second ion guide chamber is $7 \times 10^{-6}$ torr. (Smith at 54, 2nd col.; Lazar at 3207.) |
|---|---|

The charts above show that Lazar discloses each of the elements of claim 9, except that Lazar does not state that adding translational kinetic energy to adduct ions as they travel through the chambers such that in his second chamber, the DC offset is adjusted specifically to convert solvent adduct ions to sample ions in his second ion guide chamber.  It was well-known to those skilled in the art to dissociate adduct ions without dissociating sample ions in ion guide chambers at various pressures by adjusting the DC offset voltage appropriately.  It would have been obvious in view of Smith to adjust the DC offset voltage of Lazar's second ion guide appropriately to convert adduct ions where present to sample ions at the similar pressure of Lazar's second ion guide chamber without fragmentation of the sample ions.  The person of ordinary skill in the art as of 1999 would have been motivated to do so and would have expected success on the basis of his understanding of the collisional dissociation technique for converting adduct ions to sample ions and the well-known implementation of the technique using a DC offset voltage between a multipole ion guide and a preceding lens.  Therefore, claim 9 is unpatentable over Lazar in view of Smith under 35 U.S.C. § 103.

Claim 9 is also unpatentable over Buchanan in view of either Smith or Thomson for the reasons discussed above with regard to claim 1 on pages 31-32.

APL 067350

## III.    CONCLUSION

Substantial new questions of patentability are introduced by the cited references, as indicated in the claim charts and analysis set forth above.  Based on the foregoing, reexamination is requested.

Respectfully submitted,

Date:   September 16, 2005

Lewis V. Popovski  (Reg. No. 37,423)
KENYON & KENYON
One Broadway
New York, N.Y.  10004
(212) 425-7200 (telephone)
(212) 425-5288 (facsimile)

*Attorney for Applera Corporation*

42

APL 067351

# EXHIBIT G

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
COGNEX CORPORATION, Plaintiff,
v.
NATIONAL INSTRUMENTS CORPORATION,
Defendant.
**No. Civ.A. 00-442-JJF.**

June 29, 2001.

Neal C. Belgam, and Dale R. Dube, of Blank Rome Comisky & McCauley LLP, Wilmington, Delaware, George M. Sirilla, G. Paul Edgell, and William P. Atkins, of Pillsbury Winthrop LLP, Washington, D.C., for Plaintiff, of counsel.

William J. Marsden, Jr., and John T. Meli, Jr., of Fish & Richardson P.C., Wilmington, Delaware, Frank E. Scherkenbach, David M. Barkan, and John V. Picone III, of Fish & Richardson P.C., Menlo Park, California, for Defendant, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.

**\*1** Pending before the Court in this patent infringement action is Cognex Corporation's Motion To Stay Or, In The Alternative, For An Extension Of The Deadlines In This Case (D.I.84). By its Motion, Plaintiff, Cognex Corporation ("Cognex"), requests a stay or, in the alternative, a three month delay in the proceedings in this case, because it has requested a reexamination of a patent in suit by the United States Patent and Trademark Office ("PTO"). By letter dated May 29, 2001, Cognex advised the Court that the PTO granted Cognex's request for reexamination of United States Patent No. 5,481,712 (the " '712 Patent"). Cognex contends that reexamination of the '712 Patent will narrow and/or resolve the issues in this case. Specifically, Cognex contends that if the '712 Patent is declared unpatentable, it is likely that the patent litigation will be dismissed. On the other hand, if the PTO finds the '712 Patent patentable over the prior art, Cognex contends that the PTO decision might encourage the parties to settle this action.

Defendant, National Instruments Corporation ("National Instruments"), opposes any stay in this case. Specifically, National Instruments contends that

a stay would cause National Instruments severe prejudice because: (1) the litigation schedule and trial date would be delayed causing National Instruments additional expense; (2) Cognex would be able to continue to hold the specter of litigation over National Instruments and its customers; and (3) Cognex has already forced National Instruments to spend over a million dollars defending itself in this action before requesting the stay, despite the fact that Cognex had the materials necessary to seek reexamination earlier.

After reviewing the parties' positions with respect to the instant motion and the applicable law, the Court concludes that a stay and/or extension is not warranted in this case. Accordingly, for the reasons discussed, the Court will deny Cognex's Motion To Stay Or, In The Alternative, For An Extension Of The Deadlines In This Case.

DISCUSSION

The decision to grant or deny a stay is within the court's broad range of discretionary powers. *Dentsply International, Inc. v. Kerr Manufacturing Co.,* 734 F.Supp. 656, 658 (D.Del.1990) (citations omitted). In determining whether a stay is appropriate, the court should "weigh the competing interests of the parties and attempt to maintain an even balance." *Id.* In weighing the interests involved, courts are generally guided by such factors as (1) whether a stay would unduly prejudice or present a clear tactical advantage to the non-movant; (2) whether a stay will simplify the issues raised by the parties; and (3) whether discovery is complete and a trial date has been set. *Gioello Enterprises Ltd. v. Mattel, Inc.,* 2001 WL 125340 (D.Del. Jan.29, 2001); *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991). In balancing these factors, courts must be particularly mindful of the consequences of the stay on other parties. *Dentsply International,* 734 F.Supp. at 658 (recognizing that Court must consider whether "there is 'even a fair possibility' that the stay would work damage on another party") (citations omitted). Where a stay will forestall the trial date agreed upon by the parties, this Court has required the party requesting the stay to "make a showing of 'a clear case of hardship or inequity' before the Court can enter a stay order." *Id.* (citing *Gold v. Johns-Manville Sales Corp.,* 723 F.2d 1068, 1076 (3d Cir.1983)).

**\*2** In this case, discovery was scheduled to close on May 4, 2001, less than three weeks before Cognex filed the instant Motion To Stay, and trial is scheduled for October 23, 2001. [FN1] Accordingly,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cognex must demonstrate a clear case of hardship or inequity before the Court will enter an order staying this action.

> FN1. Although discovery has since been extended until July 2001 by stipulation between the parties (D.I.106), the trial date in this case has not been changed.

After reviewing the parties' arguments, the Court concludes that Cognex cannot demonstrate a clear case of hardship or inequity, and that National Instruments would be prejudiced if the Court were to grant a stay in this case. Cognex primarily contends that reexamination will simplify the issues in this case such that the litigation may be settled or dismissed and the parties' expenses significantly reduced. However, as National Instruments points out, Cognex's complaint alleges a variety of claims which are not linked to the patent infringement claim, including claims of copyright and trademark infringement and unfair competition, all of which will require a trial.

In addition, Cognex contends that the reexamination may result in changed claims, which would cause this action to be litigated twice, wasting the Court's and the parties' resources. However, the Court is unpersuaded by Cognex's contention. The trial in this case is scheduled for October 2001, and the PTO granted Cognex's request for reexamination in May 2001. Although Cognex disputes the figures provided by National Instruments concerning the pendency of applications in the PTO because National Instruments relies on original applications rather than reexamination applications, even Cognex's figures suggest that the median reexamination time is 16 months. Thus, given the current time tables for action in the PTO, the Court believes that the trial in this case will likely be completed prior to any action by the PTO. (D.I. 87 at Exh. G; D.I. 94, Exh. D).

Further, any hardship incurred by Cognex as a result of its request for reexamination is, in part, a result of Cognex's own making. National Instruments contends and Cognex has not disputed, that Cognex has had at least some of the documents it presented to the PTO in its request for reexamination for quite some time. National Instruments identified specific prior art references in its Answer to the Complaint in June 2000, yet Cognex waited until six months before the scheduled trial date in this case to seek reexamination of the '712 Patent. [FN2] Accordingly, the Court cannot conclude that Cognex has demonstrated a clear case of hardship or inequity justifying a stay in this case. *Dentsply*, 734 F.Supp. at

659 ("The Court will not elevate [a party's] failure to address its concerns in a timely fashion to an example of hardship warranting a stay."); *see also Remington Arms Company, Inc. v. Modern Muzzleloading, Inc.,* 1998 WL 1037920 (D.N.C. Dec.17, 1998) (denying stay where trial date set and defendant's delay in requesting reexamination with PTO was unjustified given that defendant knew of the prior art forming its request for reexamination well prior to its reexamination request).

> FN2. Although Cognex contends that National Instruments did not produce many of these documents until much later, National Instruments also contends and Cognex has not disputed, that some of the documents Cognex presented to the PTO were in Cognex's possession as early as 1990, well before the inception of this litigation. Thus, it appears to the Court that Cognex still could have filed its request for reexamination at an earlier date.

**\*3** Moreover, given the late stage of Cognex's request, the Court finds that any delay in the trial date scheduled for this case would severely prejudice National Instruments. The parties have conducted extensive discovery in Delaware, California, Texas, Washington, D.C. and Massachusetts based on a schedule coinciding with the October 23 trial date. National Instruments has scheduled its experts and made trial support accommodations in Delaware based upon the October 23 trial date. Any deviation from the October trial date at this late stage in the litigation would necessarily prejudice National Instruments. *See Wayne Automation Corp. v. R.A. Pearson Co.,* 782 F.Supp. 516 (E.D.Wash.1991) (denying plaintiff's motion for stay where parties conducted extensive discovery and trial date was set). Accordingly, the Court will deny Cognex's request for a stay.

As for Cognex's request for alternative relief in the form of a three month extension, the Court notes that the discovery deadlines in this case have been extended by stipulation of the parties. This scheduling extension should address Cognex's time concerns without necessitating a change in the October 2001 trial date. Accordingly, at this time, the Court will deny Cognex's request for a three month extension.

### CONCLUSION

For the reasons discussed, Cognex Corporation's Motion To Stay Or, In The Alternative, For An Extension Of The Deadlines In This Case will be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

denied.

 An appropriate Order will be entered.

 Not Reported in F.Supp.2d, 2001 WL 34368283
(D.Del.)

   **Motions, Pleadings and Filings (Back to top)**

• 1:00CV00442 (Docket) (May. 02, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, M.D. North Carolina.
REMINGTON ARMS COMPANY, INC., Plaintiff,
v.
MODERN MUZZLELOADING, INC., Defendant.
No. 2:97CV00660.

Dec. 17, 1998.

Christopher G. Daniel, Womble Carlyle Sandridge & Rice POD 84,  Michael E. Ray, Womble Carlyle Sandridge & Rice POD 84, Winston-Salem, for Remington Arms Company, Inc., plaintiffs.

Daniel Alan M. Ruley, Bell, Davis & Pitt, P.A., James R. Fox, Bell, Davis & Pitt, P.A., William Kearns Davis, Bell, Davis & Pitt, P.A., Winston-Salem, Thad G. Long, Bradley, Arant, Rose & White, L.L .P., Birmingham, AL, Donald H. Zarley, Zarley McKee Thomte Voorhees & Sease, P.L.C., Des Moines, IA, Timothy J. Zarley, Daniel J. Cosgrove, Zarley McKee Thomte Voorhees & Sease, P.L.C., Des Moines, IA, Dennis L. Thomte, Zarley McKee Thomte Voorhees & Sease, P.L.C., Omaha, NE, for Modern Muzzleloading, Inc., defendants.

ORDER

OSTEEN, District J.

*1 For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant's Motion To Stay District Court Proceedings Pending Reexamination [89] is denied.

MEMORANDUM OPINION

This matter comes before the court on Defendant's Motion to Stay District Court Proceedings Pending Reexamination.

For the reasons discussed herein, the court will deny Defendant's Motion to Stay District Court Proceedings Pending Reexamination.

I.    FACTUAL    AND    PROCEDURAL
BACKGROUND

On June 18, 1997, Plaintiff Remington Arms Company, Inc. (Remington), filed this lawsuit against Modern Muzzleloading, Inc. (Modern), alleging willful infringement of Plaintiff's U.S. Patent No. 5,606,817 entitled Muzzle-loading Firearm ('817 patent). (Pl.'s Resp. Mot. Stay at 1.) Modern timely filed an answer and counterclaim denying infringement and alleging invalidity of the patent. (Def.'s Answer and Countercl.)

In the fall of 1997, Defendant submitted its first request for reexamination to the Patent and Trademark Office (PTO) on the grounds that the claims of the '817 patent were obvious. The PTO denied Defendant's request for reexamination. (Pl.'s Resp. Mot. Stay at 1-2.) During the next few months, the parties engaged in extensive discovery which closed on July 30, 1998. Id. A trial date has been set for February 16, 1999. A Markman Hearing was scheduled for November 5, 1998, and was postponed pending the outcome of Defendant's Motion to Stay. Id. Several dispositive motions are also pending before this court. Id.

Although there is evidence in the record indicating that Defendant was aware of the prior art as early as May 5, 1998, [FN1] Defendant chose not to request a second reexamination of Plaintiff's patent until August 13, 1998, after dispositive motions by both parties were briefed and filed, a trial date was set, and two weeks after discovery had closed. On October 15, 1998, the PTO granted Defendant's second request for reexamination of the '817 patent. Id. at 3. Modern has now moved this court to stay this litigation pending the outcome of the reexamination proceeding and Plaintiff has filed a response to Modern's motion to stay.

> FN1. There is also evidence which suggests that Defendant was aware of the prior art which forms the basis for its second request for reexamination as early as March 1998 when the Defendant received notice of a second lawsuit filed by Remington, for patent infringement, which disclosed some of the same prior art at issue in the present action. (Pl.'s Resp. Mot. Stay, Ex. 4 and Ex. 4A.)

II. DISCUSSION

A. Motion to Stay District Court Proceedings Pending Reexamination.

It is well settled that the decision to stay district court proceedings pending the outcome of a PTO reexamination proceeding "resides in the [sound]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discretion of the district court." _Emhart Indus. Inc. v. Sankyo Seiki Mfg. Co.,_ 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987). In determining whether to grant or deny a stay, "courts consider whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party, whether a stay will simplify the issues in question and trial of the case, whether discovery is completed and whether a trial date has been set." _See Target Therapeutics Inc. v. SciMed Life Sys. Inc.,_ 33 U.S.P.Q.2d 2022, 2023 (N.D.Cal.1995). While this court is cognizant of the advantages of granting the stay, this court finds that the many burdens associated with a stay outweigh the benefits.

1. Motion to Stay Would Not Be Judicially Efficient.

*2 The court agrees with Plaintiff that under the circumstances, granting the motion to stay would not be judicially efficient. Discovery has closed, a trial date has been set, and both parties have submitted dispositive motions which are presently pending before the court. (Pl.'s Resp. Mot. Stay at 2.) Finally, the Markman Hearing, originally scheduled for November 5, 1998, has already been postponed pending the outcome of Defendant's Motion to Stay. _Id._ Because a reading of the record suggests to the court that considerable monies have already been expended, staying the proceedings would only result in a waste of time and judicial resources, especially at this late stage of the litigation. _See Ascii Corp. v. STD Entertainment USA, Inc.,_ 844 F.Supp. 1378, 1380 (N.D.Cal.1994) (Evidence that "substantial expense and time had been invested in the litigation [ ] would militate against granting the motion.").

In addition, other federal courts have declined to stay district court proceedings where discovery has been completed and a trial date has been set. _See Wayne Automation Corp. v. R.A. Pearson Co.,_ 782 F.Supp. 516, 519 (E.D.Wash.1991) (denying plaintiff's motion to stay litigation where the parties had conducted extensive discovery and the case was set for trial); _Enprotech Corp. v. Autotech Corp.,_ 15 U.S.P.Q.2d 1319, 1320 (N.D.Ill.1990) (finding that "[w]e are too far along the road to justify halting the journey while the defendant explores an alternate route"); _Accent Designs Inc. v. Jan Jewelry Designs Inc.,_ 32 U.S.P.Q.2d 1036, 1039- 40 (S.D.N.Y.1994); _Digital Magnetic Sys., Inc. v. Ansley,_ 213 U.S.P.Q. 290 (W.D.Okla.1982) ("Parties should not be permitted to abuse the process by applying for reexamination after protracted, expensive discovery or trial preparation."). [FN2]

FN2. The court also finds that a stay would

be inappropriate because the average duration of a PTO reexamination proceeding is 19 months. (Pl.'s Resp. Mot. Stay, Ex. 2, PTO Data, at 3.)

Although Defendant contends, and the court does not disagree, that stays are to be liberally granted, the cases which have granted stays pending reexamination are easily distinguishable from the present action. Generally, courts grant stays where the case is in the early stages of litigation. _See Target Therapeutics,_ 33 U.S.P.Q. at 2023 (Stay of proceedings is warranted where the action is in its early stages and the parties have not yet engaged in extensive discovery.); _accord Ascii,_ 844 F.Supp. at 1381. Because this court finds the cases granting stays to be inapposite to the present matter, Defendant's reliance on these authorities is misplaced.

2. Stay of the Proceedings Would Be Unfairly Prejudicial to Plaintiff.

In ruling on a motion to stay proceedings, a court should consider whether a stay would unduly prejudice the non-moving party. _See United Sweetener USA, Inc. v. Nutrasweet Co.,_ 766 F.Supp. 212, 217 (D.Del.1991); _Wayne,_ 782 F.Supp. at 519. In the present case, it is clear that Plaintiff will be prejudiced by staying the proceeding. Discovery has closed and a trial date has been set. In addition, the court is persuaded by Plaintiff's argument that since "a stay for reexamination could last for years ... [a]fter such a passage of time, Remington's prayer for relief to enjoin Modern from further infringement may no longer have value as technology or market conditions change." (Pl.'s Resp. Mot. Stay at 7.)

*3 The most compelling reason for denying the stay, however, is Defendant's unjustified delay in requesting a second reexamination with the PTO. Although Defendant maintains that the newly found prior art, which forms the basis for its second reexamination petition, was just recently discovered, this court finds evidence to the contrary. The record indicates that Defendant was aware of the prior art as early as May 5, 1998, if not sooner, when Defendant deposed the inventor of the patent. (Pl.'s Resp. Mot. Stay at 2; Resp. Def.'s Mot. Leave Am. Answer & Countercl. at 4.) [FN3]

FN3. It is arguable that Defendant had knowledge of this prior art as early as March 1998, when Plaintiff filed a second but related patent infringement lawsuit against Modern. In the second action, Plaintiff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

attached a copy of the '073 patent to the complaint, which included some of the prior art (i.e., Rodney patent) that Defendant now alleges Plaintiff should have disclosed to the PTO in its '817 patent application. Thus, Defendant was put on notice that the Rodney patent was relevant prior art in March 1998. (Pl.'s Resp. Mot. Stay at 2, Ex. 4 and Ex. 4A.)

Finally, Defendant has failed to convince the court that it was not fully aware of the existence of this material prior to deposing patent attorney Donald Huntley on July 6, 1997. On July 1, 1998, in the second but related patent action, Defendant filed a motion to amend the answer and counterclaim to add the affirmative defense of inequitable conduct based upon Plaintiff's failure to disclose material prior art, despite the fact that it had not yet deposed Mr. Huntley. (Resp. Def.'s Mot. Leave Am. Answer & Countercl. at 4.) This strongly suggests that Mr. Huntley's testimony was not critical to Defendant's discovering the existence of this undisclosed prior art.

Generally, courts are reluctant to stay proceedings where a party is using the reexamination process merely as a dilatory tactic. *See Freeman v. Minnesota Mining and Mfg. Co.,* 661 F.Supp. 886, 887 (D.Del.1987) (denying a stay where defendant knew of the prior art for eight months yet delayed in filing its request for reexamination). Therefore, Defendant's unjustified delay in filing its reexamination petition weighs in favor of denying the stay.

The PTO may ultimately conclude that in light of the undisclosed prior art, Plaintiff's patent is invalid. Even if this court, however, were to uphold the validity of the patent, it is well settled that "the two forums can quite correctly come to different conclusions regarding validity." *Whistler Corp. v. Dynascan Corp.,* 29 U.S.P.Q.2d 1866, 1872 (N.D.Ill.1993); *Output Tech. Corp. v. Dataproducts Corp.,* 22 U.S.P.Q.2d 1073-1074 (W.D.Wash.1991) ("[T]he Court and PTO have different functions and they are 'concepts not in conflict.' ").

While the court would surely benefit from the expert opinion of the PTO, [FN4] and while awaiting the outcome of the reexamination process could possibly eliminate the need for trial if the claims are canceled, prejudice to Plaintiff counsels strongly against granting the stay. Therefore, in its discretion, this court will deny Defendant's Motion To Stay pending reexamination.

FN4. *See Bausch & Lomb Inc. v. Alcon Lab., Inc.,* 914 F.Supp. 951, 953 (W.D.N.Y.1996); *Wayne Automation Corp. v. R.A. Pearson Co.,* 782 F.Supp. 516, 518 (E.D.Wash.1991); *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (finding that the PTO's expertise in construing the validity of a patent is a factor which weighs heavily in favor of granting a stay pending reexamination).

III. CONCLUSION

For the reasons stated above, the court will deny Defendant's Motion To Stay District Court Proceedings Pending Reexamination.

An order in accordance with this memorandum opinion shall be filed contemporaneously herewith.

Not Reported in F.Supp.2d, 1998 WL 1037920 (M.D.N.C.)

**Motions, Pleadings and Filings (Back to top)**

• 2:97cv00660 (Docket) (Jun. 18, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Indiana, Indianapolis Division.
CENTILLION DATA SYSTEMS, LLC., Plaintiff,
v.
CONVERGYS CORPORATION, Qwest
Communications International, and Qwest
Corporation, Defendants,
QWEST CORPORATION and Qwest
Communications Corporation, Plaintiffs,
v.
CENTILLION DATA SYSTEMS, LLC., and CTI
Group (Holdings), Inc., Defendants.
**No. 1:04-CV-0073-LJM-WTL.**

Aug. 24, 2005.

David C. Campbell, Hamish S. Cohen, Bingham
McHale LLP, Indianapolis, IN, Grant S. Palmer,
Matthew J. Siembieda, Blank Rome, LLP,
Philadelphia, PA, Michael C. Greenbaum, Peter S.
Weissman, Victor M. Wigman, Denise Catherine
Lane-White, Hemant Keeto Sabharwal, Michael
Douglas White, Blank Rome, LLP, Washington, DC,
Leonard D. Steinman, Blank Rome, LLP, New York,
NY, Mary B. Matterer, Blank Rome LLP,
Wilmington, DE, for Plaintiffs.

Edward Han, Mark D. Wegener, Matthew J. Moore,
Howrey Simon Arnold & White LLP, Washington,
DC, James Dimos, Joel E. Tragesser, Randall R.
Riggs, Locke Reynolds LLP, James W. Riley, Jr.,
Riley Bennett & Egloff LLP, Indianapolis, IN,
Hector G. Gallegos, Vincent J. Belusko, J. Manena
Bishop, Morrison & Foerster LLP, Los Angeles, CA,
Stephen J. Tan, Brown Reavis & Manning PLIC,
Andrew M. Mar, Brian G. Bodine, Davis Wright
Tremaine, Jill Morgan Ballo, Davis Wright Tremaine
LLP, Seattle, WA, for Defendants.

*ORDER ON RENEWED MOTION TO STAY*

MCKINNEY, Chief J.

**\*1** This cause is now before the Court on
defendants', Convergys Corporation, Qwest
Communications International, and Qwest
Corporation (Qwest defendants collectively, "Qwest
defendants", all defendants collectively,
"Defendants"), Renewed Motion to Stay these
proceedings pending a reexamination of the patent-
in-suit, U.S. Patent No. 5,287,270 ("'270"). On June
13, 2005, this Court denied Defendants' previous
request for a stay, but left open whether the Court
would revisit the issue later. Defendants have
renewed their motion arguing that because the Patent
and Trademark Office ("PTO") granted the Qwest
defendants' request for reexamination of the '270
patent, the Court should follow the weight of
authority that advise that a stay of these proceedings
is appropriate. Plaintiff, Centillion Data Systems,
LLC ("Centillion"), contends that the PTO's grant a
reexamination does not significantly change the core
infringement issues in this cause and a stay would
unduly prejudice its ability to enforce its patent.

For the following reasons, the Court DENIES
Defendants' Renewed Motion to Stay.

*I. DISCUSSION*

In its prior order the Court set forth the following
factors for the grant of a motion to stay: (1) whether a
stay will unduly prejudice or tactically disadvantage
the non-moving party; (2) whether a stay will
simplify the issues in question and streamline the
trial; and (3) whether a stay will reduce the burden of
litigation on the parties and the Court. See *Xerox
Corp. v. 3 Com Corp.*, 69 F.Supp.2d 404, 406
(W.D.N.Y.1999) (citations omitted). The only
circumstance that is different today than it was when
the Qwest defendants filed their original motion to
stay is that the PTO has now granted the petition for
reexamination. The standard for granting such
reexamination is whether there is a "substantial new
question of patentability," 35 U.S.C. § 515(a), which
Defendants contend puts the efficacy of this
proceeding in jeopardy as the PTO may find the
patent flawed. To continue this suit while the PTO
makes it reexamination, Defendants argue, both the
parties and the Court waste resources.

The Court finds that the balance of the factors, at this
stage of the litigation, does not favor a stay. This
cause has been delayed for over eighteen months
because Qwest defendants fought jurisdiction in this
cause. Although the Court cannot fault a party for
making a legitimate challenge to jurisdiction, the
transfer to this Court Qwest defendants' parallel
action from the Western District of Washington, begs
the question of whether or not Qwest defendants had
a legitimate challenge to such jurisdiction. Moreover,
the timing of Qwest defendants challenge of the '270
patent before the PTO also indicates that this request
for a stay may be more of a dilatory tactic than one of
necessity.

The Court cannot ignore the fact that to proceed with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this litigation through claim construction and a trial without the benefit of a decision on the petition for reexamination by the PTO may in fact waste resources. However, the Court sees no reason to delay discovery, particularly in light of Defendants' desire to file challenge the allegations in the complaint via a motion pursuant to Federal Rule of Civil Procedure 11. Such a motion need not wait for a decision by the PTO on reexamination.

**\*2** If the parties proceed through discovery apace, and that is a question given the flurry of motions to compel that have been filed, and the case proceeds to the claim construction phase without a decision by the PTO, the Court may again reconsider its decision to deny Defendants' motion to stay. However, given the current circumstances, the Court is unwilling to issue a stay.

## II. *CONCLUSION*

For the foregoing reasons, the Court DENIES defendants', Convergys Corporation, Qwest Communications International, and Qwest Corporation, Renewed Motion to Stay.

IT IS SO ORDERED.

Slip Copy, 2005 WL 2045786 (S.D.Ind.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2733353 (Trial Motion, Memorandum and Affidavit) Reply in Support of Supplemented Motion for Protective Order (Oct. 28, 2004)

• 2004 WL 2733348 (Trial Motion, Memorandum and Affidavit) Reply in Support of Plaintiff's Motion to Compel Jurisdictional Discovery (Oct. 21, 2004)

• 2004 WL 2733345 (Trial Motion, Memorandum and Affidavit) Response to Plaintiff's Motion to Compel and Supplement to Motion for Protective Order (Oct. 14, 2004)

• 2004 WL 2733342 (Trial Motion, Memorandum and Affidavit) Plaintiff's Brief in Support of Its Motion to Compel Jurisdictional Discovery (Sep. 29, 2004)

• 2004 WL 2733336 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Protective Order (Aug. 03, 2004)

• 2004 WL 2733337 (Trial Motion, Memorandum and Affidavit) Surreply to Defendant Convergys's Motion to Dismiss for Lack of Personal Jurisdiction

(Jul. 26, 2004)

• 2004 WL 2733332 (Trial Motion, Memorandum and Affidavit) Defendant Convergys Corporation's Reply in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction (Jul. 19, 2004)

• 2004 WL 2733314 (Trial Motion, Memorandum and Affidavit) Defendant Citizens Communication Company's Brief in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction (Jul. 02, 2004)

• 2004 WL 2733318 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Qwest Corporation's Motion to Dismiss for Lack of Personal Jurisdiction (Jul. 02, 2004)

• 2004 WL 2733321 (Trial Pleading) Qwest Communications International Inc.'s Answer to Plaintiff's Second Amended Complaint and Jury Demand (Jul. 02, 2004)

• 2004 WL 2733326 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant Convergys's Motion to Dismiss for Lack of Personal Jurisdiction (Jul. 02, 2004)

• 2004 WL 2733307 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant Qwest's Motion for A More Definite Statement (Jun. 08, 2004)

• 2004 WL 2733305 (Trial Motion, Memorandum and Affidavit) Defendant Convergys Corporation's Brief in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction (Jun. 01, 2004)

• 2004 WL 2733311 (Trial Pleading) Second Amended Complaint for Patent Infringement and Demand for Jury Trial (Jun. 2004)

• 2004 WL 2733296 (Trial Pleading) Answer and Affirmative Defenses of Citizens Communications Company (May. 18, 2004)

• 2004 WL 2733275 (Trial Pleading) First Amended Complaint for Patent Infringement and Demand for Jury Trial (Feb. 25, 2004)

• 2004 WL 2733269 (Trial Pleading) Complaint for Patent Infringement and Demand for Jury Trial (Jan. 12, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.go

*Ex Parte* Reexamination Filing Data - September 30, 2005

1.  Total requests filed since start of ex parte reexam on 07/01/81 ....................................7743

    a.  By patent owner                           3221   42%
    b.  By other member of public           4357   56%
    c.  By order of Commissioner             165    2%

2.  Number of filings by discipline

    a.  Chemical Operation                  2420   31%
    b.  Electrical Operation                 2457   32%
    c.  Mechanical Operation              2866   37%

3.  Annual Ex Parte Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | | |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | | |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | | |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | | |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | | |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | | |
| 1988 | 268 | 1996 | 418 | 2004 | 441 | | |

4.  Number known to be in litigation............................................................1705   22%

5.  Determinations on requests .........................................................................7510

   a.  No. granted...........................................................................6846 ..................91%

      (1)  By examiner                     6740
      (2)  By Director (on petition)         106

   b.  No. denied ..............................................................................664 ..................9%

      (1)  By examiner                     629
      (2)  Order vacated                 35

6. Total examiner denials (includes denials reversed by Director)......................................735

    a.  Patent owner requester                          419        57%
    b.  Third party requester                            316        43%

7. Overall reexamination pendency  (Filing date to certificate issue date)

    a.  Average pendency                  21.9  (mos.)
    b.  Median pendency                   17.2  (mos.)

8. Reexam certificate claim analysis:

| | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|
| a.  All claims confirmed | 23% | 29% | 13% | 26% |
| b.  All claims cancelled | 7% | 12% | 19% | 10% |
| c.  Claims changes | 70% | 59% | 68% | 64% |

9. Total ex parte reexamination certificates issued (1981 - present)...................................5209

    a.  Certificates with all claims confirmed          1363    26%
    b.  Certificates with all claims canceled           526    10%
    c.  Certificates with claims changes              3320    64%

10. Reexam claim analysis - requester is patent owner or 3rd party; or Comm'r initiated.

    a.  Certificates _ PATENT OWNER REQUESTER....................................................2272

           (1)  All claims confirmed                527    23%
           (2)  All claims canceled                 164     7%
           (3)  Claim changes                     1581   70%

    b.  Certificates _ 3rd PARTY REQUESTER...............................................................2803

           (1)  All claims confirmed                819    29%
           (2)  All claims canceled                 332    12%
           (3)  Claim changes                     1652   59%

    c.  Certificates _ COMM'R INITIATED REEXAM .....................................................134

           (1)  All claims confirmed                  17    13%
           (2)  All claims canceled                  26    19%
           (3)  Claim changes                     91    68%



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

## *Inter Partes* Reexamination Filing Data - September 30, 2005

1. Total requests filed since start of *inter partes* reexam on 11/29/99 ................................. 112

2. Number of filings by discipline

   a. Chemical Operation          29    26%
   b. Electrical Operation         34    30%
   c. Mechanical Operation         49    44%

3. Annual Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|------------|-----|------------|-----|------------|-----|
| 2000 | 0 | 2002 | 4 | 2004 | 27 |
| 2001 | 1 | 2003 | 21 | 2005 | 59 |

4. Number known to be in litigation............................................29.................26%

5. Decisions on requests ........................................................................... 104

   a. No. granted............................................................................ 99 .................95%

      (1) By examiner                                      99
      (2) By Director (on petition)                        0

   b. No. not granted............................................................... 5.,................. 5%

      (1) By examiner                                      3
      (2) Reexam vacated                                   2

6. Overall reexamination pendency  (Filing date to certificate issue date)

   a. Average pendency                                     29.5 (mos.)
   b. Median pendency                                      31.2 (mos.)

7. Total inter partes reexamination certificates issued (1999 – present).....................................3

   a. Certificates with all claims confirmed        0         0%
   b. Certificates with all claims canceled         3         100%
   c. Certificates with claims changes              0         0%