# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| APPLERA CORPORATION, MDS INC., and APPLIED BIOSYSTEMS/MDS SCIEX INSTRUMENTS | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No: 04-1230-GMS |
| v. | ) ) | |
| THERMO ELECTRON CORPORATION, | ) ) | |
| Defendant and Counter-Plaintiff. | ) ) ) | |

**DEFENDANT THERMO ELECTRON CORPORATION'S SECOND SUPPLEMENTAL
RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES (NOS. 1-15)**

**[Douglas Patent]**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and

Counter-Plaintiff Thermo Electron Corp. ("Thermo") further responds to the First Set of

Interrogatories by Applera Corp., MDS Inc., and Applied Biosystems/MDS Sciex Instruments

(together "Applera") as follows:

**GENERAL OBJECTIONS**

Unless otherwise indicated, Thermo will not provide an answer to any interrogatory, or to

any sub-part thereto, encompassed by the following objections.

1.      Thermo objects to any interrogatory that seeks information protected from

disclosure by the attorney-client privilege, the attorney work product doctrine, the joint defense

or common interest privilege, or any other applicable privilege or immunity. The inadvertent

1

production by Thermo of information protected from disclosure by any privilege or doctrine shall not constitute a waiver by Thermo of such protections.

2.    Thermo objects to any interrogatory that is premature.

3.    Thermo objects to any interrogatory to the extent that it is overbroad or unduly burdensome, or purports to impose upon Thermo any duty or obligation that is inconsistent with or in excess of those obligations that are imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable rule. In particular, Thermo objects to any interrogatory to the extent that it calls for production of information not relevant to the claims or defenses of the parties.

4.    Thermo objects to any interrogatory to the extent that it seeks irrelevant information about accused products. Such interrogatories are overbroad and unduly burdensome. Thermo will only produce documents that are relevant to the '736 patent or which are otherwise related to the claims or defenses of the parties.

5.    Thermo objects to any instruction or interrogatory to the extent that it would impose a duty on Thermo to undertake a search for or an evaluation of information, documents, or things for which Applera is equally able to search and evaluate.

6.    Thermo objects to any instruction or interrogatory which purports to require identification of oral privileged communications. Such instruction or interrogatory is overbroad, vague, ambiguous, and unduly burdensome.

7.      Thermo objects to the definitions of "Defendant" and "You/Your" as overbroad, vague, and ambiguous to the extent that they seek documents or materials not in the possession, custody, or control of Thermo.

8.      Thermo objects to the definition of "Accused Mass Spectrometer" to the extent it includes the LTQ series ion traps on the grounds that it is overbroad and encompasses documents not relevant to the claims or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence as required by Rule 26(b)(1) of the Federal Rules of Civil Procedure. Notwithstanding this objection, Thermo will comply with the Court's order and produce the requested discovery on the LTQ series ion traps subject to its general and specific objections as applicable.

9.      Thermo objects to the definition of "ion guide" as vague and ambiguous. Thermo will provide discovery concerning the Accused Mass Spectrometers or otherwise relevant to the claims or defenses of the parties.

10.      Nothing contained herein is an admission relative to the existence of any information sought, to the relevance or admissibility of any response, or to the truth or accuracy of any statement or characterization contained in any particular interrogatory.

11.      Thermo objects to each interrogatory as vague, ambiguous, overbroad, and unduly burdensome to the extent that it does not limit itself to any reasonable time period. Until such time as the parties agree to a reasonable time period, Thermo will provide information concerning the time period that is relevant to the claims and defenses of the parties.

12.      Thermo objects to each interrogatory to the extent that it is compound.

3

## SPECIFIC RESPONSES

Subject to any specific objections set forth below, and specifically incorporating each of the foregoing General Objections into each Specific Response below, and without waiving said objections, Thermo responds as follows.

### Interrogatory No. 1:

*Separately identify each Accused Mass Spectrometer by product name, model number, version, and market introduction date.*

### Response to Interrogatory No. 1:

Thermo objects to the term "market introduction date" as vague and ambiguous. Subject to the foregoing general objections, Thermo answers as follows:

(1)    TSQ Quantum, TSQ-20000, November 2000

(2)    TSQ Quantum AM, TSQ-30000, March 2002

(3)    TSQ Quantum Discovery, TSQ-20001, March 2003

(4)    TSQ Quantum Ultra, TSQ-20002, March 2003

(5)    TSQ Quantum Ultra AM, TSQ-30001, March 2003

(6)    LTQ FT, March 2003

(7)    LTQ, June 2003

(8)    TSQ Quantum Discovery MAX, TSQ-20003, March 2004

(9)     TSQ Quantum Ultra EMR, TSQ-30002, March 2004

(10)    LTQ Orbitrap, September 2005

**Interrogatory No. 2:**

*Separately for each identified Accused Mass Spectrometer identify the three most knowledgeable persons concerning: (i) its conception, design, development, structure, engineering, operation, and any modifications; (ii) its manufacture and production; (iii) its operating parameters, settings, methods of use, and manner in which it functions to produce mass spectra for analysis; (iv) Defendant's marketing, advertising, and promotion of the product; (v) Defendant's sale of the product; and (vi) Defendant's profits gained from the sale of the product.*

**Response to Interrogatory No. 2:**

Thermo objects to the request to identify "the three most knowledgeable persons" as vague and ambiguous, overbroad and unduly burdensome.  Thermo objects to this interrogatory on the grounds that it is compound, containing at least six separate questions.  Subject to the foregoing general and specific objections, Thermo answers as follows:

Thermo has identified persons who are knowledgeable about the subjects identified in this interrogatory in its Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a).  Thermo identifies Clay Campbell as knowledgeable about items (i), (ii), and (iii) concerning the TSQ Quantum series products identified in its Response to Interrogatory No. 1.  Thermo identifies Berg Tehlirian and Jae Schwartz as knowledgeable about items (i), (ii), and (iii) concerning the LTQ series products identified in its Response to Interrogatory No. 1.  Thermo identifies Iain

USIDOCS 5404824v1

Mylchreest as knowledgeable about items (iv), (v) and (vi) of each of the products identified in its Response to Interrogatory No. 1.

**Interrogatory No. 3:**

*For each Accused Mass Spectrometer, describe the operating parameters including, but not limited to, the identity of the operating range for (i) the pressures in each vacuum section from the source to the detector; (ii) the length and configuration of each set of RF ion guide rods; and (iii) the voltages applied to each structure within the region of vacuum.*

**Response to Interrogatory No. 3:**

Thermo objects to the terms "operating parameters," "vacuum section," "ion guide rods," "each structure," and "region of vacuum" as vague and ambiguous. Subject to the foregoing general and specific objections, Thermo answers as follows:

Thermo's TSQ Quantum products have at least two multipole structures that are located between a source and a triple-quadrupole mass analyzer, that are subjected to AC voltages, and that are in chambers subject to vacuum pressures. Sample ions travel through two multipole structures into the mass analyzer for ultimate detection. Particular parameters can vary depending on the user. Thermo does not know and cannot control all operational parameters used by its customers.

Thermo's LTQ series products have at least two multipole structures that are located between a source and an ion trap mass analyzer, that are subjected to AC voltages, and that are in chambers subject to vacuum pressures. Sample ions travel through two multipole structures into the mass analyzer for ultimate detection. Particular parameters can vary depending on the user. Thermo does not know and cannot control all operational parameters used by its customers.

6

**Interrogatory No. 5:**

*For each Accused Mass Spectrometer, and separately for sales in the U.S. and outside the U.S., state the monthly (i) total sales in units and dollars; (ii) total costs of goods sold, including an identification of whether the costs were fixed costs or variable costs; and (iii) total net and gross profit.*

**Response to Interrogatory No. 5:**

Subject to the foregoing general objections, Thermo answers as follows:

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Thermo has produced relevant, non-privileged documents in its possession, custody or control. For such documents, please see documents bearing the bates numbers T005894-T007304; T024501-T024506; T028662- T028690; TO30841-T030852; T031227-T031236; TO31248-T031261.

**Interrogatory No. 6:**

*Separately for each Accused Mass Spectrometer, identify each product, service, or program that is or has been sold with, offered for sale with, promoted with, distributed with, or marketed with the Accused Mass Spectrometer.*

**Response to Interrogatory No. 6:**

Subject to the foregoing general objections, Thermo answers as follows:

With its TSQ Quantums and LTQ series mass spectrometers, Thermo sells and/or offers to sell software, ion sources, liquid chromatography equipment, and service contracts.

8

**Interrogatory No. 7:**

*For each additional product or service identified in response to Interrogatory No. 6, and separately for sales of each product in the U.S. and outside the U.S., state the monthly (i) total sales in units and dollars; (ii) total sales of goods or services sold, including an identification of whether the costs were fixed costs or variable costs; and (iii) total net and gross profit.*

**Response to Interrogatory No. 7:**

Subject to the foregoing general objections, Thermo answers as follows:

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Thermo has produced relevant, non-privileged documents in its possession, custody or control. For such documents, please see documents bearing the bates numbers T005894-T007304; T024501-T024506; T028662- T028690; TO30841-T030852; T031227-T031236; TO31248-T031261.

**Interrogatory No. 8:**

*Describe in detail the circumstances by which Defendant first became aware of the '736 patent or any foreign counterparts or priority applications of the patent, and every subsequent action taken by or on behalf of Defendant with respect to such patent including, but not limited to, the date when Defendant first became aware of the '736 patent, the identity of the person(s) who first learned of the '736 patent, a description of all efforts taken by or on behalf of Defendant to circumvent or design around the '736 patent, the identity of all persons involved in any efforts to circumvent or design around the '736 patent, the identity of any legal opinions, written or otherwise, concerning the '736 patent obtained by or on behalf of Defendant.*

**Response to Interrogatory No. 8:**

Thermo objects to this interrogatory because it is compound, containing at least two separate questions. Thermo objects to this interrogatory because it is premature. Thermo objects to this interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine. Subject to the foregoing general and specific objections, Thermo answers as follows:

Thermo first became aware of the '736 patent in approximately late 1990 or early 1991. It was (and is) Thermo's business to stay informed about patents that issue in the field of mass spectrometry, and Thermo became aware of the patent in the ordinary course of its business. Thermo cannot fairly identify "one" person or group of people who first became aware of the patent. There have been various design changes, actual and contemplated, to the Accused Mass Spectrometers over time. Among the considerations that are part of the design process is the desire to avoid infringing the intellectual property of others. All design changes are made to enhance the operation of the machines. Thermo is unaware of any change that was made particularly to avoid or "design around" the '736 patent.

**Interrogatory No. 9:**

*For each Accused Mass Spectrometer that Defendant contends does not infringe the '736 patent, identify each and every claim limitation that is missing from such product, describe each and every fact that forms the basis for such non-infringement contention, and identify each and every document that supports or tends to support each such fact.*

10

**Response to Interrogatory No. 9:**

Thermo objects to the request to "describe each and every fact" and to "identify each and every document" as overbroad and unduly burdensome. Thermo objects to this request because certain of the asserted claims are method claims, which cannot be infringed by a "product." Thermo objects to this interrogatory as premature. Subject to the foregoing general and specific objections, Thermo answers as follows:

The Accused Mass Spectrometers do not satisfy the claimed elements (literally or equivalently) of any asserted claim of the '736 patent. The Accused Mass Spectrometers would not satisfy a number of claim elements. For example, the Accused Mass Spectrometers lack the requirement of Claim 1 of "first and second vacuum chambers separated by a wall, said first vacuum chamber having an inlet orifice therein," and each of such chambers containing a "rod set" "comprising a plurality of elongated parallel rod means." As all lettered limitations of Claim 1 depend on that initial structure, the Accused Mass Spectrometers also do not satisfy the lettered limitations of Claim 1. As a specific example, the Accused Mass Spectrometers do not satisfy the requirement of a specified product of pressure times length being equal to or greater than $2.25 \times 10^{-2}$ torr cm "whereby to provide improved transmission of ions."

The Accused Mass Spectrometers do not meet the limitation of claims 2-6.

The Accused Mass Spectrometers do not contain the limitation "wherein said means for controlling the kinetic energy of said ions comprises means for applying a low DC voltage between said first rod set and said inlet wall" of claim 8.

The Accused Mass Spectrometers do not contain the limitation "wherein said means for controlling the kinetic energy of said ions comprises means for applying a low DC voltage between said first rod set and said inlet wall, said low DC voltage being between 1 and 30 volts DC" of claim 9.

11

The Accused Mass Spectrometers do not contain the limitation "wherein said means for controlling the kinetic energy of said ions comprises means for applying a low DC voltage between said first rod set and said inlet wall, said low DC voltage being between 1 and 15 volts DC" of claim 10.

The Accused Mass Spectrometers do not contain the limitation "wherein said means for controlling the kinetic energy of said ions comprises means for applying a low DC voltage between said first rod set and said inlet wall, said low DC voltage being between 1 and 10 volts DC" of claim 11.

For the reasons stated above, Thermo cannot provide an answer as to Claim 14, which is a method claim that cannot be practiced by a "product." Subject to and without waiving the general and specific objections set forth above, Thermo states that the Accused Mass Spectrometers do not contain a "first rod set and a second rod set located in first and second vacuum chambers respectively, said first and second rod sets each comprising a plurality of rod means." As all lettered limitations of Claim 14 depend on that initial structure, the Accused Mass Spectrometers also do not satisfy the lettered limitations of Claim 14. As a specific example, the Accused Mass Spectrometers do not satisfy the requirement of a specified product of pressure times length being equal to or greater than $2.25 \times 10^{-2}$ torr cm "whereby to provide improved transmission of ions." Thermo cannot provide a response to the assertion of claims 15-19, 21-24, and 27, 29, and 30 because these are method claims that cannot be practiced by a "product" or machine by itself.

In addition, the LTQ series mass spectrometers do not have a "mass filter." The absence of a mass filter means that the LTQ series mass spectrometers also do not meet several other limitations in the claims of the '736 patent. In addition, the LTQ series mass spectrometers do

12

not apply a DC voltage "between the rods" in the mass analyzer. As pertinent to this part of the patent claims, the machines in the LTQ series only apply an AC voltage between the rods.

**Interrogatory No. 10:**

*Describe in detail each and every fact that supports or tends to support Defendant's contention that one or more claims of the '736 patent are invalid including, without limitation, a description of each and every fact that formed the basis of such contention.*

**Response to Interrogatory No. 10:**

Thermo objects to the request for "each and every fact" as overbroad and unduly burdensome. Thermo objects to this interrogatory as premature. Subject to the foregoing general and specific objections, Thermo answers as follows:

Thermo is aware that in litigation against Plaintiffs, Micromass UK Ltd. and Micromass Inc. asserted several theories as to the invalidity of the '736 patent. Thermo is aware that Micromass Ltd. has filed an opposition to the European counterpart of the '736 patent with the European Patent Office raising invalidity arguments. On March 29, 2005, Thermo Finnigan LLC filed Third-Party Observations in support of the Micromass opposition.

In addition, Thermo states that the following references, individually or in combination, render the '736 patent invalid:

1. Scott L. Anderson & Luke Hanley, *Metal Cluster Ion Chemistry*, SPIE, vol. 669 (Laser Applications in Chemistry), pp. 133-136 (1986).

2. C.A. Boitnott, J.R.B. Slayback & U. Steiner, *Optimization of Instrument Parameters for Collision Activated Decomposition (CAD) Experiments for a Triple Stage Quadrupole (TSQ$^{TM}$) GC/MS/MS/DS*, Finnigan MAT, Finnigan Topic 8160 (1981).

3. Charles A. Boitnott, Urs Steiner & John R.B. Slayback, *Optimization of Instrument Parameters for Collision Activated Decomposition (CAD) Experiments for a Finnigan Triple Stage Quadrupole GC/MS/MS/DS*, Abstracts, 1981 Pittsburgh Conference, no. 782 (1981).

13

4. V.J. Caldecourt, D. Zakett & J.C. Tou, *An Atmospheric-Pressure Ionization Mass Spectrometer/Mass Spectrometer*, Int'l J. Mass Spectrometry & Ion Physics, vol. 49, p. 233 (1983).

5. Finnigan MAT, *Triple Stage Quadrupole GC/MS/MS/DS System* (1981).

6. Luke Hanley & Scott L. Anderson, *Chemistry and Cooling of Transition Metal Cluster Ions*, Chem. Phys. Lett., vol. 122, pp. 410-414 (1985).

7. Luke Hanley, Stephen A. Ruatta, & Scott L. Anderson, *Collision-induced dissociation of aluminum cluster ions: Fragmentation patterns, bond energies, and structures for $Al_2^+$-$Al_7^+$* (ca. 1987).

8. José A. Olivares et al., *On-Line Mass Spectrometric Detection for Capillary Zone Electrophoresis*, 59 Anal. Chem. 1230-32 (1987).

9. H. Schaaf, U. Schmeling & G. Werth, *Trapped Ion Density Distribution in the Presence of He-Buffer Gas*, Appl. Phys., vol. 25, p. 249 (1981).

10. J.R.B. Slayback et al., *Determination of Metipranolol in Serum by Triple Stage Quadrupole (TSQ)$^{TM}$ GC/MS/MS/DS*, Finnigan Topic 8161, presented at 1981 Pacific Conference on Chemistry and Spectroscopy.

11. Richard D. Smith et al., *Capillary Zone Electrophoresis – Mass Spectrometry Using an Electrospray Ionization Interface*, 60 Anal. Chem. 436 (1988).

12. G.C. Stafford, Jr., et al., *Recent Improvements in and Analytical Applications of Advanced Ion Trap Technology*, 60 Int'l J. Mass Spectrom. & Ion Processes 85-98 (1984).

13. F. Vedel & J. Andre, *Influence of space charge on the computed statistical properties of stored ions cooled by a buffer gas in a quadrupole rf trap*, Phys. Rev. A, vol. 29, p. 2098 (1984).

14. U.S. Patent No. 4,328,420.

15. U.S. Patent No. 4,842,701.

16. European Patent No. 0023826 A1.

17. European Patent No. 0113207.

**Interrogatory No. 11:**

*For each prior art reference or combination of references that Defendant contends render the claims of '736 patent invalid, set forth where in the prior art each claim element may be found, and, if more than one reference is being relied upon, identify the motivation to combine the cited references.*

14

**Response to Interrogatory No. 11:**

Thermo objects to this interrogatory as premature. Subject to the foregoing general and specific objections, Thermo answers as follows:

Thermo incorporates its Response to Interrogatory No. 10.

**Interrogatory No. 12:**

*Describe in detail each and every fact that supports or tends to support Defendant's contention that the '736 patent is unenforceable against Defendant including, without limitation, a description of each and every fact that formed the basis of such contention, and identify each and every document that supports or tends to support each such fact.*

**Response to Interrogatory No. 12:**

Thermo objects to the request to "describe in detail each and every fact" as overbroad and unduly burdensome. Subject to the foregoing general and specific objections, Thermo answers as follows:

The '736 patent is unenforceable against Thermo by at least application of the equitable doctrines of waiver, estoppel, or laches because Applera did not allege that Thermo's TSQ Quantum series mass spectrometers infringed the '736 patent until the TSQ Quantum series had been on the market for nearly four years and the LTQ series mass spectrometers had been on the market for more than one year.

Additionally, the '736 patent is unenforceable due to patent misuse and related equitable doctrines including without limitation equitable estoppel, judicial estoppel, collateral estoppel, and unclean hands. AB/Sciex has used the '736 patent to attempt to impermissibly expand the scope of the patent right, with anticompetitive effects. AB/Sciex's conduct has no purpose

except to unjustly enrich AB/Sciex and to stifle competition including by threatening competing products premised on a baseless legal claim.

As detailed below, AB/Sciex and/or its representatives have pervasively taken inconsistent positions—including with this Court and the U.S. Patent Office—with respect to the scope of the patent right. AB/Sciex's present position contradicts positions taken in this Court and in the U.S. Patent Office. The purpose and effect of AB/Sciex's present positions is to expand the scope of the patent far beyond what AB/Sciex previously represented (and the Court held), without regard to the '736 patent's plain meaning or its alleged inventive features. As a result, AB/Sciex is attempting to obtain damages for sales of, and/or obtain an injunction to suppress the sale of products that do not use the teaching of the patent.

As detailed below, AB/Sciex has accused Thermo products of infringement in a bad faith attempt to expand the patent beyond its lawful scope.

Additionally, AB/Sciex's positions have created significant uncertainty as to what AB/Sciex considers the '736 patent to mean. AB/Sciex's purpose and effect is to stifle competition in the mass spectrometry market by creating the apprehension among competitors in this field (including without limitation Thermo) that any mass spectrometer is at risk of being sued for infringement, regardless of its operating features and regardless of prior statements by AB/Sciex and/or its representatives that machines with those features fall outside the patent scope. This apprehension has had and continues to have anticompetitive effect by preventing competitors from designing and selling mass spectrometers in an open and fair market place.

The following statements by AB/Sciex are inconsistent with any current claim that any Thermo product infringes the '736 patent. These statements are by way of example only and are not intended to be exhaustive:

16

AB/Sciex has previously represented to this Court that "The inventors disclosed all prior art that they considered relevant to their invention. . . . [R]eferences relating to 'ion traps' . . . were not relevant." (*See* APL 022244-45.)

AB/Sciex has previously represented to this Court that, "An 'ion trap' is a device that consists of a chamber that is capable of storing ions for a relatively long period of time before ejecting the ions out of the device." (*See* APL 014943.)

The named inventor of the '736 patent (Mr. Douglas) testified under oath that "there's no ion storage in the '736 patent." (*See* APL 015494.)

Mr. Douglas testified under oath that an ion trap is "a very different device." (*See* APL 015494.)

The Court ruled in prior litigation that "AB/Sciex should be estopped from claiming that the claims of the '736 patent cover ion traps under the doctrine of equivalents. . . . [A] competitor would reasonably conclude that ion traps would not infringe the claimed mass spectrometer system." (*See* Applera Corp. v. Micromass UK Ltd., 204 F.Supp.2d 724, 773 (D. Del. 2002).)

Repeatedly in reexamination, AB/Sciex represented to the Patent Office that the '736 patent was not invalidated by prior art because that prior art related to ion traps.

For example, AB/Sciex represented to the Patent Office that prior art ion traps "operate[] on a fundamentally different principle that the mass spectrometer system according to the invention." (*See* APL 028550, APL 028553.)

During re-examination of the '736 patent, AB/Sciex and/or its representatives and/or the patent applicants specifically distinguished a prior art French reference on a number of grounds including that "the French application receives an AC only voltage . . . ." (*See* APL 028558.)

17

Prior art experiments by Mr. Smith showed use of a PxL value in a first chamber of 1.76 x $10^{-2}$ torr cm. The specification of the '736 patent refers to this as "[t]he traditional use of low pressure . . . ." ('736 patent, 5:3.)

AB/Sciex and/or its representatives have stated that "the '736 patent was not claiming the range of PL values disclosed by Smith." (*See* APL 022734.)

Before the '736 patent issued, Mr. Douglas performed at least one so-called "low pressure" experiment. AB/Sciex and/or its representatives have stated that "Dr. Douglas had no reason to think that the experiment was material." (*See* APL 015024.)

**Interrogatory No. 13:**

*From January 1, 1998, to the present, please identify and describe in detail each design around, alternative manufacturing process, alternative design, alternative technology or method that could be used as a commercial alternative to the patented technology of the '736 patent; and separately for each such design around, alternative manufacturing process, alternative design, alternative technology or method, identify by Bates numbers each document that supports and corroborates the existence of such alternative.*

**Response to Interrogatory No. 13:**

Thermo objects to the phrases "each design around, alternative manufacturing process, alternative design, and/or alternative technology or method," "each document," and "commercial alternative" as vague, ambiguous, overly broad and unduly burdensome and as seeking information which is neither relevant to the claims or defenses of any party or the subject matter involved in this action, nor reasonably calculated to lead to the discovery of admissible evidence. Thermo objects to the term "could be used as a commercial alternative" as calling for a legal

18

conclusion. Thermo also objects to this interrogatory as premature as discovery is just beginning

in this case; the Court has not ruled on the proper construction and scope of the claims, and a

Markman hearing is scheduled for March 6, 2006. Subject to the foregoing general and specific

objections, Thermo answers as follows:

No version of the TSQ Quantum or LTQ series mass spectrometers infringes any claim of

the '736 patent. There have been various design changes, actual and contemplated, to the

Accused Mass Spectrometers over time. Among the considerations that are part of the design

process is the desire to avoid infringing the intellectual property of others. All design changes

are made to maximize the operation of the machines. Thermo is unaware of any change that was

made particularly to avoid or "design around" the '736 patent. Nor did Thermo particularly

develop these designs as "commercial alternatives" to the '736 patent. Nevertheless, all of these

designs can be considered as "commercial alternatives" to the '736 patent. Another obvious

"alternative" to the '736 patent would be to use an AC and DC voltage between the multipole

structures that are located between the source and the mass analyzer. Upon information and

belief, Plaintiffs have knowledge of "design arounds" by Micromass UK Ltd. and Micromass

Inc.

**Interrogatory No. 14:**

   *Describe in detail each and every fact that supports or tends to support Defendant's*

*affirmative defenses contained in Defendant's Answer and Counterclaim dated March 28, 2005*

*including, without limitation, a description of each and every fact that formed the basis of such*

*defenses, and identify each and every document that supports or tends to support each such fact.*

**Response to Interrogatory No. 14:**

19

Thermo objects to the request for "each and every fact" and for "each and every document" as overbroad and unduly burdensome. Subject to the foregoing general and specific objections, Thermo answers as follows:

Applera made statements during prosecution and reexamination of the '736 patent and in litigation which acted as disclaimers of certain subject matter. As a result, Applera is barred by the doctrines of res judicata, claim preclusion, issue preclusion, collateral estoppel, and/or judicial estoppel from claiming that certain of Thermo's products, including its ion trap mass spectrometer systems, infringe the '736 patent. Thermo incorporates its response to Interrogatory No. 12.

**Interrogatory No. 15:**

*Separately for each Interrogatory propounded by Plaintiffs, please identify each person who supplied information used in preparing the response.*

**Response to Interrogatory No. 15:**

Thermo objects to the request for "each person" as overbroad and unduly burdensome.

Subject to the foregoing specific and general objections, Clay Campbell, Jae Schwartz, and Iain

Mylchreest gathered and supplied information used in preparing the responses to the above

interrogatories.

*Kelly E. Farnan*
Frederick L. Cottrell, III (#2555)
Cottrell@RLF.com
Kelly E. Farnan (#4395)
Farnan@RLF.com
Richards, Layton & Finger
One Rodney Square
920 N. King Street
P.O. Box 551
Wilmington, DE 19899
Telephone (302) 651-7700
Attorney for Thermo Election Corp.

OF COUNSEL:
William F. Lee
Wayne L. Stoner
Stephen M. Muller
Michael R. Dube
Lauren B. Fletcher
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

Dated:  December 2, 2005

21

# EXHIBIT L



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office

Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| CONTROL NUMBER | FILING DATE | PATENT UNDER REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 90/004,771 | 09/30/97 | 4963736 | 33179/165596 |

B5M2/1120

JOHN S PRATT
KILPATRICK STOCKTON
1100 PEACHTREE STREET SUITE 2800
ATLANTA GA 30309-4530

| EXAMINER |
|---|
| BERMAN, J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2506 | 6 |

DATE MAILED: 11/20/97

# ORDER GRANTING/DENYING REQUEST FOR REEXAMINATION

The request for reexamination has been considered. Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s): ☐ PTO-892, ☒ PTO-1449, ☐ Other: _____

1. ☒  The request for reexamination is GRANTED.

    RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:

    For Patent Owner's Statement (optional): TWO MONTHS from the mailing date hereof. 37 CFR 1.530(b). EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).

    For Requester's reply (optional): TWO MONTHS from the date of service of any patent owner's statement. 37 CFR 1.535. NO EXTENSION OF TIME IS PERMITTED. If patent owner does not file a timely statement under 37 C.F.R. 1.530(b), no reply by requester is permitted.

2. ☐  The request for reexamination is DENIED.

    This decision is not appealable. 35 U.S.C. 303(c). Requester may seek review by petition to the Commissioner within ONE MONTH from the mailing date hereof. 37 CFR 1.515(c). EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183.

    In due course, a refund under 37 CFR 1.26(c) will be made to requester (listed below if not patent owner) ☐ by Treasury check, ☐ by credit to Deposit Account No. _____ unless notified otherwise. 35 U.S.C. 303(c).

    (Third party requester's correspondence address)

Serial Number: 90/004771                                                    Page 2

Art Unit: 2506

A substantial new question of patentability affecting claims 1-24 of United States Patent Number 4,963,736 is raised by the request for reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extension of time in reexamination proceedings are provided for in 37 CFR 1.550(c).

French raises a substantial new question of patentability as to claims 1-24 of the Douglas et al. patent. At lines 4 through 17 on page 20, the French application teaches that instead of the three quadrupole system discussed in the rest of the application, it is possible to arrange only two quadrupoles in series. According to the application, the first quadrupole in such a system should have only AC applied to it so that it acts as an ion guide to direct ions produced outside the system to the second quadrupole, which has both AC and DC applied to it so that it acts as a mass spectrometer. As the requester points out, the French application also teaches that such an AC-only quadrupole should have rods which are 4 inches long and be operated at pressures of $10^{-2}$ to $10^{-4}$ torr for a product of 0.1016 to $10.16 \times 10^{-2}$ torr cm. The two Finnigan references teach that the collision energies of ions in collision cells which include AC-only quadrupoles should be varied between 0 and 30 volts. Such teachings were not present during the prosecution of the application which became the Douglas et al. patent. There is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the

JA 378

Serial Number: 90/004771                                                          Page 3

Art Unit: 2506

claims are patentable. Accordingly, French and the Finnigan references raise a substantial new

question of patentability as to claims 1-24, which question has not been decided in a previous

examination of the Douglas et al. patent. Therefore, all the claims of U.S. Patent No. 4,963,736

will be reexamined.

   The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a), to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 4,963,736 throughout the course of this reexamination proceeding.  See MPEP

§§ 2207, 2282 and 2286.

   Any inquiry concerning this communication or earlier communications from the examiner

should be directed to Examiner Jack Berman whose telephone number is (703) 308-4849.

JACK I. BERMAN
PRIMARY EXAMINER
GROUP 2500

jb

November 18, 1997