# EXHIBIT A

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3                         - - -

 4   THERMO FINNIGAN LLC,        :   Civil Action
                                 :
 5            Plaintiff,         :
                                 :
 6       v.                      :
                                 :
 7   APPLERA CORPORATION,        :
                                 :
 8            Defendant.         :   No. 04-1505 (GMS)

 9                         - - -

10                    Wilmington, Delaware
                   Wednesday, April 27, 2005
11                       10:00 a.m.
                        In Chambers
12
                           - - -
13
     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
14
     APPEARANCES:
15
              FREDERICK L. COTTRELL, III, ESQ.
16            Richards, Layton & Finger
                   -and-
17            WAYNE L. STONER, ESQ., and
              STEPHEN M. MULLER, ESQ.
18            Wilmer Cutler Pickering Hale and Dorr LLP
              (Boston, Massachusetts)
19
                        Counsel for Plaintiff
20
              JOSY W. INGERSOLL, ESQ.
21            Young Conaway Stargatt & Taylor, LLP
                   -and-
22            WALTER E. HANLEY, JR., ESQ.,
              JAMES GALBRAITH, ESQ., and
23            WILLIAM JAMES, ESQ.
              Kenyon & Kenyon
24            (New York, New York)

25                      Counsel for Defendant
```

1  will.
2         I guess, Your Honor, I would like to have the
3  actual trial plan addressed at a later time.
4         MS. INGERSOLL: But just reserve, say, 12 days,
5  which would cover the possibility.
6         MR. HANLEY: I would like to be able to make a
7  pitch later on, if it seems to make sense because of what
8  has happened in the course of trial preparation, maybe there
9  are issues that have been resolved on summary judgment,
10 there might be a sensible alternative to a single unified
11 trial.
12        THE COURT: Okay.
13        The way you should leave the room today is
14 contemplating a joint trial, along the lines of what Mr.
15 Cottrell has just outlined.
16        I will, when I go back, advise my schedulers
17 that we should plan on a couple of extra days possibly. So
18 we will leave a couple blanks, hopefully, there are blanks
19 there.
20        We are turning again to the specifics of the
21 schedule for the 1230 and 110 case. The Court is in accord
22 with the dates that have been proposed up through the
23 Markman hearing, which will takes place on January 9
24 beginning at 10:00 a.m.
25        Let me say a few things about the Markman

Case 1:05-cv-00110-GMS    Document 69-2    Filed 01/27/2006    Page 4 of 9

29

```
 1            THE COURT:  I think this is the second one.
 2   It's amazing.  As you know, around here, we play Russian
 3   Roulette every day.
 4            This is not a multiple booking, by the way.  But
 5   we do have to do that.  Otherwise we would be out in '08 for
 6   sure.
 7            Okay.  We will want a referral to the Magistrate
 8   Judge as to this one as well.  And you can get it back to me
 9   the same time as the other.
10            Once the schedule is electronically approved, we
11   will -- your pretrial order form is on my website.  Counsel
12   in this room have it.
13            MR. COTTRELL:  Just to make clear, Your Honor,
14   for the two cases that are tried together, we still need to
15   do a separate one for each?  Or should we just combine?
16            THE COURT:  You can just combine them.  Does
17   anyone have a different view?
18            MS. INGERSOLL:  No.  The schedule is the same.
19            THE COURT:  The schedule is the same.
20            MS. INGERSOLL:  I will do that one.
21            MR. COTTRELL:  We will put in there for the
22   clerk's benefit consolidated so when we file papers, we
23   don't get a call saying you've got to file in the other
24   case, too.  We can take care of that, Your Honor.  We don't
25   have to take your time.
```

# EXHIBIT B

**Page 423**

- VOLUME C -

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

- - -

APPLERA CORPORATION, MDS, INC., : CIVIL ACTION
and APPLIED BIOSYSTEMS/MDS SCIEX, :
        Plaintiffs           :
                             :
        vs.                  :
                             :
MICROMASS UK LTD. and        :
MICROMASS, INC.,             :
                             :
        Defendants           : NO. 2000-105 (RRM)

- - -

                Wilmington, Delaware
                Wednesday, March 6, 2002
                9:00 o'clock, a.m.

- - -

BEFORE: HONORABLE RODERICK R. McKELVIE, U.S.D.C.J., and a jury

- - -

APPEARANCES:

    MORRIS, NICHOLS, ARSHT & TUNNELL
    BY: JACK B. BLUMENFELD, ESQ.

            -and-

                    Official Court Reporters

**Page 424**

APPEARANCES (Continued):

    KENYON & KENYON
    BY: JAMES GALBRAITH, ESQ.,
        WALTER E. HANLEY, JR., ESQ.,
        LEWIS V. POPOVSKI, ESQ.,
        JEFFREY S. GINSBERG, ESQ. and
        HUIYA WU, ESQ.
        (New York, New York)

            Counsel for Plaintiffs

    RICHARDS, LAYTON & FINGER
    BY: ROBERT W. WHETZEL, ESQ.

            -and-

    LATHAM AND WATKINS
    BY: JAMES G. HUNTER, ESQ.,
        KENNETH G. SCHULER, ESQ. and
        KEVIN C. MAY, ESQ.
        (Chicago, Illinois)

            Counsel for Defendants

- - -

**Page 425**

PROCEEDINGS

(Proceedings commenced at 9:00 a.m., and the following occurred without the presence of the jury.)

THE COURT: Good morning.

(Counsel respond "Good morning.")

Juror No. 6 is not here. That is the same juror that was late yesterday.

Did I get a notebook of expert reports from Micromass? Did you give me one? If you haven't, can I have one?

(At this point the jury entered the courtroom and took their seats in the box.)

THE COURT: All right. Ready to proceed.

- - -

PLAINTIFFS' TESTIMONY
CONTINUED

... CHRISTIE G. ENKE, having been previously duly sworn as a witness, was resumed and testified further as follows ...

MR. HUNTER: Can I get your Tutorial No. 34,

**Page 426**

please.

I am sorry. I must have the wrong one. It is this one.

CROSS-EXAMINATION
CONTINUED

BY MR. HUNTER:

Q. Dr. Enke, do you recognize the demonstrative that is up on the screen here?

A. Yes, I do.

Q. You testified yesterday at some length about this demonstrative as showing the process of collisional focusing that is the subject of the '736 patent, did you not?

A. Yes. I indicated that this represented collisional focusing.

MR. HUNTER: Yesterday, Dr. Enke in his direct examination testified at some great length, with Mr. Hanley examining him, about this as being a diagram that shows collisional focusing. I am sure that the jury, when it looked at this, viewed this as basically showing that there was the equivalent of a rifle shot out of the end of the AC-only rod set in the collisional focusing process, so that essentially what you will see here, if you believe this demonstrative that Mr. Hanley used and that the witness testified at length about, virtually 99 percent of

**Page 555**

1  (Witness excused)
2  ---
3  MR. HANLEY: Ladies and gentlemen, I want to
4  introduce another lawyer on our team, who I didn't
5  introduce to you the other day. This is Lew Popovski. He
6  is also with Kenyon & Kenyon, my law firm. He is going to
7  conduct the examination of the next witness.
8  ---
9  ... WILLIAM R. DAVIDSON, having
10  been duly sworn as a witness, was examined
11  and testified as follows ...
12  MR. POPOVSKI: Your Honor, ladies and gentlemen
13  of the jury: Our next witness, Dr. William Davidson, is
14  the Vice President of Science and Technology at MDS Sciex.
15  Dr. Davidson is going to testify on a number
16  of important topics. I will try to introduce each one of
17  these topics as they come up so you have some contextual
18  placement for these topics.
19  The first topic we are going to start with is
20  some background history on Dr. Davidson as well as some
21  background history on the company that Dr. Davidson works
22  for.
23  DIRECT EXAMINATION
24  BY MR. POPOVSKI:
25  Q. Dr. Davidson, thank you for coming here.

**Page 556**

1  Would you please tell us who you work for?
2  A. Yes. I am the Vice President of Science and
3  Technology for MDS Sciex, which is a division of MDS, Inc.
4  Q. And as the Vice President of Science and Technology,
5  what are your responsibilities?
6  A. Presently, my responsibilities are to seek out new
7  technologies and, when appropriate, to commercialize them
8  under MDS Sciex.
9  Q. And what types of new technologies do you seek out?
10  A. Well, my major focus is on mass spectrometry and
11  other bioanalytical instrumentation.
12  Q. I called you Dr. Davidson. Could you please give us
13  a brief summary of your educational background?
14  A. Yes. In 1969, I graduated, had my undergraduate
15  degree with the University of Alberta, with a first-class
16  honors degree in chemistry.
17  I then completed a Ph.D. in chemistry in 1974
18  at the University of Alberta, specializing in mass
19  spectrometry. Followed that with a post-doctoral
20  Fellowship at the University of California in Santa
21  Barbara for two and a half years, again specializing in
22  mass spectrometry, and lecturing in chemistry.
23  Q. Would you please give us some background on your
24  employment history?
25  A. In 1977 and early '78, I was working for the

**Page 557**

1  University of Alberta Hospital as a mass spectroscopist
2  in charge of drug analysis for the Commonwealth Games.
3  The Commonwealth Games are very similar to the Olympic
4  Games, except they only involve countries from the British
5  Commonwealth, Canada, Australia, Great Britain, New Zealand,
6  and so on.
7  Later that year, I joined Sciex Inc., as it was
8  called then, as a senior research scientist. In 1981, MDS
9  Health Group Limited purchased Sciex. And we became part
10  of the MDS Health Group set of companies.
11  In 1996 -- I am sorry, 1983, I was promoted to
12  the Director of Research and Development. In 1996, MDS
13  Health Group Limited changed its name to MDS, Inc. and
14  Sciex became known at that time as MDS Sciex.
15  In 1997 I was promoted to Vice President of
16  Research, and in 1999 further promoted to Vice President
17  of Science and Technology.
18  Q. Thank you, Dr. Davidson. I would like you to turn
19  to Tab 1 of your witness book, PX-372. Do you recognize
20  this document?
21  A. This is an Industry of Canada certificate of
22  amendment under the Canadian Business Corporations Act.
23  On Page 2 you can see MDS Health Group Limited, so MDS
24  Health Group Limited had changed its name then to MDS,
25  Inc. That occurred on the 10th -- anyway, this occurred

**Page 558**

1  on the 10th of October, 1996.
2  Q. Please turn to Tab 2 of your witness book, and that
3  is the now familiar copy of the '736 patent. You mentioned
4  MDS Health Group Limited. Is that the same entity as this
5  group here?
6  A. Yes. That's the same entity.
7  Q. It is designated the assignee of this patent?
8  A. It is, yes.
9  Q. With the name change, who now owns the patent?
10  A. MDS, Inc. now owns the patent, the '736 patent.
11  Q. Dr. Davidson, how many years have you worked in
12  the area of mass spectrometry?
13  A. I started in 1969, so that would be over 30 years.
14  Q. Would you please give us a little background history
15  on MDS Sciex and its history?
16  A. Yes. MDS Sciex, or Sciex as it was known at the
17  time, was formed in 1974. In fact, it was based on
18  technology, mass spectrometry technology that was used
19  to analyze the surface of Mars, the atmosphere of Mars.
20  Over the next few years, Sciex or MDS Sciex
21  gained an international reputation in mass spectrometry
22  research product development and manufacture.
23  Over the past 25 years we have been very
24  innovative and have several patents in the area of mass
25  spectrometry, including the '736 patent. We are a

**Page 575**

1  A. It's called the Quantum
2  Q. Do you know whether the Quantum is using the
3  invention of the '736 patent?
4  A. Well, we've recently come across some literature,
5  marketing literature that indicates that, or suggests, I
6  guess, would be a better word, that they could be
7  infringing some portion of the '736 patent, but we're a
8  very cautious and conservative group when it comes to
9  legal issues and certainly would not take any action until
10 we had a lot more proof of that.
11 Q. Okay. When did MDSI acquire this literature about
12 the Quantum?
13 A. We acquired it a few weeks ago, maybe a month ago.
14 Q. Okay.
15    MR. POPOVSKI: Your Honor, ladies and gentlemen
16 of the jury, I'd like to change to a different topic and
17 basically, while we're talking about history here, we'd like
18 to talk about the history of the lawsuit, how the plaintiffs
19 came to bring the lawsuit against the defendants.
20 BY MR. POPOVSKI:
21 Q. Dr. Davidson, when did you first tell Micromass about
22 the '736 patent?
23 A. It was in, I believe, early 1997 that we sent them a
24 letter regarding that.
25 Q. Would you please turn to Tab 4 of your witness book

**Page 576**

1  where you will find a document marked PTX-198 and tell me
2  if you recognize that document?
3  A. Yes, this is the letter that our attorney, Richard
4  Parr, (phonetic) sent to Micromass in January 10th, 1997.
5  As you can see in the second paragraph, we informed them
6  of the existence of this patent. We were concerned that
7  one of their potential products that was coming out, it
8  appeared that it could infringe this, the claims. And we,
9  and you can see in the bottom, bottom paragraph, we
10 ...

**Page 577**

1
2  A. (Continuing) We weren't entirely sure that it was
3  infringing. What we were doing is sort of seeking, well
4  it looks like it could be infringing, please tell us why
5  it isn't type of response. So you can see, in the top
6  paragraph, we mentioned it was of considerable importance
7  and we asked for their comments as soon as possible, within
8  at least three weeks of the date of this letter.
9  Q. Did Micromass in fact respond to that letter?
10 A. Yes, they eventually responded.
11 Q. What did they say?
12 A. They said that the product concept in dispute did not
13 infringe any valid claim of the patent. Surprisingly, they
14 also further on in the letter mentioned that they didn't
15 want to seek a license, which to us was strange, because
16 we hadn't offered them one.
17 Q. Did that letter identify any references that
18 Micromass brought to your attention?
19 A. Yes. The references that have been mentioned many
20 times over the last few days were brought to our attention.
21 Q. What did MDS Sciex do with those articles and
22 references?
23 A. Well, we reviewed them internally, and our scientists
24 couldn't see the particular relevance of them, because most
25 of them related to collision cells for triple quadrupoles,

**Page 578**

1  whereas ours was an ion guide. But we were a very
2  conservative bunch, and we decided to have -- instead of
3  getting into arguments back and forth with Micromass, we
4  decided to have an independent third party, disinterested
5  third party, look at the patent and at the references,
6  and come up with, again, an independent decision.
7  Q. Please tell the jury who this third party was?
8  A. Yes. The third party was the United States Patent
9  Office, and we were going to do that through their
10 re-examination process.
11 Q. Is it your understanding that you could seek that as
12 well as others?
13 A. Yes. It was pointed out in an earlier witness that
14 we could seek it or any individual could seek the
15 re-examination of the '736 patent.
16 Q. In this re-examination, did MDS Sciex give to the
17 Patent Office every reference that was given to them by
18 Micromass?
19 A. Yes. I think, as pointed out in one of the last
20 slides that was put up there, all of the references that
21 were given to us from Micromass, and I believe a couple of
22 others, also, were given to the re-examination office.
23 Q. Are you aware of any references co-authored by Dr.
24 Luke Hanley and Dr. Scott Anderson?
25 A. Yes. I recently became aware of them.

Applera vs. Micromass, CA No. 00-105 (RRM)                    Page 575 - Page 578

APL 014295

### Page 579

1  Q. Did you provide the Patent Office with a copy of
2  these references?
3  A. No. At that time we were not aware of these
4  references and they were not among the references that
5  Micromass gave to us at the time back in 1997.
6  Q. When did you become aware of these references?
7  A. I became aware of these references through our
8  attorneys about a month ago. I think they were passed on
9  to our attorneys about a month ago, maybe five weeks. A
10 short time ago.
11 Q. Dr. Davidson, would you please turn to Tab 5 of your
12 witness book?
13      I ask you if you recognize this document, which
14 is marked as PTX-2?
15 A. Yes. This is the re-examination certificate for the
16 '736 patent. And on the second page, up in this area here,
17 you can see that the patentability of Claims 1 to 24 is
18 confirmed. Of course, these new claims are added as well.
19      So the U.S. Patent Office re-examined it and
20 claimed these claims were patentable.
21 Q. After the re-examination was concluded, did you
22 undertake to determine whether Micromass was infringing
23 the re-examined '736 patent?
24 A. Yes. We had one of our principal research scientists,
25 Bruce Thomson, look at -- carefully look at the Quattro

### Page 580

1  Ultima and take some measurements. And these measurements
2  he passed on to our attorneys.
3  Q. What happened then?
4  A. We sued Micromass.
5  Q. Why did you sue Micromass?
6  A. We feel very strongly in protecting our intellectual
7  property. It takes a lot of effort and a lot of money to
8  develop these kind of technologies in our field.
9      We felt that if someone was utilizing this
10 technology that we had developed and protected, then we
11 should do something to, again, protect ourselves. I guess
12 you would look at it this way.
13      So at that time, we felt that the best road
14 forward was to sue Micromass.
15 Q. Have you filed a lawsuit against Thermal Finnegan
16 for their Millenium device?
17 A. No. At this time we haven't filed a lawsuit against
18 Thermal Finnegan. Again, we have just suspicions, we don't
19 have facts or proof.
20 Q. I said Millenium. I meant to say Quantum?
21 A. That's all right. I heard Quantum. So we have not
22 filed this because we don't have enough evidence at this
23 point in time to demonstrate without a doubt that they do
24 infringe. Again, we very conservative and we will wait
25 until we have further information before we carry forward

### Page 581

1  with such action, and certainly allow them to respond
2  Q. Would you consider allowing a competitor in this
3  field the right to use the patented technology of the '736
4  patent?
5  A. No. We value the technology much too much. It
6  really is something that differentiates our technology
7  from our competitors, and there is no way we would feel
8  comfortable, it would be very damaging to our company to
9  do so.
10     MR. POPOVSKI: Your Honor, ladies and
11 gentlemen of the jury, we are now going to go into a topic
12 that explains a little bit the relationships between the
13 three plaintiffs. Dr. Davidson has already said that MDS
14 Sciex, which is the portion of MDS Inc., one of the
15 plaintiffs, is the company that is involved with the mass
16 spectrometry business of MDS Inc. There are two other
17 plaintiffs in this case.
18 BY MR. POPOVSKI:
19 Q. Dr. Davidson, could you explain what the AB/Sciex
20 plaintiff's joint venture is?
21 A. Yes. The AB/Sciex joint venture is a joint venture
22 between Applied Biosystems and MDS Sciex, division of MDS,
23 Inc.
24     Back when we started the joint venture in 1986,
25 MDS Sciex was a very small company, full of creative

### Page 582

1  ideas, great science and engineering, and Applied
2  Biosystems was under another name, but we will just call
3  it Applied Biosystems for simplicity, had a tremendous
4  worldwide marketing and distribution channel. So we
5  decided in 1986 to join forces and, of course, conquer
6  the world was the idea at the time.
7      So at this point, and from actually 1986 to
8  today, Sciex has been responsible for the research, product
9  development and manufacture of mass spectrometry products
10 and Applied Biosystems is responsible for marketing, sales,
11 support, training, and warranty.
12 Q. Did AB/Sciex, plaintiff, have any involvement in the
13 work that led up to the '736 patent?
14 A. Well, the way our joint venture works, any of the
15 research or R&D activities are shared equally between both
16 parties in terms of finances. So that they would have
17 been responsible for the financing of not only the R&D,
18 but also the patent expenses and whatnot.
19 Q. So it was a joint effort?
20 A. That's correct. In the joint venture, all of the
21 expenses are shared equally between both parties, and all
22 of the profits are shared equally as well. And in the
23 early days, they were losses. It turns out it was easier
24 to share losses than profits.
25 Q. Has MDS Sciex licensed the '736 patent to any

Applera vs. Micromass, CA No. 00-105 (RRM)                    Page 579 - Page 582

APL 014296